ORAL ARGUMENT NOT YET SCHEDULED

Nos. 19-1176 & No. 19-1179 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

WESTMORELAND MINING HOLDINGS LLC and
THE NORTH AMERICAN COAL CORPORATION,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and ANDREW R. WHEELER, Administrator of the
United States Environmental Protection Agency,
*Respondents*.

On Petitions for Judicial Review of an Action of the
United States Environmental Protection Agency
84 Fed. Reg. 32520 (July 8, 2019)

## COAL INDUSTRY PETITIONERS OPENING BRIEF

Shay Dvoretzky
Charles T. Wehland *
Robert E. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939

 * Not admitted in DC

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
One Cleveland Center
1375 East Ninth Street, Suite 1930
Cleveland, Ohio 44114
(216) 696-6700

*Counsel for*
*The North American Coal Corporation*

Martin T. Booher
Robert D. Cheren
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 621-0200

Mark W. DeLaquil
Andrew Grossman
BAKER & HOSTETLER LLP
Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 861-1500

*Counsel for*
*Westmoreland Mining Holdings LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners Westmoreland Mining Holdings LLC and The North American Coal Corporation ("Coal Petitioners") certify as follows:

### A. Parties, Intervenors, and Amici

1.  Petitioners

Petitioner in No. 19-1176 is Westmoreland Mining Holdings LLC.

Petitioner in No. 19-1179 is The North American Coal Corporation.

2.  Respondents

Respondents in Nos. 19-1176 and 19-1179 are the United States Environmental Protection Agency and Andrew Wheeler, Administrator, United States Environmental Protection Agency.

3.  Intervenors

Intervenors in Nos. 19-1176 and 19-1179 are the American Lung Association, American Public Health Association, Appalachian Mountain Club, Center for Biological Diversity, Chesapeake Bay Foundation, Inc., City and County of Denver Colorado, City of Boulder, City of Chicago, City of Los Angeles, City of New York, City of Philadelphia, City of South Miami, Clean Air Council, Clean Wisconsin, Commonwealth of Massachusetts, Commonwealth of Pennsylvania, Commonwealth of Virginia, Conservation Law Foundation, District of Columbia, Environmental Defense Fund, Environmental Law and Policy Center, Georgia Power Company, Minnesota Center for Environmental Advocacy, Natural Resources Defense Council,

PowerSouth Energy Cooperative, Sierra Club, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, and State of Washington.

4.    Amici

The following entities have filed notices of intent to participate as amici in consolidated case No. 19-1140: National Association of Home Builders of the United States, Maximilian Auffhammer, Philip Duffy, Kenneth Gillingham, Lawrence H. Goulder, James Stock, Gernot Wagner, the Union of Concerned Scientists, Institute for Policy Integrity at New York University School of Law, National Parks Conservation Association, Coalition to Protect America's National Parks, Thomas C. Jorling, the American Thoracic Society, the American Academy of Allergy, Asthma & Immunology, the American College of Occupational and Environmental Medicine, the National Medical Association, the American College of Chest Physicians, Todd Aagaard, Blake Emerson, Daniel Farber, Kathryn Kovacs, Richard Lazarus, Ronald Levin, and Nina Mendelson.

**B. Rulings Under Review**

Under review in Nos. 19-1176 and 19-1179 is a final action of the United States Environmental Protection Agency published in the Federal Register at 84

Fed. Reg. 32520 (July 8, 2019), entitled "Emission Guidelines for Greenhouse Gas Emissions From Existing Electric Utility Generating Units."

### C. Related Cases

Numerous other Petitioners have filed Petitions for Review seeking to challenge the same rulemaking at issue in these cases. To Coal Petitioners' knowledge, all of those Petitions have been consolidated at No. 19-1140.

In addition, Respondent United States Environmental Protection Agency promulgated a separate regulation for new and modified electric utility generating units, which is under review in *State of North Dakota v. EPA*, No. 15-1381 (D.C. Cir.) ("*North Dakota*"), and some of the issues coal industry petitioners raise in this case have also been raised in *North Dakota*. Proceedings in *North Dakota* are currently being held in abeyance, as EPA has proposed major amendments to the rule at issue in that case. *See* 83 Fed. Reg. 65424 (Dec. 20, 2018). Because EPA's proposed amendments to that rule will have no effect on the regulation challenged here, this case is currently ripe for judicial decision.

## CORPORATE DISCLOSURE STATEMENTS

Coal Petitioners submit the following statements pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1:

The North American Coal Corporation ("NA Coal") operates surface coal mines in North Dakota, Texas, Mississippi, Louisiana, and on the Navajo Nation in New Mexico. NA Coal is a wholly-owned subsidiary of NACCO Industries, Inc. NA Coal is not publicly held, but NACCO Industries, Inc., its parent, is a publicly traded corporation that owns more than 10% of the stock of NA Coal. No other publicly-held corporation owns more than 10% of the stock of NA Coal.

Westmoreland Mining Holdings LLC ("Westmoreland") has an extensive portfolio of coal mining operations in the United States and Canada. Westmoreland has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................. 1

STATEMENT OF ISSUES............................................................ 1

STATUTES AND REGULATIONS .............................................. 1

STATEMENT OF THE CASE ....................................................... 2

A. Regulatory Backdrop ................................................................ 2

B. EPA's Regulation of Coal Power Plants .................................. 2

    1.  Endangerment Finding ....................................................... 3

    2.  Section 112 Exclusion ........................................................ 5

SUMMARY OF ARGUMENT ...................................................... 6

STANDING .................................................................................... 7

STANDARD OF REVIEW ............................................................ 7

ARGUMENT .................................................................................. 7

I.  EPA Has Not Made The Endangerment Finding Mandated By
Congress As A Prerequisite To Regulation Under Section 111.................. 7

    A.  By Its Plain Terms, Section 111 Requires A Pollutant-Specific
Endangerment Finding. ...................................................... 8

    B.  EPA Has Never Found U.S. Coal Power Plants Significantly
Contribute To Atmospheric Concentrations Of $CO_2$ ...................... 15

II. EPA Cannot Use Section 111(d) to Regulate Coal Power Plants
Because EPA Is Already Regulating this Industry Under Section 112. ..... 20

    A.  Congress Expressly Precluded Section 111(d) Regulation of
Sources that Are Subjected to the Section 112 Program. ................. 20

    B.  Section 302(a) of the 1990 Amendments Is Nothing But a
Superfluous and Superseded Scrivener's Amendment...................... 25

    C.  The Source Category Exclusion Does Not Actually
"Conflict" with Section 302(a). ....................................... 29

    D.  Narrowing the Source Category Exclusion Does Not
"Give Effect" to Section 302(a). ...................................... 31

    E.  EPA Cannot Circumvent the Source Category Exclusion. .............. 33

CONCLUSION ............................................................................. 36

STANDING ADDENDUM

Declaration of John Neumann................................................................ADD1

Declaration of Jeremy Cottrell.............................................................ADD4

STATUTORY ADDENDUM

Clean Air Act, current law
        42 U.S.C. §7411 .........................................................................SA01
        42 U.S.C. §7412(a)–(q) ...............................................................SA07

1990 Amendments to the Clean Air Act
        Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990) ...................SA25
        Pub. L. 101–549, §302(a), 104 Stat. 2399, 2574 (1990) ...................SA26

Statement of Senate Managers
        136 Cong. Rec. 36007, 36065 (1990)...............................................SA27

Clean Air Act, pre-1990 law
        42 U.S.C. §7411(d) (1988) .............................................................SA29
        42 U.S.C. §7412(a) (1988) .............................................................SA34

H.R. Rep. No. 95-564 at 183–84 (1977) ...................................................SA36

H.R. Rep. No. 94-1175 at 33 (1976) .........................................................SA39

# TABLE OF AUTHORITIES

## CASES

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*
  321 F.3d 1166 (D.C. Cir. 2003) ........................................................... 15

*CEI v. NHTSA*
  901 F.2d 107 (D.C. Cir. 1990) .............................................................. 7

*Cent. Arizona Water Conservation Dist. v. EPA*
  990 F.2d 1531 (9th Cir. 1993) .............................................................. 7

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*
  467 U.S. 837 (1984) ........................................................................... 20

*Encino Motorcars, LLC v. Navarro*
  136 S. Ct. 2117 (2016) ....................................................................... 15

*Engine Mfrs. Ass'n v. EPA*
  88 F.3d 1075 (D.C. Cir. 1996) ....................................................... 20, 35

*Envtl. Def. Fund v. EPA*
  82 F.3d 451 (D.C. Cir. 1996) ........................................................ 24 n.7

*Envtl. Def. Fund v. EPA.*
  852 F.2d 1316 (D.C. Cir. 1988) ...................................................... 8 n.2

*FCC v. Fox Television Stations, Inc.*
  556 U.S. 502 (2009) ........................................................................... 12

*Jicarilla Apache Nation v. Dep't of Interior*
  613 F.3d 1112 (D.C. Cir. 2010) .................................................... 11–12

*Massachusetts v. EPA*
  549 U.S. 497 (2007) ...................................................................... 16 n.4

*Michigan v. EPA*
  268 F.3d 1075 (D.C. Cir. 2001) .......................................................... 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*
  463 U.S. 29 (1983) ............................................................................. 17

*Nat'l Asphalt Pavement Ass'n v. Train*
539 F.2d 775 (D.C. Cir. 1976)................................................................. 13

*New Jersey v. EPA*
517 F.3d 574 (D.C. Cir. 2008)................................................................. 30

*North Carolina v. EPA*
531 F.3d 896 (D.C. Cir. 2008) ................................................................ 17

*Northeast Maryland Waste Disposal Authority v. EPA*
358 F.3d 936 (D.C. Cir. 2004) ........................................................... 13–14

*Pharm. Research & Mfrs. of Am. v. Thompson*
251 F.3d 219 (D.C. Cir. 2001) ................................................................ 14

*Stephan v. United States*
319 U.S. 423 (1943)................................................................................. 28

*Styrene Info. & Research Ctr., Inc. v. Sebelius*
944 F. Supp. 2d 71 (D.D.C. 2013) ..................................................... 8 n.2

*Tripoli Rocketry Ass'n, Inc. v. U.S. Bureau of Alcohol, Tobacco & Firearms*
No. 00-273 (D.D.C. June 24, 2002) ................................................... 8 n.2

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*
508 U.S. 439 (1993)................................................................................. 28

*Utility Air Regulatory Group v. EPA*
573 U.S. 302 (2014)................................................................. 11, 34 n. 8

**STATUTES**

Clean Air Act, as amended
42 U.S.C. §7408 ..................................................................................2, 10
42 U.S.C. §7411, Amendments, 1990, Subsec. (d)(1)(A)(i) (2012)........ 27
42 U.S.C. §7411(a)(1)...........................................................................7–9
42 U.S.C. §7411(b)(1)..................................................................... 2–3, 7–8
42 U.S.C. §7411(d)...................................................................... 2, 5, 20–21
42 U.S.C. §7412(a)(7)............................................................................. 21
42 U.S.C. §7412(b)(1)....................................................21–22, 31, 34
42 U.S.C. §7412(c)(3)............................................................................ 22
42 U.S.C. §7412(n)(1)............................................................................ 22

42 U.S.C. §7415(a) .................................................................... 10
42 U.S.C. §7521(a)(1) ............................................................... 10
42 U.S.C. §7545(c)(1) ............................................................... 10
42 U.S.C. §7571(a)(2) ............................................................... 10
42 U.S.C. §7607(b)(1) ................................................................. 1
42 U.S.C. §7607(d)(9) ................................................................. 7

1990 Amendments to the Clean Air Act
Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990) ..............5, 20, 23
Pub. L. 101–549, §302(a), 104 Stat. 2399, 2574 (1990) ....................... 25
Pub. L. 101–549, §302(d), (f) & (g), 104 Stat. 2399, 2574 (1990) ......... 25
H.R. 3030 as Introduced, §108(d) ............................................... 23
S. 1630 as Passed the House on May 23, 1990, §108(f) ....................... 23

Clean Air Act, as amended in 1977
42 U.S.C. §7411(d) (1988) .......................................................... 21
42 U.S.C. §7412(a) (1988) .......................................................... 21

1 U.S.C. Chapter 3—Code of Laws of United States ...
1 U.S.C. §204 ............................................................................ 28

2 U.S.C. Chapter 9A—Office of Law Revision Counsel
2 U.S.C. §285b .......................................................................... 27
2 U.S.C. §285c .......................................................................... 27

REGULATIONS AND OTHER AUTHORITIES

*National Emission Standards for Hazardous Air Pollutants:*
*Coal- and Oil-Fired Electric Utility Steam Generating Units*
40 C.F.R. Part 63 Subpart UUUUU .................................................... 5

NA Coal Comment (JA __) ........................................................... 8 n.2

NBCG Comment (JA__) ......................................................... 27–28, 34

TPPF Comment (JA __) .............................................................. 8 n.2

H.R. Rep. No. 94-1175 (1976) ....................................................... 14

H.R. Rep. No. 95-564 (1977) ........................................................ 14

S. 816 as Introduced, §4(c) ......................................................... 25

Statement of Senate Managers
 136 Cong. Rec. 36007, 36065 (1990) .................................................. 24

A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990
 (Comm. Print 1993) ............................................................. 28

UNITED STATES HOUSE OF REPRESENTATIVES, OFFICE OF LEGISLATIVE COUNSEL,
HOUSE LEGISLATIVE COUNSEL'S MANUAL ON DRAFTING STYLE (1995) ....... 27

UNITED STATES SENATE, OFFICE OF LEGISLATIVE COUNSEL,
LEGISLATIVE DRAFTING MANUAL (1997) .................................................. 27

*Addition to the List of Categories of Stationary Sources*
 42 Fed. Reg. 53657 (1977) .................................................. 13

*Stationary Gas Turbines, Standards of Performance for New Stationary Sources*
 42 Fed. Reg. 53782 (1977) .................................................. 13

*Proposed National Emission Standards for Hazardous Air Pollutants; and, in the
Alternative Proposed Standards of Performance for New and Existing Stationary
Sources: Electric Utility Steam Generating Units*
 69 Fed. Reg. 4652 (2004) .................................................. 28–29, 32

*Revision of December 2000 Regulatory Finding on the Emissions of Hazardous Air
Pollutants From Electric Utility Steam Generating Units and the Removal of Coal-
and Oil-Fired Electric Utility Steam Generating Units From the Section 112(c) List*
 70 Fed. Reg. 15994 (2005) .................................................. 32

*Endangerment and Cause or Contribute Findings for Greenhouse Gases Under
Section 202(a) of the Clean Air Act*
 74 Fed. Reg. 66496 (2009) .................................................. 3–4, 16–19

*National Emission Standards for Hazardous Air Pollutants From Coal- and
Oil-Fired Electric Utility Steam Generating Units*
 77 Fed. Reg. 9304 (2012) .................................................. 5

*Standards of Performance for Greenhouse Gas Emissions From New, Modified,
and Reconstructed Stationary Sources: Electric Utility Generating Units*
 80 Fed. Reg. 64510 (2015) .................................................. 2, 4, 8–9, 15–17

*Carbon Pollution Emission Guidelines for Existing Stationary Sources:*
*Electric Utility Generating Units*
      80 Fed. Reg. 64662 (2015)......................................... 2, 18, 25, 29, 31–32

*Finding That Greenhouse Gas Emissions From Aircraft Cause or Contribute to*
*Air Pollution That May Reasonably Be Anticipated To Endanger Public Health*
*and Welfare*
      81 Fed. Reg. 54422 (2016) .................................................................. 18

*Repeal of the Clean Power Plan; Emission Guidelines for Greenhouse Gas Emissions*
*From Existing Electric Utility Generating Units; Revisions to Emission Guidelines*
*Implementing Regulations*
      84 Fed. Reg. 32520 (2019) ............................................................1, 3–4

*Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified*
*Sources Review*
      84 Fed. Reg. 50244 (2019)........................................... 4-5, 10, 12–14, 17

*Final Guideline Document: Control of Fluoride Emissions from Existing*
*Phosphate Fertilizer Plants*
      EPA-450/2-77-005 (March 1977) ........................................................ 12

Legal Memorandum for Proposed Carbon Pollution Emission Guidelines
      EPA-HQ-OAR-2013-0602-0419 ......................................................... 32

Reply Brief of Environmental Petitioners
      *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008)............................... 32–33

EPA Brief
      *West Virginia v. EPA*, No. 15-1363 (Apr. 22, 2016) ............................... 32

*Petition for Listing and Rulemaking Under Section 112 of the Clean Air Act*
*to Establish Greenhouse Gases as Hazardous Air Pollutants* (Apr. 3, 2019)............ 34

## GLOSSARY

| | |
|---|---|
| ACE Rule | The Affordable Clean Energy Rule |
| CAA | The Clean Air Act |
| CPP | The Clean Power Plan |
| $CO_2$ | Carbon Dioxide |
| EPA | United States Environmental Protection Agency |
| NBCG | National Bituminous Coal Group |
| Power Plants | Electric Utility Steam Generating Units |
| Statutes at Large | The United States Statutes at Large |
| The Code | The Code of Laws of the United States |
| The Office | The Office of the Law Revision Counsel |

## JURISDICTIONAL STATEMENT

EPA issued its final rule on July 8, 2019. 84 Fed. Reg. 32520 ("ACE Rule" or "Rule"). Coal Petitioners timely filed petitions on September 5, 2019. This Court has jurisdiction under 42 U.S.C. §7607(b)(1).

## STATEMENT OF ISSUES

Coal Petitioners seek vacatur of the Rule's regulation of coal power plants for two reasons:

(1)    EPA has not made the requisite Section 111 endangerment finding;

(2)    EPA is already regulating coal power plants under Section 112.

## STATUTES AND REGULATIONS

Statutes and regulations are provided in the attached COAL PETITIONERS STATUTORY ADDENDUM.

## STATEMENT OF THE CASE

### A.    Regulatory Backdrop

The Clean Air Act separately regulates mobile and stationary sources and also distinguishes between new, modified, and existing sources. New or modified stationary sources can be regulated under Section 111(b) if the source category "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §7411(b)(1). Existing stationary sources are primarily regulated under Sections 108 and 112. 42 U.S.C. §§ 7408, 7412.

In addition, ***Section 111(d)*** allows EPA to require states to regulate certain emissions from ***existing stationary sources*** that are not regulated under Section 112 but would be subject to regulation under Section 111(b) "if such existing source were a new source." 42 U.S.C. §7411(d).

### B.    EPA's Regulation of Coal Power Plants

This case concerns EPA's regulation of $CO_2$ emissions from coal power plants. In 2015, EPA promulgated standards of performance for new coal power plants under Section 111(b), *see* 80 Fed. Reg. 64510, and, in a rulemaking known as the Clean Power Plan ("CPP"), required states to regulate existing coal power plants under Section 111(d), *see* 80 Fed. Reg. 64662. Numerous challenges to the CPP were filed but eventually dismissed without a decision after argument because EPA repealed the CPP when it issued the ACE Rule. *See West Virginia v. EPA*, No. 15-1363.

– 2 –

The ACE Rule remedies several aspects of the CPP that were previously challenged. *See* 84 Fed. Reg. 32520. The Rule renews, however, EPA's assertion that it has authority to regulate $CO_2$ emissions from existing coal power plants under Section 111(d). *See id.* at 32533. Coal Petitioners filed petitions for review challenging that assertion of authority in two respects.

### 1. Endangerment Finding

First, Coal Petitioners challenge EPA's failure to make the necessary threshold finding that $CO_2$ from coal power plants "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §7411(b)(1).

Numerous CAA programs require endangerment findings, but Section 111(b) is unusual in that it requires a "***significant***[ ]" contribution as a prerequisite to the implementation of any regulation.[1] That distinction is important, as EPA has recognized: For example, in 2009, when it made an endangerment finding for greenhouse gas emissions from automobiles, EPA acknowledged that "the global nature of the air pollution problem... means that no single country and no single source category dominate or are even close to dominating on a global scale," 74 Fed. Reg. at 66538, but found that the provision at issue there "authorized regulatory controls... even if the air pollution problem results from a wide variety of sources" because, "***[u]nlike other CAA provisions... [it] does not***

---

[1] EPA sometimes distinguishes "endangerment" and "significant contribution" findings, but this brief uses the term "endangerment finding" to refer to both aspects of the determination required by Section 111.

*require 'significant' contribution*." *Id.* at 66506 (citing Section 111) (emphasis added).

Before regulating coal power plants under Section 111, EPA should have determined what "significant" means in the context of global atmospheric $CO_2$ concentrations —and whether emissions from a single U.S. source category (*i.e.*, industry) can qualify as significant. But EPA did not consider that question. It sidestepped the issue, declaring that it could proceed based on endangerment findings made in the 1970s for coal power plant emissions of *other pollutants* that have nothing to do with atmospheric $CO_2$. 80 Fed. Reg. at 64529. In contravention of past agency practice, Congressional intent, and this Court's prior interpretation, EPA reasoned that the "plain language" of Section 111 is "clear that the endangerment finding is made with respect to the source category" and not "specific pollutants." *Id.* at 64529-30.

The ACE Rule is premised on this same flawed interpretation of Section 111. *See* 84 Fed. Reg. at 32533. However, EPA recently cast doubt on the propriety of its actions. In a proposed rulemaking addressing methane emissions under Section 111, *see* 84 Fed. Reg. 50244, EPA observed its current interpretation of Section 111 conflicts with its own earlier interpretation of that provision, *id.* at 50266 (citing 40 Fed. Reg. 53340 (Nov. 17, 1975)), and is "potentially anomalous" insofar as EPA has consistently required endangerment findings on a pollutant-by-pollutant basis. *Id.* at 50263. EPA requested comment on whether "Congress 'almost surely could not have meant'" to allow EPA to regulate without a pollutant-specific endangerment finding. *Id.* EPA identified numerous

compelling reasons why "section 111 requires the EPA to make a pollutant-specific [endangerment finding] … as a prerequisite to regulating." *Id.* at 50261.

### 2. Section 112 Exclusion

In addition, Coal Petitioners challenge EPA's Rule on the ground that coal power plants are already regulated under Section 112.

In 2012, EPA promulgated a uniform national emission standard for coal power plants using Section 112 of the Clean Air Act. *See* 77 Fed. Reg. 9304; 40 C.F.R. Part 63 Subpart UUUUU. EPA now seeks to require States to regulate coal power plant emissions under Section 111(d). But Congress prohibits EPA from using Section 111(d) to regulate pollutants "emitted from a source category that is regulated under section 112." Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990); 42 U.S.C. §7411(d).

## SUMMARY OF ARGUMENT

The ACE Rule exceeds EPA's authority in two ways.

*First*, EPA issued the ACE Rule without making a statutorily-required endangerment finding. EPA relies on a contorted interpretation of Section 111 under which it can regulate $CO_2$ based on an endangerment finding concerning *entirely different* substances in power plant emissions. That interpretation conflicts with the statute's text and structure and departs from past interpretations by the agency, Congress, and the courts. EPA's interpretation unlawfully eliminates the key limitation on its authority that prohibits the regulation of emissions from a source category that are not "significant" and—as a result—EPA failed to consider an important aspect of the problem (and thus fell short of the standard set by this Court's precedents). Even EPA has recently criticized its interpretation.

*Second*, EPA lacked authority to regulate coal power plant emissions under Section 111 because EPA already regulates those sources under Section 112. Once EPA comprehensively regulates an industry under Section 112, EPA itself is charged with listing all the pollutants that warrant regulation and issuing standards under that program. EPA cannot deploy Section 111(d)'s complex machinery of cooperative federalism when it has already itself assumed full regulatory authority and responsibility over the industry's emissions. The Rule unlawfully violates this common-sense limit on EPA's authority.

## STANDING

Coal Petitioners have standing because they mine and sell coal, and the Rule will harm their business by reducing coal use. *See* COAL PETITIONERS STANDING ADDENDUM (attached). This "economic injury is sufficiently concrete and imminent" and "is likely to be redressed by a favorable decision." *Cent. Arizona Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1538 (9th Cir. 1993); *CEI v. NHTSA*, 901 F.2d 107, 113 (D.C. Cir. 1990).

## STANDARD OF REVIEW

The Court must set aside EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. §7607(d)(9)(A).

## ARGUMENT

### I.  EPA Has Not Made The Endangerment Finding Mandated By Congress As A Prerequisite To Regulation Under Section 111.

Before EPA can issue a standard of performance—defined as a "standard for emissions of air pollutants"—EPA must find that the regulated source "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §7411(a)(1), (b)(1)(A). EPA has previously suggested that this requirement could impose a meaningful hurdle in the context of the atmospheric $CO_2$ concentrations associated with climate change, where emissions come from a broad variety of sources across the globe. Yet EPA did not make any endangerment finding for $CO_2$ emissions from U.S. coal power plants and, as a result, failed to address the

relevant threshold question, which is whether a single pollutant from a single U.S. source category (no matter how large) makes a *significant* contribution to atmospheric concentrations of $CO_2$.[2]

### A.    By Its Plain Terms, Section 111 Requires A Pollutant-Specific Endangerment Finding.

EPA justified its approach on the premise that finding a threat to public health from emissions of *one* pollutant from a source gives the Agency authority to regulate *any* substance emitted from the same source. 80 Fed. Reg. at 64529–30. As EPA itself has now largely acknowledged, this interpretation makes no sense and cannot be squared with the statute.

#### 1.    EPA's Interpretation Is Contrary To Text.

At a minimum, Section 111 requires a finding that the source category "significantly" contributes to "air pollution" that endangers health or welfare. 42 U.S.C. §7411(b)(1)(A). And, once that finding is made, the statute authorizes EPA to issue a standard of performance, defined as a "standard for emissions of air pollutants." 42 U.S.C. §7411(a)(1). The plain meaning of this language is that

---

[2] Although EPA first adopted its erroneous interpretation of Section 111 in its 2015 rulemakings, that interpretation can be reviewed in this proceeding because the ACE Rule is premised on EPA's renewed determination that it can regulate under Section 111 without a pollutant-specific endangerment finding and therefore "necessarily raises the issue of whether" that interpretation is valid. *Envtl. Def. Fund v. E.P.A.*, 852 F.2d 1316, 1324–25 (D.C. Cir. 1988); *see also, e.g., Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 78–79 (D.D.C. 2013); *Tripoli Rocketry Ass'n, Inc. v. U.S. Bureau of Alcohol, Tobacco & Firearms*, No. 00-273, 2002 WL 33253171, at *3 (D.D.C. June 24, 2002). Several commenters raised these issues in proceedings before the agency. *See* NA Coal Comment (JA __); TPPF Comment (JA __).

EPA can regulate "air pollutants" from a source if they significantly contribute to "air pollution" that endangers health and welfare. If that's not what Section 111(b) means—and according to EPA it isn't—then EPA's regulatory authority is absurdly broad; it literally could require companies to spend untold amounts implementing emission limitations that will have no impact whatsoever on the air pollution that triggered the regulatory action in the first place.

EPA in effect reads the words "air pollution" out of the statute. In EPA's telling, Section 111 "does not provide that an endangerment finding is made as to specific pollutants." 80 Fed. Reg. at 64529–30. But EPA cannot possibly assess whether sources significantly contribute to "air pollution" that endangers public health or welfare without identifying the "air pollution" at issue, and certainly EPA cannot establish a meaningful "standard of performance" without identifying the endangering pollutant. Otherwise, the performance standard will have no impact on the air pollution or the resulting harm.

There is no merit to EPA's suggestion that, "once a source category is listed, the CAA does not specify what pollutants should be the subject of standards." 80 Fed. Reg. at 64530. Section 111 defines a standard of performance as a "standard for emissions *of air pollutants*," 42 U.S.C. §7411(a)(1) (emphasis added), and the obvious and straightforward interpretation of the statutory language is that the "air pollutants" to be regulated comprise the *same* "air pollution" addressed by the endangerment finding. EPA's contrary interpretation contorts the text by reading Section 111's references to "pollution" and "pollutants" in a vacuum, as if they have no relation to each other, despite

the fact that they appear in closely-interrelated provisions of a single statutory section.

### 2.    EPA's Interpretation Is Contrary To Statutory Structure.

EPA's interpretation also conflicts with the CAA's structure, as it is illogical for EPA to regulate one pollutant based on an endangerment finding made with respect to an entirely different pollutant.

The requirement of an endangerment finding is repeated throughout the CAA, and in each instance the CAA directs EPA to make findings about *certain specific pollutants* before regulating *those pollutants*. *See, e.g.*, 42 U.S.C. §§ 7408(a)(1), 7415(a), 7521(a)(1), 7545(c)(1), 7571(a)(2). The structure of the CAA thus requires EPA to make threshold findings about the harms posed by pollutants before regulating those pollutants. Yet EPA reads Section 111(b) as an exception to this statutory scheme—under which EPA can regulate a source's emissions of oxygen or water vapor, for example, simply because it has made an endangerment finding pertaining to emissions of lead or nitrogen dioxide. Nothing suggests Congress intended to create such a nonsensical outlier in Section 111.

Even EPA recognizes that this interpretation of Section 111 is flawed. 84 Fed. Reg. at 50263. EPA admitted that it "is clear that CAA section 111(b) requires the EPA, and CAA section 111(d) requires the states, to regulate on a pollutant-by-pollutant basis," and, "it seems potentially anomalous not to require that the EPA make [an endangerment finding] for those pollutants." *Id.*

– 10 –

Moreover, EPA's interpretation runs up against *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 317 (2014), which holds that the CAA's use of "air pollutant" must be given "reasonable, context-appropriate" interpretations to avoid this kind of absurdity. *Utility Air* deems it "plain as day that the Act does not envision an elaborate, burdensome permitting process for major emitters of steam, oxygen, or other harmless airborne substances," *id.*, which is precisely what EPA's interpretation of Section 111 would allow. And *Utility Air* gives instructive examples where the CAA has been interpreted to avoid that result: Where the CAA requires a permit for a source in a nonattainment area "with the potential to emit 100 tons per year of 'any air pollutant,'" the term is "limited to pollutants *for which the area is designated nonattainment*." *Id.* at 317–18. And, even closer to home, when Section 111(b) authorizes performance standards if a source "increases its emission 'of any air pollutant,'" the term is "limited to air pollutants *for which EPA has promulgated new source performance standards*." *Id.* at 317. Likewise, here, context makes clear that a rule under Section 111(d) must address the *same* "air pollutants" that EPA has found endanger public health or welfare.

> 3. EPA's Interpretation Is Contrary To Agency And Court Interpretations, As Well As Congressional Intent.

EPA's interpretation also inexplicably breaks with decades of past interpretations of Section 111. But "reasoned decision making... necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent." *Jicarilla Apache Nation v. Dep't of Interior*,

– 11 –

613 F.3d 1112, 1119 (D.C. Cir. 2010) (marks omitted). "An agency may not... depart from a prior policy *sub silentio*," as "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That rule applies here, as EPA fails even to acknowledge its break with past practice.

*First*, EPA breaks with its past interpretation of Section 111. Shortly after Section 111 was adopted, EPA interpreted it to require a pollutant-specific endangerment finding:

> The Administrator first considers potential *health and welfare effects of a designated pollutant* in connection with the establishment of standards of performance for new sources of that pollutant under section 111(b) of the Act. Before such standards may be established, the Administrator *must find that the pollutant in question* "may contribute significantly to air pollution which causes or contributes to the endangerment of public health or welfare" [see section 111(b)(1)(A)]. Because this finding is, in effect, a prerequisite to the same pollutant being identified as a designated pollutant under section 111(d), *all designated pollutants will have been found to have potential adverse effects on public health, public welfare, or both.*

EPA-450/2-77-005 (March 1977) at 2-1; *see also* 84 Fed. Reg. at 50266 n.77 (citing guidance in accord with this interpretation). EPA recently admitted the agency "in the past did... require a pollutant-specific" finding. 84 Fed. Reg. at 50266.

EPA's subsequent practice is consistent with these early interpretations. As EPA recently explained, "for the most part, [EPA's] past practice has been to list a source category and to propose NSPS for pollutants from the source

category at the same time as, or shortly after the listing," and, "under those circumstances, EPA could be considered to have made... endangerment findings for those pollutants." 84 Fed. Reg. at 50266. EPA made this explicit in one of the 1970s-era source category listings EPA relies on for authority here: When EPA listed stationary gas turbines as a category, it relied on the simultaneous promulgation of pollutant-specific performance standards for the category as the "basis for" its endangerment finding. 42 Fed. Reg. 53657; *see also* 42 Fed. Reg. 53782. That highlights EPA's error, as EPA cannot possibly be allowed to rely on a prior endangerment finding that expressly addressed one pollutant to justify its regulation here of an ***entirely different*** pollutant.[3]

*Second*, EPA now seeks to break with this Court's interpretation of Section 111. For instance, *National Asphalt Pavement Association*, 539 F.2d at 783 (marks omitted and emphasis added)), states Section 111 "obviously contemplates an evaluation of whether ***certain types of air pollution*** endanger the public health and whether the source category contributes significantly to ***that air pollution***." And *Northeast Maryland Waste Disposal Authority v. EPA*, 358 F.3d 936, 939 (D.C. Cir. 2004), states Section 111 "requires EPA to develop emission standards generally

---

[3] EPA's practice of making pollutant-specific endangerment findings when promulgating standards of performance underpinned some of this Court's jurisprudence. In *Nat'l Asphalt Pavement Ass'n v. Train*, 539 F.2d 775, 785 (D.C. Cir. 1976), petitioners complained that EPA listed a source category without notice and comment. But this Court rejected the challenge, explaining that EPA had "concluded that the asphalt concrete industry was a 'significant contributor' of particulate matter air pollution" when it issued the accompanying standard of performance and that petitioners had the opportunity to comment in that proceeding. *Id.*

for each category of pollutant EPA determines 'causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.'" This Court's cases confirm what is clear from the statutory text.

*Third*, EPA's interpretation broke with Congress's interpretation of Section 111, as revealed by legislative history. *See Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 225 (D.C. Cir. 2001) (invoking legislative history to reject agency's interpretation of statute). When EPA recently reviewed the legislative history, it found "evidence that Congress, in fact, intended to require the EPA (or, indeed, understood that the EPA had always been required), in promulgating a pollutant-specific [performance standard] under CAA section 111, to make a pollutant-specific finding." 84 Fed. Reg. at 50264–65. The House Conference Report for the 1977 amendments to the CAA—which overhauled many of the Act's endangerment finding provisions—states that an endangerment finding is required under a variety of provisions, including Section 111, before EPA can "regulate any air pollutant from those sources, the emissions of which . . . cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." H.R. Rep. No. 95-564 at 183–84 (1977); *see also* H.R. Rep. No. 94-1175 at 33 (1976).

EPA's interpretation of Section 111 must therefore be rejected as contrary to text, structure, and past interpretations by the agency and this Court, as well as congressional intent. Moreover, to the extent that EPA argues its interpretation is entitled to *Chevron* deference, that argument fails: First, EPA's

– 14 –

unexplained departure from past practice means its position receives no deference at all. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Second, *Chevron* applies only if a statute is ambiguous; this one is not. *See, e.g., Michigan v. EPA*, 268 F.3d 1075, 1087 (D.C. Cir. 2001). Third, even under *Chevron*, courts do not defer to an interpretation unless it is reasonable. *See, e.g., Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1178 (D.C. Cir. 2003). EPA's interpretation that it can regulate one thing because of concerns over a completely separate thing is unreasonable on its face.

### B.    EPA Has Never Found U.S. Coal Power Plants Significantly Contribute To Atmospheric Concentrations Of $CO_2$.

Having contorted Section 111 in order to avoid having to make an endangerment finding, EPA unsurprisingly failed to make the required finding. EPA points to *other* findings it has made—in this or other proceedings—as substitutes for that finding. But none of these other findings addresses the required threshold question whether emissions from U.S. coal power plants make a "significant" contribution to atmospheric concentrations of $CO_2$.

*First*, EPA justified its regulation of coal power plants by referencing two endangerment findings in the 1970s with respect to emissions of $SO_2$, $NO_2$, and particulate matter from two different source categories—steam generators and combustion turbines. *See* 80 Fed. Reg. at 64530. But, for the reasons discussed above, EPA cannot rely on endangerment findings made over 40 years ago for completely different emitted substances to justify its regulation of $CO_2$.

*Second*, EPA cannot rely here on its 2009 endangerment finding for automobiles, as that finding was made under a different statutory standard, which merely required a finding that the category's contribution was "more than *de minimis* or trivial." 74 Fed. Reg. at 66542. Indeed, the 2009 determination specifically relies on the fact that the endangerment finding provision for automobiles—unlike Section 111—does not require a "significant" contribution. *See id.* at 66506, 66538. In doing so, the 2009 determination points to the possibility that the contribution of a single domestic source category might *not* be significant, as the "breadth of countries and sources emitting greenhouse gases means that no single country and no single source category dominate or are even close to dominating on a global scale." *Id.* The 2009 determination therefore serves only to highlight the question that EPA was required to answer here.[4]

*Third*, EPA cannot meet this requirement by pointing to the fact that its 2015 new-source rulemaking found a "rational basis" to regulate $CO_2$ emissions from coal power plants. To be sure, EPA did say in a conclusory way that "the same facts that support our rational basis determination" would support an endangerment finding if one were required. *See* 80 Fed. Reg. at 64531. But mere

---

[4] The same is true of *Massachusetts v. EPA*, 549 U.S. 497 (2007). There, the Supreme Court found that automobile emissions make a "meaningful" contribution to climate change but noted that "EPA does not believe that any realistic possibility exists that the relief petitioners seek would mitigate global climate change." *Id.* at 524–25. Here, EPA had to determine whether emissions are "significant" (as opposed to "meaningful").

reference to "facts" is insufficient; EPA does not address what it means to make a "significant" contribution to atmospheric concentrations of $CO_2$. EPA thus "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[5]

EPA recently outlined the numerous questions that must be answered before the agency could even begin to assess significance under Section 111, including (among other things) whether the inquiry should (1) address domestic or global emissions; (2) involve a "simple percentage criterion" or some other metric; (3) take into account historical trends and future projections; and (4) proceed differently for greenhouse gasses than for other pollutants. 84 Fed. Reg. at 50269. EPA's 2015 rational basis discussion cannot substitute for an endangerment finding under Section 111 because it does not address these or any other such questions and ultimately fails to "draw the [significance] line at all." *North Carolina v. EPA*, 531 F.3d 896, 919 (D.C. Cir. 2008).

Rather than reasoning through these issues, EPA broadly declared that, "under any reasonable threshold or definition, the emissions from [electric generating units] are a significant contribution." 80 Fed. Reg. at 64531. That is not a *fait accompli*, however, as it is possible to imagine any number of "reasonable threshold[s] or definition[s]" under which U.S. coal power plants, by themselves, do not make a "significant" contribution to global emissions. As

---

[5] The same analysis applies to EPA's statement in 2009—proffered without analysis or explanation—that it "would find that the contribution from [automobiles] is significant" if such a finding were required. *See* 74 Fed. Reg. at 66542.

EPA itself has explained, the "unique, global aspects of the climate change problem" mean that "emissions of greenhouse gases worldwide are from numerous sources and countries, with each country and each source category contributing a relatively small percentage of the total." 74 Fed. Reg. at 66538. In 2005, emissions from all fossil-fuel fired domestic electric generating units accounted for just 6.1% of anthropogenic global greenhouse gas emissions. *See id.* at 66539; 80 Fed. Reg. 64689. By 2013 that number had declined to 4.5%. *See* cait.wri.org/historical. Any domestic reduction achieved by EPA regulation could have a negligible effect on the global whole.[6]

After the CPP, EPA has continued to admit that other large domestic source categories may *not* qualify as "significant" on the global scale. In 2016, EPA made an endangerment finding for greenhouse gas emissions from aircraft and, in doing so, relied on the fact that the applicable statutory language "contrasts with other CAA provisions that expressly require 'significant' contribution" and thus "clearly authorize[s] regulatory controls to address air pollution even if the air pollution problem results from a wide variety of sources." 81 Fed. Reg. 54422. There is no question that in other circumstances EPA admits "significance" is a major hurdle.

---

[6] This global lens is appropriate given EPA's view that "climate change is a *global* problem that results from *global* greenhouse gas emissions." 74 Fed. Reg. at 66543 (emphasis added); *see also id.* at 66514 (stating that "[g]reenhouse gasses, once emitted, become well mixed in the atmosphere," such that "emissions in other countries can affect the United States").

This is more than a procedural objection. To find a "significant contribution," EPA would need to interpret "significant" so that it applies to one of "numerous sources and countries, with each country and each source category contributing a relatively small percentage of the total." 74 Fed. Reg. at 66538. It is questionable whether that interpretation—if adopted—would survive judicial review. But, at a minimum, EPA was required to squarely address the issues involved to make the statutorily required finding.

## II. EPA Cannot Use Section 111(d) to Regulate Coal Power Plants Because EPA Is Already Regulating this Industry Under Section 112.

Congress unambiguously and squarely prohibited use of Section 111(d) to regulate pollutants "emitted from a source category that is regulated under section 112." Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990); 42 U.S.C. §7411(d). EPA's rule improperly flouts a precise statutory proscription without showing there is any genuine ambiguity or absurdity. Accordingly, the agency is not entitled to deference and the rule must be vacated. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (agency interpretation is only relevant if Congress "has not directly addressed the precise question at issue"); *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996) ("[T]o avoid a literal interpretation" EPA "must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it.").

### A.    Congress Expressly Precluded Section 111(d) Regulation of Sources that Are Subjected to the Section 112 Program.

Congress deliberately enacted the Section 112 source category exclusion in 1990 as part of a comprehensive expansion of EPA's Section 112 authority.

Before these changes, Section 112 and Section 111(d) covered distinct sets of pollutants. Section 112 gave the federal government direct regulatory authority to impose uniform national emission standards only for pollutants that were extremely hazardous to human health because they "result in an increase in

mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. §7412(a) (1988). Pollutants outside that category—apart from so-called "criteria pollutants," which were separately regulated under Section 108—were separately covered under Section 111(d). 42 U.S.C. §7411(d) (1988). Section 111(d) as originally enacted excluded both (1) criteria pollutants, and (2) non-criteria pollutants that were listed for direct federal regulation under Section 112 because they were extremely hazardous. *Id.*

In 1990, Congress dramatically expanded federal authority under the Section 112 program to include pollutants that posed less serious health risks, as well as pollutants that posed risks of adverse environmental effects without posing any health risks. 42 U.S.C. §§ 7412(a)(7), 7412(b)(1) (requiring EPA to regulate non-criteria pollutants that pose "a threat of adverse human health effects... or adverse environmental effects"); *see also* 42 U.S.C. §7412(a)(7) (defining "adverse environmental effect"). With this change, Congress added classes of pollutants that were previously separately covered exclusively by Section 111(d) to the Section 112 program. By so dramatically increasing EPA's authority and responsibilities under Section 112, Congress provided that there would no longer be any non-criteria pollutants that EPA could not and would not regulate with Section 112 standards.

In light of the expansion of the scope of Section 112, Congress could have chosen to eliminate the Section 111(d) program either by removing it from the statute or simply by leaving in place existing language that prevented EPA from using Section 111(d) for pollutants covered by the Section 112 program, since

there was no longer any daylight between the pollutants that each covers. However, Congress decided that some categories of existing stationary sources, including power plants and certain smaller sources, might not be regulated by EPA under Section 112. *See* 42 U.S.C. §7412(n)(1); 42 U.S.C. §7412(c)(3). Accordingly, to avoid a potential regulatory gap, Congress decided to remove language from the pre-1990 version of Section 111(d) that had previously provided that Section 111(d) would not apply to *pollutants* subject to regulation under Section 112.

At the same time, Congress decided to add new language to forbid EPA from applying Section 111(d) to *source categories* already subject to comprehensive emission standards under Section 112. This was a common-sense change reflecting the expansive nature of EPA's authority under Section 112. Once EPA has invoked Section 112 to exercise the full measure of direct federal authority over a particular industry's emissions, it makes little sense for EPA to separately order States to issue tailored, source-specific standards for particular pollutants under Section 111(d), especially since Congress gave EPA not only the authority but the obligation to address all non-criteria emissions from sources regulated under Section 112 that "present, or may present... a threat of adverse human health effects... or adverse environmental effects." 42 U.S.C. §7412(b)(1).

There is no plausible argument that Congress made these changes to the scope of Section 111(d) accidentally or inadvertently. The amendment is found in a prominent location in a section including several substantive changes to the Clean Air Act. Specifically, the amendment was located in Section 108 of the

1990 Amendments, which includes a host of substantive changes under the heading "Miscellaneous Guidance." The Section 108(g) amendment even has its own subheading describing its subject: "Regulation of Existing Sources." Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990). The amendment makes two changes to Section 111(d): First, the amendment removes the Section 112 *pollutant* exclusion by striking the text "or 112(b)(1)(A)." Second, the amendment enacts the new Section 112 *source category* exclusion by inserting the text "or emitted from a source category which is regulated under section 112." Even without consulting the previous legislation it was apparent the amendment repealed existing legislative text and enacted new legislative text. And by picking up the United States Code it was evident the new text prohibits Section 111(d)'s use for emissions "from a source category which is regulated under section 112."

The legislative history confirms the deliberate nature of the amendment. The amendment's two distinct changes to the scope of Section 111(d) were originally proposed by the Administration and first passed in the House bill. H.R. 3030 as Introduced, §108(d); S. 1630 as Passed the House on May 23, 1990, §108(f). Throughout the legislative process—including during conference— stylistic adjustments were made to the Section 108(g) amendment, evidencing awareness and appreciation of the amendment at each step along the way. H.R. 3030 as Introduced, §108(d); S. 1630 as Passed the House on May 23, 1990, §108(f); Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990).

When the House and Senate met in conference, Senate conferees agreed to enact the Administration's proposed amendment to Section 111(d), which is

– 23 –

why the provision was then included in legislation that was passed by the House and Senate and signed by the President. As explained in the Statement of Senate Managers:

> Section 108—Miscellaneous Provisions...
>
> *Senate amendment*....
>
> *House amendment*.... [T]he House amendment contains provisions... for amending **section 111** of the Clean Air Act relating to new and **existing stationary sources**....
>
> *Conference agreement.* The Senate recedes to the House except... with respect to the requirement regarding judicial review of reports... and with respect to transportation planning....

136 Cong. Rec. 36007, 36067 (1990) (emphasis added).[7] Section 108(g) is the only provision "amending section 111 of the Clean Air Act relating to... existing stationary sources" and is described in its subheading as an amendment relating to "Regulation of Existing Sources." Thus, the Statement of Senate Managers *specifically* acknowledges Section 108 includes the amendment to "section 111... relating to... existing stationary sources." There is not a shred of evidence of Senators opposing the amendment. Nor are there records of Senators discussing the issues addressed by the Section 108(g) amendment prior to the conference.

---

[7] The agreement to the Administration's amendment to Section 111(d) would typically be reflected in a conference report, but in this instance the Statement of Senate Managers was prepared and printed in the Congressional Record because "[d]ue to time constraints" there was not "a particularly useful statement of managers" in the conference report. 136 Cong. Rec. 36007, 36065 (Oct. 27, 1990). This Court has found that the Statement is "certainly probative of congressional intent." *EDF v. EPA*, 82 F.3d 451, 460 n.11 (D.C. Cir. 1996).

**B.    Section 302(a) of the 1990 Amendments Is Nothing But a Superfluous and Superseded Scrivener's Amendment.**

EPA's contrary argument is primarily based on Section 302(a) of the 1990 Amendments, but Section 302(a) is a superfluous scrivener's amendment that was superseded by Section 108(g) and accordingly had no legal effect.

When changes to Section 112 were originally proposed in a Senate bill they were accompanied by a succinct conforming amendment updating a Section 112 cross-reference in Section 111(d) by providing "Section 111(d) of the Clean Air Act is amended by striking '112(b)(1)(A)' and inserting in lieu thereof '112(b)'." S. 816 as Introduced, §4(c). This simple scrivener's amendment was never discussed or highlighted at any time during the entire legislative process, but it was nonetheless carried along and ultimately included in the 1990 Amendments in Section 302(a). Pub. L. 101–549, §302(a), 104 Stat. 2399, 2574 (1990). In total, Section 302 includes four updates to cross references to Section 112, in each case updating a reference to track changes in Section 112's revised organization. *See id.* §302(d), (f) & (g) (updating "112(c)" in Section 118(b) with "112(i)(4)", "112(c)(1)(B)" in Section 304(b) with "112(i)(3)(A) or (f)(4)", and "112(c)" in Section 307(b)(1) with "112").

Since Congress separately decided to entirely eliminate the cross-reference in Section 111(d) to the Section 112 list of pollutants, the continued inclusion of an innocuous scrivener's amendment to update the cross reference along with other similarly innocuous cross-reference updates was nothing more than a harmless bit of legislative imprecision found in many large and complex bills.

– 25 –

In this instance and others, a trivial update to text that is elsewhere deleted simply has nothing to do and therefore has no legal effect. For example, Congress might repeal an entire section of a statute but also include a conforming amendment updating a cross reference located in the repealed section. The typical way that the resulting legislative text is produced is to execute amendments in the order they are found in the legislation. If the repeal comes first in order then it is considered to successfully delete the section entirely and the subsequent update to the cross reference is considered as "failing to execute" because the text it purports to amend no longer exists. If the cross-reference update comes first in order then it succeeds in updating the cross reference and then the repeal succeeds in entirely eliminating the provision altogether, including the cross reference. In either case, an amendment purporting to adjust a cross reference does not negate an express intent to strike a provision altogether.

This is precisely how the Office of the Law Revision Counsel—the legislative agency charged with producing the United State Code—dealt with the superfluous cross-reference update in Section 302(a) in light of the part of Section 108(g) that repealed the cross reference:

> Pub. L. 101–549, §302(a), which directed the substitution of "7412(b)" for "7412(b)(1)(A)", could not be executed, because of the prior amendment by Pub. L. 101–549, §108(g)....

42 U.S.C. §7411, Amendments, 1990, Subsec. (d)(1)(A)(i) (2012). This analysis is consistent with Congress's legislative drafting manuals and with how Congress's Office of the Law Revision Counsel in turn processes serial amendments to reflect legislative intent in these exact circumstances. UNITED STATES SENATE, OFFICE OF LEGISLATIVE COUNSEL, LEGISLATIVE DRAFTING MANUAL §126(d) (1997) ("If, after a first amendment to a provision is made... the provision is again amended, the assumption is that the earlier (preceding) amendments have been executed."); UNITED STATES HOUSE OF REPRESENTATIVES, OFFICE OF LEGISLATIVE COUNSEL, HOUSE LEGISLATIVE COUNSEL'S MANUAL ON DRAFTING STYLE §332(d) (1995) ("The assumption is that the earlier (preceding) amendments have been executed."); NBCG Comment 34–35 (JA____–_____) (citing dozens of examples of a subsequent amendment failing to execute because of a prior amendment in the same bill).

The Office's expert judgment on this issue as reflected in the Code is correct. The Office is a legislative agency directed by the nonpartisan Law Revision Counsel appointed by and serving at the pleasure of the Speaker of the House. 2 U.S.C. §285c. The Office is charged with updating the United States Code by faithfully executing amendments according to Congress's instructions. 2 U.S.C. §285b. There is no agency more well-versed and experienced in executing amendments consistent with legislative intent. Accordingly, Congress has directed that, in determining the text of federal law, deference must be given to

the Office's work by providing that "the Code of Laws of the United States current at any time shall... establish prima facie the laws of the United States... in force." 1 U.S.C. §204. Thus, the Code must be considered to be the authoritative statement of federal law unless it is plainly inconsistent with the Statutes at Large or the Office's determinations are unreasonable. *E.g.*, *Stephan v. United States*, 319 U.S. 423, 426 (1943) (inclusion of provision "inconsistent" with repeal of the provision in the Statutes at Large); *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993) (omission of provision unreasonably based on punctuation error in light of "overwhelming evidence from the structure, language, and subject matter" of the legislation); *see* NBCG Comment 162–165 (JA____–_____).

By contrast, the history of EPA's interpretation confirms executive branch personnel who only occasionally, if ever, deal with executing amendments or consulting the Statutes at Large are not experts in these matters. EPA's interpretation was originally conceived when its personnel mistook an unofficial, error-laden document prepared by a Congressional Research Service paralegal as the United States Statutes at Large. EPA then quoted from that document in the Federal Register and misidentified it as the Statutes at Large. *Compare* 69 Fed. Reg. 4652, 4685 (2004), *with* A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990 at 3–411 (Comm. Print 1993) (reprinting unofficial Congressional Research Service document), *and with id.* at 43–50 (unofficial rendition of Section 111 containing multiple inaccuracies). As a result of this mistake, EPA believed "two amendments are reflected in

– 28 –

parentheses in the Statutes at Large." 69 Fed. Reg. 4652, 4685 (2004). EPA then disregarded the United States Code because it "does not *contain [a] parenthetical reference* to the Senate amendment in Section 302" that EPA wrongly believed was included in the Statutes at Large. *Id.* (emphasis added). Cast adrift in confusion, EPA tried to "give some effect" to a "parenthetical reference" in the Statutes at Large which does not exist, and EPA also failed to give appropriate deference to the Office's careful and accurate rendition of the text in the Code and the guidance provided by the Office in the Code's amendment notes. *Id.*

As between the Office and EPA, the Office has far more experience in these matters and a demonstrated institutional capability of faithfully, accurately, and predictably divining legislative intent in executing amendments. At a minimum, courts and executive agencies should hesitate to second guess the Office and the Code, particularly when—as here—the determination of the Office in the Code makes sense of the statutory scheme.

## C. The Source Category Exclusion Does Not Actually "Conflict" with Section 302(a).

Even if the issue is considered *de novo*, the purported "conflict" that EPA relies on is entirely illusory in this specific case. EPA claims it "[r]econciled" Section 108(g) and Section 302(a) by asserting authority to use Section 111(d) unless **both** the pollutant is listed **and** the source category is regulated under Section 112. *See* 80 Fed. Reg. at 64715. But in fact there is no actual conflict to "reconcile" between Section 108(g)'s enactment of a source category exclusion and Section 302(a) through this atextual interpretation.

– 29 –

As explained above, Section 302(a) simply updated a cross reference that Section 108(g) had already eliminated. The fact that Section 302(a) does not enact a source category exclusion is not an implied repudiation of an intent to enact a source category exclusion in Section 108(g). Nor does the superfluous update to a cross reference have any bearing on the matter of whether Congress separately intended to enact a source category exclusion, as Congress could enact a source category exclusion while also either retaining or repealing a pollutant exclusion. Excluding pollutants and excluding source categories are different policies and Congress could have chosen to do either, both, or neither.

In the end, the only purportedly unresolved "conflict" between the chambers is that a bill that first passed the House enacted a source category exclusion while a bill that first passed the Senate did not have a provision on the subject at all. But this "conflict" was fully resolved when the Senate agreed in conference to include a source category exclusion and then voted to approve the bill containing the provision that expressly enacts the source category exclusion into law.

The issue in this case is therefore unlike the issue raised and discussed in the context of the Clean Air Mercury Rule which this Court vacated in *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008). In that situation, EPA sought to regulate a pollutant that is listed under Section 112(b)—mercury—and the purported "conflict" was whether Section 302(a) precluded EPA from using Section 111(d) to regulate pollutants listed under Section 112(b). But Section 302(a) says nothing about EPA using Section 111(d) to regulate source categories the agency is supposed to comprehensively regulate under Section 112. Indeed, the only

arguable ambiguity posed by Section 302(a) exclusively concerns the *repeal of a pollutant exclusion*, not the separate *enactment of a source category exclusion*. In any event, this Court vacated the Clean Air Mercury Rule after concluding the power plant source category was not lawfully delisted under Section 112 because Section 111(d) "cannot be used to regulate sources listed under section 112." *Id.* at 583.

### D.    Narrowing the Source Category Exclusion Does Not "Give Effect" to Section 302(a).

EPA's argument ultimately boils down to a conclusory and illogical claim that regulating emissions from industries that are regulated under Section 112 will "give some effect" to Section 302(a). 80 Fed. Reg. at 64714 n.294. Of course, it is not necessary to "give effect" to a superseded amendment; the amendment simply fails to execute. *Supra* Section II.B. In any event, EPA has never offered a coherent explanation of how its interpretation "gives effect" to Section 302(a) because it does not actually do so.

To give effect to the actual text of Section 302(a), one would have to ***narrow*** the scope of Section 111(d) to exclude pollutants listed under Section 112(b). At best Section 302(a) represents an unrequited attempt to retain a pollutant exclusion which would have the "effect" of *limiting* use of Section 111(d) by effectively foreclosing its use for all pollutants that pose "a threat of adverse human health effects... or adverse environmental effects" which EPA is required to list under Section 112(b). 42 U.S.C. §7412(b)(1). But EPA's interpretation does not actually exclude any emissions of these pollutants that are not already

excluded by Section 108(g)'s source category exclusion. Instead, EPA's interpretation inexplicably *expands* Section 111(d) by shrinking the scope of the source category exclusion to allow regulation of pollutants that have not been listed under Section 112(b) even though such pollutants are not addressed at all by the language of Section 302(a) or the purported intent to retain a Section 112 pollutant exclusion. But partially flouting Congress's manifest intent to preclude any regulation of Section 112 *source categories* does nothing to resolve alleged congressional indecision over the fate of the Section 112 *pollutant exclusion*.

Rather than explain how its interpretation supposedly "gives some effect" to Section 302(a), EPA consistently asserts the point without any explanation. *See* EPA Brief at 91, *West Virginia v. EPA*, No. 15-1363 (Apr. 22, 2016); 80 Fed. Reg. at 64714 n.294; Legal Memorandum for Proposed Carbon Pollution Emission Guidelines at 26, EPA-HQ-OAR-2013-0602-0419 (June 18, 2014). At most, EPA has only ever mustered a single sentence in support of its specious argument: EPA has claimed its interpretation "gives effect to the Senate's desire to focus on HAP listed under section 112(b), rather than applying the section 111(d) exclusion to non-HAP emitted from a source category regulated under section 112, which a literal reading of the House amendment would do." 70 Fed. Reg. 15994, 16032 (2005); 69 Fed. Reg. 4652, 4685 (2004); *see* 80 Fed. Reg. at 64714 n.294 (citing 70 Fed. Reg. at 16029–32). As environmental groups aptly observed over a decade ago, EPA's explanation of how narrowing the Section 112 source category exclusion "gives effect" to Section 302(a) is just this "single, garbled sentence," and it is really nothing more than a convoluted non sequitur.

Reply Brief of Environmental Petitioners at 13, *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008).

### E.    EPA Cannot Circumvent the Source Category Exclusion.

After litigation revealed the weakness of EPA's arguments based on Section 302(a), EPA tried to defend its assertion of authority without resort to the purported legislative glitch theory. But this belated argument conflicts with unambiguous legislative text and does not reasonably interpret the statute.

EPA's alternative atextual interpretation engrafts a limit onto the statute that is not there. According to EPA, the exclusion only applies where ***both*** the source category is regulated under Section 112 ***and*** the pollutant is listed under Section 112(b). But the statute nowhere says that, and EPA cannot take a restriction it disagrees with and engraft an evasive limitation on it without impermissibly exercising the full measure of Legislative Power.

In any event, EPA's proposed limitation on the exclusion does not even make sense in the statutory context. Through its atextual interpretation, EPA is arguing that it can decline to list a pollutant under Section 112(b) so that it can use Section 111(d) to regulate it instead. But that conflicts with Section 112(b)'s mandate that EPA's ***must*** list all pollutants with substantial human health or environmental effects that warrant regulation.[8]

---

[8] Greenhouse gases do not fit comfortably with certain aspects of Section 112. But this poor fit does not authorize rewriting a provision of another part of the statute to allow regulation of a pollutant under Section 111(d) that EPA prefers not to regulate under Section 112 for policy reasons. Rather, the poor fit would be addressed the same way as in other parts of the CAA, such as

The illogic of EPA's argument is illustrated by the fact that EPA recently received a petition to list greenhouse gases under Section 112, which EPA is required to process by October, 2020. *Petition for Listing and Rulemaking Under Section 112 of the Clean Air Act to Establish Greenhouse Gases as Hazardous Air Pollutants* (Apr. 3, 2019), *available at* foodandwaterwatch.org/sites/default/files/caa_112_ghg_petition.pdf. If EPA finds greenhouse gases do not pose "a threat of adverse human health effects... or adverse environmental effects," there is no compelling reason for EPA to regulate them at all. 42 U.S.C. §7412(b)(1). But if EPA finds greenhouse gases do pose substantial risks that warrant regulation, EPA is statutorily required to list them under Section 112(b). The only way non-criteria pollutants of substantial federal concern would ever be subject to regulation under Section 111(d) but not Section 112 would be if EPA fails to comply with the mandatory obligation to list them under Section 112(b).

There is really no reason to torture the statute. As EPA has conceded, NBCG Comment 29–31 (JA_____–_____), the literal text of the exclusion forecloses use of Section 111(d) to regulate emissions from sources categories which are regulated under Section 112. EPA has never shown this is absurd. Rather, EPA points to an alleged statutory "gap" that does not actually exist.

---

interpreting the statute not to obligate EPA to regulate solely on the basis of annual tonnage thresholds that were obviously never intended to apply to greenhouse gases. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (reasonable interpretation must avoid "enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization").

EPA worries it cannot regulate non-criteria pollutant emissions from sources regulated under Section 112 *unless and until* EPA first lists the pollutants under Section 112(b). But EPA has never identified any non-criteria pollutant that can be regulated under Section 111 that EPA is not able and *required* to list under Section 112(b) since the expansion of Section 112 in 1990 eliminated any daylight between the two programs. Thus, the purported "gap" is in fact "illusory," and even if it exists it is not so "large" as to be "demonstrably at odds" with congressional intent because it would not render "the regulatory scheme" "unworkable or absurd," as is required "to avoid a literal interpretation." *Engine Mfrs. Ass'n*, 88 F.3d at 1089–93.

## CONCLUSION

The coal industry petitions for review should be granted and the portion of the Rule regulating coal power plants should be vacated.

Respectfully submitted,

/s/ *Charles T. Wehland*

Shay Dvoretzky
Charles T. Wehland *
Robert E. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001

 * Not admitted in DC

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
One Cleveland Center
1375 East Ninth Street, Suite 1930
Cleveland, OH 44114

*Counsel for*
*The North American Coal Corporation*

/s/ *Robert D. Cheren*

Martin T. Booher
Robert D. Cheren
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

Mark W. DeLaquil
Andrew Grossman
BAKER & HOSTETLER LLP
Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036

*Counsel for*
*Westmoreland Mining Holdings LLC*

**COAL PETITIONERS
STANDING ADDENDUM**

Declaration of John Neumann..................................................................ADD1

Declaration of Jeremy Cottrell...............................................................ADD4

## DECLARATION OF JOHN NEUMANN

I, John Neumann, declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      I am the Vice President, General Counsel, and Secretary of The North American Coal Corporation ("NA Coal").

2.      I am providing this declaration in support of NA Coal's Petition for Review seeking vacatur of the EPA's ACE Rule.  This declaration is based on my personal knowledge of the facts and analysis conducted by my staff and me.

3.      NA Coal operates surface coal mines in North Dakota, Texas, Mississippi, and on the Navajo Nation in New Mexico. In 2019, these mines delivered, on a long-term contractual basis, approximately 32.6 million tons of coal to electric utility generating units in the United States.  Over the past three years, these mines delivered, on average, approximately 33.7 million tons of coal to domestic power plants.  NA Coal has an estimated 2 billion tons of proven and probable coal reserves in the United States.

4.      Most of the operations serviced by NA Coal involve a "mine-mouth" setup, which means that the source of coal is either co-located with the serviced power plant or located nearby.  This means that most of our mines provide their

output to a single nearby power plant.  Any impact on power plant operations necessarily has a corresponding impact on our co-located mines.

5.      I believe that EPA's effort to use Section 111(d) of the Clean Air Act to require states to adopt CO2 emission limitations for existing coal fired power plants will harm NA Coal.  EPA's determination that the Clean Air Act allows the Agency to use Section 111(d) to require CO2 emission limitations on existing coal power plants will make their operations more expensive, thus reducing the amount of electricity they generate and the amount of coal they demand.  This result is evident in the estimate in Table 4 that coal production for power sector use will decrease in every future modeled time period over the next 15 years.  (84 FR at 32562).

6.      NA Coal and its customers make decisions concerning investment and resources on a multi-year time horizon.  Ever since EPA proposed in 2015 to require states to adopt $CO_2$ emission limitations for coal power plants, the uncertainty about whether those limitations are authorized by the Clean Air Act has contributed to customer decisions not to make significant investments with a corresponding reduction in the coal demand.   EPA's effort to use Section 111(d) of the Clean Air Act to require states to adopt $CO_2$ emission limitations for coal power plants is already harming NA Coal's business.

2

7.    These harms will be alleviated if the Rule is vacated.  If the Rule does not go into effect, coal power plants will be able to plan and invest in future operations with certainty, with a corresponding impact on NA Coal's business. Conversely, if the Rule is not vacated, the harms NA Coal is already experiencing will only increase.

Executed this 15th day of April, 2020.

_____
John Neumann

3

## DECLARATION OF JEREMY COTTRELL

I, Jeremy Cottrell, declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.     I am the General Counsel and Secretary of Westmoreland Mining Holdings LLC ("Westmoreland").

2.     I am providing this declaration in support of Westmoreland's Petition for Review seeking vacatur of the EPA's ACE Rule. This declaration is based on my personal knowledge of the facts and analysis conducted by my staff and me.

3.     Westmoreland operates surface coal mines in Montana, North Dakota, Texas, and New Mexico. Westmoreland also has surface coal mines in Alberta and Saskatchewan. In 2019, Westmoreland's mines delivered approximately 36.6 million tons of coal to electric utility generating units ("power plants"). Westmoreland has an estimated 364.0 million tons of proven and probable coal reserves.

4.     Many power plants serviced by Westmoreland are "mine-mouth," which means mines are co-located with power plant customers or located nearby. These mines provide all or nearly all of their output to a single nearby power plant. Any reduction in the power plant's operations necessarily has a corresponding negative impact on our co-located mines.

5.    For example, Westmoreland's Rosebud mine in Montana supplies millions of tons of coal every year to the adjacent Colstrip power plant. When EPA first promulgated regulations of power plants under Section 111(d) with the Clean Power Plan, it was demonstrated that the implementation of that rule would have a substantial adverse impact on the Colstrip power plant and in turn Westmoreland's Rosebud mine. UNIVERSITY OF MONTANA BUREAU OF BUSINESS AND ECONOMIC RESEARCH, THE ECONOMIC IMPLICATIONS OF IMPLEMENTING THE EPA CLEAN POWER PLAN IN MONTANA (Nov. 2015); Declaration of John D. Hines and Michael R. Cashell , *North Western Corp. v. EPA*, No. 15-1378 (D.C. Cir. Nov. 5, 2015).

6.    As demonstrated by EPA's own projections, EPA's new effort to use Section 111(d) of the Clean Air Act to require states to adopt $CO_2$ emission limitations for existing coal fired power plants will also harm Westmoreland. EPA's Table ES-4 from the Regulatory Impact Analysis projects an overall reduction in $CO_2$ emissions that results largely from a reduction in coal consumption. Table 4 of the Rule projects that it will cause a decrease in coal production for power sector use in every future modeled time period over the next 15 years. (84 FR at 32562). $CO_2$ emission limitations imposed on coal power plants will reduce the demand for coal from our mine-mouth coal mines by the power plants to which those mines are dedicated.

7.     Westmoreland and its customers make decisions concerning investment and resources on a multi-year time horizon. Ever since EPA proposed in 2015 to require states to adopt $CO_2$ emission limitations for coal power plants, the uncertainty about whether those limitations are authorized by the Clean Air Act has contributed to customer decisions not to make significant investments with a corresponding reduction in the coal demand. EPA's continuing effort to use Section 111(d) of the Clean Air Act to require states to adopt $CO_2$ emission limitations for coal power plants is already harming Westmoreland's business.

8.     These harms will be alleviated if the ACE Rule is vacated. If the Rule does not go into effect, coal power plants will be able to plan and invest in future operations with certainty, with a corresponding impact on Westmoreland's business. Conversely, if the ACE Rule is not vacated, the harms Westmoreland is already experiencing will only increase.

    Executed this 16 day of April, 2020.

Jeremy Cottrell

**CLAUDIA COOPER**
NOTARY PUBLIC - STATE OF COLORADO
Notary ID #20194009741
My Commission Expires 3/11/2023

Claudia Cooper
ComEx: 3/11/23

# COAL PETITIONERS
# STATUTORY ADDENDUM

Clean Air Act, current law
    42 U.S.C. §7411 ................................................................SA01
    42 U.S.C. §7412(a)–(q) ....................................................SA07

1990 Amendments to the Clean Air Act
    Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990) ...................SA25
    Pub. L. 101–549, §302(a), 104 Stat. 2399, 2574 (1990) ...................SA26

Statement of Senate Managers
    136 Cong. Rec. 36007, 36065 (1990)..............................................SA27

Clean Air Act, pre-1990 law
    42 U.S.C. §7411(d) (1988) ..............................................SA29
    42 U.S.C. §7412(a) (1988) ..............................................SA34

H.R. Rep. No. 95-564 at 183–84 (1977) ....................................SA36

H.R. Rep. No. 94-1175 at 33 (1976) ........................................SA39

"and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, § 107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, § 108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, § 107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, § 108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, § 108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 § 14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, § 108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, § 4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, § 4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

## Effective Date of 1977 Amendment

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

## Pending Actions and Proceedings

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## Modification or Rescission of Rules, Regulations, Orders, Determinations, Contracts, Certifications, Authorizations, Delegations, and Other Actions

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## Modification or Rescission of Implementation Plans Approved and In Effect Prior to Aug. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## Savings Provision

Pub. L. 91–604, § 16, Dec. 31, 1970, 84 Stat. 1713, provided that:

"(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

"(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

"(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter]."

## Federal Energy Administrator

"Federal Energy Administrator", for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term "existing source" means any stationary source other than a new source.

(7) The term "technological system of continuous emission reduction" means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii)[1] of this title, shall not be deemed to be a modification for purposes of paragraphs (2) and (4) of this subsection.

**(b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards**

(1)(A) The Administrator shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

(B) Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every 8 years, review and, if appropriate, revise such standards following the procedure required by this subsection for promulgation of such standards. Notwithstanding the require-

ments of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard. Standards of performance or revisions thereof shall become effective upon promulgation. When implementation and enforcement of any requirement of this chapter indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.

(2) The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards.

(3) The Administrator shall, from time to time, issue information on pollution control techniques for categories of new sources and air pollutants subject to the provisions of this section.

(4) The provisions of this section shall apply to any new source owned or operated by the United States.

(5) Except as otherwise authorized under subsection (h), nothing in this section shall be construed to require, or to authorize the Administrator to require, any new or modified source to install and operate any particular technological system of continuous emission reduction to comply with any new source standard of performance.

(6) The revised standards of performance required by enactment of subsection (a)(1)(A)(i) and (ii)[1] shall be promulgated not later than one year after August 7, 1977. Any new or modified fossil fuel fired stationary source which commences construction prior to the date of publication of the proposed revised standards shall not be required to comply with such revised standards.

**(c) State implementation and enforcement of standards of performance**

(1) Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located in such State. If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards.

(2) Nothing in this subsection shall prohibit the Administrator from enforcing any applicable standard of performance under this section.

**(d) Standards of performance for existing sources; remaining useful life of source**

(1) The Administrator shall prescribe regulations which shall establish a procedure similar to that provided by section 7410 of this title under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for any existing source for any air pollutant (i) for which air quality criteria have not been issued or which is not included on a list published under section 7408(a) of this title or emitted from a source category

---

[1] See References in Text note below.

which is regulated under section 7412 of this title but (ii) to which a standard of performance under this section would apply if such existing source were a new source, and (B) provides for the implementation and enforcement of such standards of performance. Regulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies.

(2) The Administrator shall have the same authority—

(A) to prescribe a plan for a State in cases where the State fails to submit a satisfactory plan as he would have under section 7410(c) of this title in the case of failure to submit an implementation plan, and

(B) to enforce the provisions of such plan in cases where the State fails to enforce them as he would have under sections 7413 and 7414 of this title with respect to an implementation plan.

In promulgating a standard of performance under a plan prescribed under this paragraph, the Administrator shall take into consideration, among other factors, remaining useful lives of the sources in the category of sources to which such standard applies.

**(e) Prohibited acts**

After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source.

**(f) New source standards of performance**

(1) For those categories of major stationary sources that the Administrator listed under subsection (b)(1)(A) before November 15, 1990, and for which regulations had not been proposed by the Administrator by November 15, 1990, the Administrator shall—

(A) propose regulations establishing standards of performance for at least 25 percent of such categories of sources within 2 years after November 15, 1990;

(B) propose regulations establishing standards of performance for at least 50 percent of such categories of sources within 4 years after November 15, 1990; and

(C) propose regulations for the remaining categories of sources within 6 years after November 15, 1990.

(2) In determining priorities for promulgating standards for categories of major stationary sources for the purpose of paragraph (1), the Administrator shall consider—

(A) the quantity of air pollutant emissions which each such category will emit, or will be designed to emit;

(B) the extent to which each such pollutant may reasonably be anticipated to endanger public health or welfare; and

(C) the mobility and competitive nature of each such category of sources and the consequent need for nationally applicable new source standards of performance.

(3) Before promulgating any regulations under this subsection or listing any category of major stationary sources as required under this subsection, the Administrator shall consult with appropriate representatives of the Governors and of State air pollution control agencies.

**(g) Revision of regulations**

(1) Upon application by the Governor of a State showing that the Administrator has failed to specify in regulations under subsection (f)(1) any category of major stationary sources required to be specified under such regulations, the Administrator shall revise such regulations to specify any such category.

(2) Upon application of the Governor of a State, showing that any category of stationary sources which is not included in the list under subsection (b)(1)(A) contributes significantly to air pollution which may reasonably be anticipated to endanger public health or welfare (notwithstanding that such category is not a category of major stationary sources), the Administrator shall revise such regulations to specify such category of stationary sources.

(3) Upon application of the Governor of a State showing that the Administrator has failed to apply properly the criteria required to be considered under subsection (f)(2), the Administrator shall revise the list under subsection (b)(1)(A) to apply properly such criteria.

(4) Upon application of the Governor of a State showing that—

(A) a new, innovative, or improved technology or process which achieves greater continuous emission reduction has been adequately demonstrated for any category of stationary sources, and

(B) as a result of such technology or process, the new source standard of performance in effect under this section for such category no longer reflects the greatest degree of emission limitation achievable through application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) has been adequately demonstrated,

the Administrator shall revise such standard of performance for such category accordingly.

(5) Unless later deadlines for action of the Administrator are otherwise prescribed under this section, the Administrator shall, not later than three months following the date of receipt of any application by a Governor of a State, either—

(A) find that such application does not contain the requisite showing and deny such application, or

(B) grant such application and take the action required under this subsection.

(6) Before taking any action required by subsection (f) or by this subsection, the Administrator shall provide notice and opportunity for public hearing.

**(h) Design, equipment, work practice, or operational standard; alternative emission limitation**

(1) For purposes of this section, if in the judgment of the Administrator, it is not feasible to

prescribe or enforce a standard of performance, he may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof, which reflects the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. In the event the Administrator promulgates a design or equipment standard under this subsection, he shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

(2) For the purpose of this subsection, the phrase ''not feasible to prescribe or enforce a standard of performance'' means any situation in which the Administrator determines that (A) a pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State, or local law, or (B) the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations.

(3) If after notice and opportunity for public hearing, any person establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such air pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

(4) Any standard promulgated under paragraph (1) shall be promulgated in terms of standard of performance whenever it becomes feasible to promulgate and enforce such standard in such terms.

(5) Any design, equipment, work practice, or operational standard, or any combination thereof, described in this subsection shall be treated as a standard of performance for purposes of the provisions of this chapter (other than the provisions of subsection (a) and this subsection).

**(i) Country elevators**

Any regulations promulgated by the Administrator under this section applicable to grain elevators shall not apply to country elevators (as defined by the Administrator) which have a storage capacity of less than two million five hundred thousand bushels.

**(j) Innovative technological systems of continuous emission reduction**

(1)(A) Any person proposing to own or operate a new source may request the Administrator for one or more waivers from the requirements of this section for such source or any portion thereof with respect to any air pollutant to encourage the use of an innovative technological system or systems of continuous emission reduction. The Administrator may, with the consent of the Governor of the State in which the source is to be located, grant a waiver under this paragraph, if the Administrator determines after notice and opportunity for public hearing, that—

(i) the proposed system or systems have not been adequately demonstrated,

(ii) the proposed system or systems will operate effectively and there is a substantial likelihood that such system or systems will achieve greater continuous emission reduction than that required to be achieved under the standards of performance which would otherwise apply, or achieve at least an equivalent reduction at lower cost in terms of energy, economic, or nonair quality environmental impact,

(iii) the owner or operator of the proposed source has demonstrated to the satisfaction of the Administrator that the proposed system will not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation, function, or malfunction, and

(iv) the granting of such waiver is consistent with the requirements of subparagraph (C).

In making any determination under clause (ii), the Administrator shall take into account any previous failure of such system or systems to operate effectively or to meet any requirement of the new source performance standards. In determining whether an unreasonable risk exists under clause (iii), the Administrator shall consider, among other factors, whether and to what extent the use of the proposed technological system will cause, increase, reduce, or eliminate emissions of any unregulated pollutants; available methods for reducing or eliminating any risk to public health, welfare, or safety which may be associated with the use of such system; and the availability of other technological systems which may be used to conform to standards under this section without causing or contributing to such unreasonable risk. The Administrator may conduct such tests and may require the owner or operator of the proposed source to conduct such tests and provide such information as is necessary to carry out clause (iii) of this subparagraph. Such requirements shall include a requirement for prompt reporting of the emission of any unregulated pollutant from a system if such pollutant was not emitted, or was emitted in significantly lesser amounts without use of such system.

(B) A waiver under this paragraph shall be granted on such terms and conditions as the Administrator determines to be necessary to assure—

(i) emissions from the source will not prevent attainment and maintenance of any national ambient air quality standards, and

(ii) proper functioning of the technological system or systems authorized.

Any such term or condition shall be treated as a standard of performance for the purposes of subsection (e) of this section and section 7413 of this title.

(C) The number of waivers granted under this paragraph with respect to a proposed technological system of continuous emission reduction shall not exceed such number as the Administrator finds necessary to ascertain whether or not such system will achieve the conditions

specified in clauses (ii) and (iii) of subparagraph (A).

(D) A waiver under this paragraph shall extend to the sooner of—

(i) the date determined by the Administrator, after consultation with the owner or operator of the source, taking into consideration the design, installation, and capital cost of the technological system or systems being used, or

(ii) the date on which the Administrator determines that such system has failed to—

(I) achieve at least an equivalent continuous emission reduction to that required to be achieved under the standards of performance which would otherwise apply, or

(II) comply with the condition specified in paragraph (1)(A)(iii),

and that such failure cannot be corrected.

(E) In carrying out subparagraph (D)(i), the Administrator shall not permit any waiver for a source or portion thereof to extend beyond the date—

(i) seven years after the date on which any waiver is granted to such source or portion thereof, or

(ii) four years after the date on which such source or portion thereof commences operation,

whichever is earlier.

(F) No waiver under this subsection shall apply to any portion of a source other than the portion on which the innovative technological system or systems of continuous emission reduction is used.

(2)(A) If a waiver under paragraph (1) is terminated under clause (ii) of paragraph (1)(D), the Administrator shall grant an extension of the requirements of this section for such source for such minimum period as may be necessary to comply with the applicable standard of performance under this section. Such period shall not extend beyond the date three years from the time such waiver is terminated.

(B) An extension granted under this paragraph shall set forth emission limits and a compliance schedule containing increments of progress which require compliance with the applicable standards of performance as expeditiously as practicable and include such measures as are necessary and practicable in the interim to minimize emissions. Such schedule shall be treated as a standard of performance for purposes of subsection (e) of this section and section 7413 of this title.

(July 14, 1955, ch. 360, title I, § 111, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1683; amended Pub. L. 92–157, title III, § 302(f), Nov. 18, 1971, 85 Stat. 464; Pub. L. 95–95, title I, § 109(a)–(d)(1), (e), (f), title IV, § 401(b), Aug. 7, 1977, 91 Stat. 697–703, 791; Pub. L. 95–190, § 14(a)(7)–(9), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 95–623, § 13(a), Nov. 9, 1978, 92 Stat. 3457; Pub. L. 101–549, title I, § 108(e)–(g), title III, § 302(a), (b), title IV, § 403(a), Nov. 15, 1990, 104 Stat. 2467, 2574, 2631.)

REFERENCES IN TEXT

Such Act, referred to in subsec. (a)(8), means Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, known as the Energy Supply and Environmental Coordination Act of 1974, which is classified principally to chapter 16C (§ 791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsec. (a)(8), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsec. (d) of section 7413 no longer relates to final compliance orders.

Subsection (a)(1) of this section, referred to in subsec. (b)(6), was amended generally by Pub. L. 101–549, title VII, § 403(a), Nov. 15, 1990, 104 Stat. 2631, and, as so amended, no longer contains subpars.

CODIFICATION

Section was formerly classified to section 1857c–6 of this title.

PRIOR PROVISIONS

A prior section 111 of act July 14, 1955, was renumbered section 118 by Pub. L. 91–604 and is classified to section 7418 of this title.

AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, § 403(a), amended par. (1) generally, substituting provisions defining "standard of performance" with respect to any air pollutant for provisions defining such term with respect to subsec. (b) fossil fuel fired and other stationary sources and subsec. (d) particular sources.

Subsec. (a)(3). Pub. L. 101–549, § 108(f), inserted at end "Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines."

Subsec. (b)(1)(B). Pub. L. 101–549, § 108(e)(1), substituted "Within one year" for "Within 120 days", "within one year" for "within 90 days", and "every 8 years" for "every four years", inserted before last sentence "Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard.", and inserted at end "When implementation and enforcement of any requirement of this chapter indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice."

Subsec. (d)(1)(A)(i). Pub. L. 101–549, § 302(a), which directed the substitution of "7412(b)" for "7412(b)(1)(A)", could not be executed, because of the prior amendment by Pub. L. 101–549, § 108(g), see below.

Pub. L. 101–549, § 108(g), substituted "or emitted from a source category which is regulated under section 7412 of this title" for "or 7412(b)(1)(A)".

Subsec. (f)(1). Pub. L. 101–549, § 108(e)(2), amended par. (1) generally, substituting present provisions for provisions requiring the Administrator to promulgate regulations listing the categories of major stationary sources not on the required list by Aug. 7, 1977, and regulations establishing standards of performance for such categories.

Subsec. (g)(5) to (8). Pub. L. 101–549, § 302(b), redesignated par. (7) as (5) and struck out "or section 7412 of this title" after "this section", redesignated par. (8) as (6), and struck out former pars. (5) and (6) which read as follows:

"(5) Upon application by the Governor of a State showing that the Administrator has failed to list any air pollutant which causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness as a hazardous air pollutant under section 7412 of this title the

Administrator shall revise the list of hazardous air pollutants under such section to include such pollutant.

''(6) Upon application by the Governor of a State showing that any category of stationary sources of a hazardous air pollutant listed under section 7412 of this title is not subject to emission standards under such section, the Administrator shall propose and promulgate such emission standards applicable to such category of sources.''

1978—Subsecs. (d)(1)(A)(ii), (g)(4)(B). Pub. L. 95–623, § 13(a)(2), substituted ''under this section'' for ''under subsection (b) of this section''.

Subsec. (h)(5). Pub. L. 95–623, § 13(a)(1), added par. (5).

Subsec. (j). Pub. L. 95–623, § 13(a)(3), substituted in pars. (1)(A) and (2)(A) ''standards under this section'' and ''under this section'' for ''standards under subsection (b) of this section'' and ''under subsection (b) of this section'', respectively.

1977—Subsec. (a)(1). Pub. L. 95–95, § 109(c)(1)(A), added subpars. (A), (B), and (C), substituted ''For the purpose of subparagraphs (A)(i) and (ii) and (B), a standard of performance shall reflect'' for ''a standard for emissions of air pollutants which reflects'', ''and the percentage reduction achievable'' for ''achievable'', and ''technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any nonair quality health and environment impact and energy requirements)'' for ''system of emission reduction which (taking into account the cost of achieving such reduction)'' in existing provisions, and inserted provision that, for the purpose of subparagraph (1)(A)(ii), any cleaning of the fuel or reduction in the pollution characteristics of the fuel after extraction and prior to combustion may be credited, as determined under regulations promulgated by the Administrator, to a source which burns such fuel.

Subsec. (a)(7). Pub. L. 95–95, § 109(c)(1)(B), added par. (7) defining ''technological system of continuous emission reduction''.

Pub. L. 95–95, § 109(f), added par. (7) directing that under certain circumstances a conversion to coal not be deemed a modification for purposes of pars. (2) and (4).

Subsec. (a)(7), (8). Pub. L. 95–190, § 14(a)(7), redesignated second par. (7) as (8).

Subsec. (b)(1)(A). Pub. L. 95–95, § 401(b), substituted ''such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger'' for ''such list if he determines it may contribute significantly to air pollution which causes or contributes to the endangerment of''.

Subsec. (b)(1)(B). Pub. L. 95–95, § 109(c)(2), substituted ''shall, at least every four years, review and, if appropriate,'' for ''may, from time to time,''.

Subsec. (b)(5), (6). Pub. L. 95–95, § 109(c)(3), added pars. (5) and (6).

Subsec. (c)(1). Pub. L. 95–95, § 109(d)(1), struck out ''(except with respect to new sources owned or operated by the United States)'' after ''implement and enforce such standards''.

Subsec. (d)(1). Pub. L. 95–95, § 109(b)(1), substituted ''standards of performance'' for ''emission standards'' and inserted provisions directing that regulations of the Administrator permit the State, in applying a standard of performance to any particular source under a submitted plan, to take into consideration, among other factors, the remaining useful life of the existing source to which the standard applies.

Subsec. (d)(2). Pub. L. 95–95, § 109(b)(2), provided that, in promulgating a standard of performance under a plan, the Administrator take into consideration, among other factors, the remaining useful lives of the sources in the category of sources to which the standard applies.

Subsecs. (f) to (i). Pub. L. 95–95, § 109(a), added subsecs. (f) to (i).

Subsecs. (j), (k). Pub. L. 95–190, § 14(a)(8), (9), redesignated subsec. (k) as (j) and, as so redesignated, substituted ''(B)'' for ''(8)'' as designation for second subpar. in par. (2). Former subsec. (j), added by Pub. L. 95–95, § 109(e), which related to compliance with applicable standards of performance, was struck out.

Pub. L. 95–95, § 109(e), added subsec. (k).

1971—Subsec. (b)(1)(B). Pub. L. 92–157 substituted in first sentence ''publish proposed'' for ''propose''.

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

REGULATIONS

Pub. L. 101–549, title IV, § 403(b), (c), Nov. 15, 1990, 104 Stat. 2631, provided that:

''(b) REVISED REGULATIONS.—Not later than three years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990], the Administrator shall promulgate revised regulations for standards of performance for new fossil fuel fired electric utility units commencing construction after the date on which such regulations are proposed that, at a minimum, require any source subject to such revised standards to emit sulfur dioxide at a rate not greater than would have resulted from compliance by such source with the applicable standards of performance under this section [amending sections 7411 and 7479 of this title] prior to such revision.

''(c) APPLICABILITY.—The provisions of subsections (a) [amending this section] and (b) apply only so long as the provisions of section 403(e) of the Clean Air Act [42 U.S.C. 7651b(e)] remain in effect.''

TRANSFER OF FUNCTIONS

Enforcement functions of Administrator or other official in Environmental Protection Agency related to compliance with new source performance standards under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, eff. July 1, 1979, §§ 102(a), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect

immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

POWER SECTOR CARBON POLLUTION STANDARDS

Memorandum of President of the United States, June 25, 2013, 78 F.R. 39535, which related to carbon pollution standards for power plants, was revoked by Ex. Ord. No. 13783, §3(a)(ii), Mar. 28, 2017, 82 F.R. 16094, set out as a note under section 13201 of this title.

## § 7412. Hazardous air pollutants

### (a) Definitions

For purposes of this section, except subsection (r)—

**(1) Major source**

The term ''major source'' means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

**(2) Area source**

The term ''area source'' means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term ''area source'' shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II.

**(3) Stationary source**

The term ''stationary source'' shall have the same meaning as such term has under section 7411(a) of this title.

**(4) New source**

The term ''new source'' means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

**(5) Modification**

The term ''modification'' means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

**(6) Hazardous air pollutant**

The term ''hazardous air pollutant'' means any air pollutant listed pursuant to subsection (b).

### (7) Adverse environmental effect

The term ''adverse environmental effect'' means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

### (8) Electric utility steam generating unit

The term ''electric utility steam generating unit'' means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

### (9) Owner or operator

The term ''owner or operator'' means any person who owns, leases, operates, controls, or supervises a stationary source.

### (10) Existing source

The term ''existing source'' means any stationary source other than a new source.

### (11) Carcinogenic effect

Unless revised, the term ''carcinogenic effect'' shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment.[1] Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

### (b) List of pollutants

**(1) Initial list**

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS number | Chemical name |
| --- | --- |
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3–Butadiene |

[1] See References in Text note below.

| CAS number | Chemical name | CAS number | Chemical name |
|---|---|---|---|
| 156627 | Calcium cyanamide | 58899 | Lindane (all isomers) |
| 105602 | Caprolactam | 108316 | Maleic anhydride |
| 133062 | Captan | 67561 | Methanol |
| 63252 | Carbaryl | 72435 | Methoxychlor |
| 75150 | Carbon disulfide | 74839 | Methyl bromide (Bromomethane) |
| 56235 | Carbon tetrachloride | 74873 | Methyl chloride (Chloromethane) |
| 463581 | Carbonyl sulfide | 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 120809 | Catechol | 78933 | Methyl ethyl ketone (2-Butanone) |
| 133904 | Chloramben | 60344 | Methyl hydrazine |
| 57749 | Chlordane | 74884 | Methyl iodide (Iodomethane) |
| 7782505 | Chlorine | 108101 | Methyl isobutyl ketone (Hexone) |
| 79118 | Chloroacetic acid | 624839 | Methyl isocyanate |
| 532274 | 2-Chloroacetophenone | 80626 | Methyl methacrylate |
| 108907 | Chlorobenzene | 1634044 | Methyl tert butyl ether |
| 510156 | Chlorobenzilate | 101144 | 4,4-Methylene bis(2-chloroaniline) |
| 67663 | Chloroform | 75092 | Methylene chloride (Dichloromethane) |
| 107302 | Chloromethyl methyl ether | 101688 | Methylene diphenyl diisocyanate (MDI) |
| 126998 | Chloroprene | 101779 | 4,4′-Methylenedianiline |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) | 91203 | Naphthalene |
| 95487 | o-Cresol | 98953 | Nitrobenzene |
| 108394 | m-Cresol | 92933 | 4-Nitrobiphenyl |
| 106445 | p-Cresol | 100027 | 4-Nitrophenol |
| 98828 | Cumene | 79469 | 2-Nitropropane |
| 94757 | 2,4-D, salts and esters | 684935 | N-Nitroso-N-methylurea |
| 3547044 | DDE | 62759 | N-Nitrosodimethylamine |
| 334883 | Diazomethane | 59892 | N-Nitrosomorpholine |
| 132649 | Dibenzofurans | 56382 | Parathion |
| 96128 | 1,2-Dibromo-3-chloropropane | 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 84742 | Dibutylphthalate | 87865 | Pentachlorophenol |
| 106467 | 1,4-Dichlorobenzene(p) | 108952 | Phenol |
| 91941 | 3,3-Dichlorobenzidene | 106503 | p-Phenylenediamine |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) | 75445 | Phosgene |
| 542756 | 1,3-Dichloropropene | 7803512 | Phosphine |
| 62737 | Dichlorvos | 7723140 | Phosphorus |
| 111422 | Diethanolamine | 85449 | Phthalic anhydride |
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) | 1336363 | Polychlorinated biphenyls (Aroclors) |
| 64675 | Diethyl sulfate | 1120714 | 1,3-Propane sultone |
| 119904 | 3,3-Dimethoxybenzidine | 57578 | beta-Propiolactone |
| 60117 | Dimethyl aminoazobenzene | 123386 | Propionaldehyde |
| 119937 | 3,3′-Dimethyl benzidine | 114261 | Propoxur (Baygon) |
| 79447 | Dimethyl carbamoyl chloride | 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 68122 | Dimethyl formamide | 75569 | Propylene oxide |
| 57147 | 1,1-Dimethyl hydrazine | 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 131113 | Dimethyl phthalate | 91225 | Quinoline |
| 77781 | Dimethyl sulfate | 106514 | Quinone |
| 534521 | 4,6-Dinitro-o-cresol, and salts | 100425 | Styrene |
| 51285 | 2,4-Dinitrophenol | 96093 | Styrene oxide |
| 121142 | 2,4-Dinitrotoluene | 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) | 79345 | 1,1,2,2-Tetrachloroethane |
| 122667 | 1,2-Diphenylhydrazine | 127184 | Tetrachloroethylene (Perchloroethylene) |
| 106898 | Epichlorohydrin (l-Chloro-2,3-epoxypropane) | 7550450 | Titanium tetrachloride |
| 106887 | 1,2-Epoxybutane | 108883 | Toluene |
| 140885 | Ethyl acrylate | 95807 | 2,4-Toluene diamine |
| 100414 | Ethyl benzene | 584849 | 2,4-Toluene diisocyanate |
| 51796 | Ethyl carbamate (Urethane) | 95534 | o-Toluidine |
| 75003 | Ethyl chloride (Chloroethane) | 8001352 | Toxaphene (chlorinated camphene) |
| 106934 | Ethylene dibromide (Dibromoethane) | 120821 | 1,2,4-Trichlorobenzene |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) | 79005 | 1,1,2-Trichloroethane |
| 107211 | Ethylene glycol | 79016 | Trichloroethylene |
| 151564 | Ethylene imine (Aziridine) | 95954 | 2,4,5-Trichlorophenol |
| 75218 | Ethylene oxide | 88062 | 2,4,6-Trichlorophenol |
| 96457 | Ethylene thiourea | 121448 | Triethylamine |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) | 1582098 | Trifluralin |
| 50000 | Formaldehyde | 540841 | 2,2,4-Trimethylpentane |
| 76448 | Heptachlor | 108054 | Vinyl acetate |
| 118741 | Hexachlorobenzene | 593602 | Vinyl bromide |
| 87683 | Hexachlorobutadiene | 75014 | Vinyl chloride |
| 77474 | Hexachlorocyclopentadiene | 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 67721 | Hexachloroethane | 1330207 | Xylenes (isomers and mixture) |
| 822060 | Hexamethylene-1,6-diisocyanate | 95476 | o-Xylenes |
| 680319 | Hexamethylphosphoramide | 108383 | m-Xylenes |
| 110543 | Hexane | 106423 | p-Xylenes |
| 302012 | Hydrazine | 0 | Antimony Compounds |
| 7647010 | Hydrochloric acid | 0 | Arsenic Compounds (inorganic including arsine) |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) | 0 | Beryllium Compounds |
| 123319 | Hydroquinone | 0 | Cadmium Compounds |
| 78591 | Isophorone | | |

| CAS number | Chemical name |
|---|---|
| 0 | Chromium Compounds |
| 0 | Cobalt Compounds |
| 0 | Coke Oven Emissions |
| 0 | Cyanide Compounds [1] |
| 0 | Glycol ethers [2] |
| 0 | Lead Compounds |
| 0 | Manganese Compounds |
| 0 | Mercury Compounds |
| 0 | Fine mineral fibers [3] |
| 0 | Nickel Compounds |
| 0 | Polycyclic Organic Matter [4] |
| 0 | Radionuclides (including radon) [5] |
| 0 | Selenium Compounds |

NOTE: For all listings above which contain the word ''compounds'' and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] 'X'CN where X = H' or any other group where a formal dissociation may occur. For example KCN or $Ca(CN)_2$.

[2] Includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol $R–(OCH2CH2)_n–OR'$ where

n = 1, 2, or 3

R = alkyl or aryl groups

R' = R, H, or groups which, when removed, yield glycol ethers with the structure: $R–(OCH2CH)_n–OH$. Polymers are excluded from the glycol category.

[3] Includes mineral fiber emissions from facilities manufacturing or processing glass, rock, or slag fibers (or other mineral derived fibers) of average diameter 1 micrometer or less.

[4] Includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C.

[5] A type of atom which spontaneously undergoes radioactive decay.

### (2) Revision of the list

The Administrator shall periodically review the list established by this subsection and publish the results thereof and, where appropriate, revise such list by rule, adding pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise, but not including releases subject to regulation under subsection (r) as a result of emissions to the air. No air pollutant which is listed under section 7408(a) of this title may be added to the list under this section, except that the prohibition of this sentence shall not apply to any pollutant which independently meets the listing criteria of this paragraph and is a precursor to a pollutant which is listed under section 7408(a) of this title or to any pollutant which is in a class of pollutants listed under such section. No substance, practice, process or activity regulated under subchapter VI of this chapter shall be subject to regulation under this section solely due to its adverse effects on the environment.

### (3) Petitions to modify the list

(A) Beginning at any time after 6 months after November 15, 1990, any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance or, in case of listed pollutants without CAS numbers (other than coke oven emissions, mineral fibers, or polycyclic organic matter) removing certain unique substances. Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision. Any such petition shall include a showing by the petitioner that there is adequate data on the health or environmental defects [2] of the pollutant or other evidence adequate to support the petition. The Administrator may not deny a petition solely on the basis of inadequate resources or time for review.

(B) The Administrator shall add a substance to the list upon a showing by the petitioner or on the Administrator's own determination that the substance is an air pollutant and that emissions, ambient concentrations, bioaccumulation or deposition of the substance are known to cause or may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects.

(C) The Administrator shall delete a substance from the list upon a showing by the petitioner or on the Administrator's own determination that there is adequate data on the health and environmental effects of the substance to determine that emissions, ambient concentrations, bioaccumulation or deposition of the substance may not reasonably be anticipated to cause any adverse effects to the human health or adverse environmental effects.

(D) The Administrator shall delete one or more unique chemical substances that contain a listed hazardous air pollutant not having a CAS number (other than coke oven emissions, mineral fibers, or polycyclic organic matter) upon a showing by the petitioner or on the Administrator's own determination that such unique chemical substances that contain the named chemical of such listed hazardous air pollutant meet the deletion requirements of subparagraph (C). The Administrator must grant or deny a deletion petition prior to promulgating any emission standards pursuant to subsection (d) applicable to any source category or subcategory of a listed hazardous air pollutant without a CAS number listed under subsection (b) for which a deletion petition has been filed within 12 months of November 15, 1990.

### (4) Further information

If the Administrator determines that information on the health or environmental effects of a substance is not sufficient to make a determination required by this subsection, the Administrator may use any authority available to the Administrator to acquire such information.

### (5) Test methods

The Administrator may establish, by rule, test measures and other analytic procedures

[2] So in original. Probably should be ''effects''.

for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants.

**(6) Prevention of significant deterioration**

The provisions of part C (prevention of significant deterioration) shall not apply to pollutants listed under this section.

**(7) Lead**

The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.

**(c) List of source categories**

**(1) In general**

Not later than 12 months after November 15, 1990, the Administrator shall publish, and shall from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information, a list of all categories and subcategories of major sources and area sources (listed under paragraph (3)) of the air pollutants listed pursuant to subsection (b). To the extent practicable, the categories and subcategories listed under this subsection shall be consistent with the list of source categories established pursuant to section 7411 of this title and part C. Nothing in the preceding sentence limits the Administrator's authority to establish subcategories under this section, as appropriate.

**(2) Requirement for emissions standards**

For the categories and subcategories the Administrator lists, the Administrator shall establish emissions standards under subsection (d), according to the schedule in this subsection and subsection (e).

**(3) Area sources**

The Administrator shall list under this subsection each category or subcategory of area sources which the Administrator finds presents a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under this section. The Administrator shall, not later than 5 years after November 15, 1990, and pursuant to subsection (k)(3)(B), list, based on actual or estimated aggregate emissions of a listed pollutant or pollutants, sufficient categories or subcategories of area sources to ensure that area sources representing 90 percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section. Such regulations shall be promulgated not later than 10 years after November 15, 1990.

**(4) Previously regulated categories**

The Administrator may, in the Administrator's discretion, list any category or subcategory of sources previously regulated under this section as in effect before November 15, 1990.

**(5) Additional categories**

In addition to those categories and subcategories of sources listed for regulation pursuant to paragraphs (1) and (3), the Adminis-

trator may at any time list additional categories and subcategories of sources of hazardous air pollutants according to the same criteria for listing applicable under such paragraphs. In the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emission standards under subsection (d) for the category or subcategory shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category or subcategory is listed, whichever is later.

**(6) Specific pollutants**

With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4). Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

**(7) Research facilities**

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, "research or laboratory facility" means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

**(8) Boat manufacturing**

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

**(9) Deletions from the list**

(A) Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3).

(B) The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

(i) In the case of hazardous air pollutants emitted by sources in the category that may

result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

(ii) In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

**(d) Emission standards**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) in accordance with the schedules provided in subsections (c) and (e). The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) as the result of the authority provided by this sentence.

**(2) Standards and methods**

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which—

(A) reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

(B) enclose systems or processes to eliminate emissions,

(C) collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

(D) are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h), or

(E) are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

**(3) New and existing sources**

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than—

(A) the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

(B) the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

**(4) Health threshold**

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

**(5) Alternative standard for area sources**

With respect only to categories and subcategories of area sources listed pursuant to subsection (c), the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f), elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

**(6) Review and revision**

The Administrator shall review, and revise as necessary (taking into account develop-

ments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D, or other authority of this chapter or a standard issued under State authority.

**(8) Coke ovens**

(A) Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate—

(i) the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

(ii) as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

(B) The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate—

(i) the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

(ii) door and jam cleaning practices.

Notwithstanding subsection (i), the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

(C) For coke oven batteries electing to qualify for an extension of the compliance date for standards promulgated under subsection (f) in accordance with subsection (i)(8), the emission standards under this subsection for coke oven batteries shall require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

**(9) Sources licensed by the Nuclear Regulatory Commission**

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act [42 U.S.C. 2011 et seq.] for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

**(10) Effective date**

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

**(e) Schedule for standards and review**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) as expeditiously as practicable, assuring that—

(A) emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

(B) emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

(C) emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

(D) emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

(E) emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

**(2) Priorities**

In determining priorities for promulgating standards under subsection (d), the Administrator shall consider—

(A) the known or anticipated adverse effects of such pollutants on public health and the environment;

(B) the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

(C) the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

**(3) Published schedule**

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

**(4) Judicial review**

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) or listing a source category or subcategory under subsection (c) shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

**(5) Publicly owned treatment works**

The Administrator shall promulgate standards pursuant to subsection (d) applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act [33 U.S.C. 1281 et seq.]) not later than 5 years after November 15, 1990.

**(f) Standard to protect health and environment**

**(1) Report**

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on—

(A) methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d);

(B) the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

(C) the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

(D) recommendations as to legislation regarding such remaining risk.

**(2) Emission standards**

(A) If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d), promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

(B) Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

(C) The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

**(3) Effective date**

Any emission standard established pursuant to this subsection shall become effective upon promulgation.

**(4) Prohibition**

No air pollutant to which a standard under this subsection applies may be emitted from

any stationary source in violation of such standard, except that in the case of an existing source—

(A) such standard shall not apply until 90 days after its effective date, and

(B) the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

**(5) Area sources**

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) and for which an emission standard is promulgated pursuant to subsection (d)(5).

**(6) Unique chemical substances**

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.

**(g) Modifications**

**(1) Offsets**

(A) A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.

(B) The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) sufficient to facilitate the offset showing authorized by subparagraph (A). Such guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

**(2) Construction, reconstruction and modifications**

(A) After the effective date of a permit program under subchapter V in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

(B) After the effective date of a permit program under subchapter V in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

**(3) Procedures for modifications**

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

**(h) Work practice standards and other requirements**

**(1) In general**

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f). In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2) Definition**

For the purpose of this subsection, the phrase ''not feasible to prescribe or enforce an emission standard'' means any situation in which the Administrator determines that—

(A) a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

(B) the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

**(3) Alternative standard**

If after notice and opportunity for comment, the owner or operator of any source estab-

lishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4) Numerical standard required**

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

**(i) Schedule for compliance**

**(1) Preconstruction and operating requirements**

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

**(2) Special rule**

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if—

(A) the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

(B) the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

**(3) Compliance schedule for existing sources**

(A) After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

(B) The Administrator (or a State with a program approved under subchapter V) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under sub-

section (d) if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations, if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b).

**(4) Presidential exemption**

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(5) Early reduction**

(A) The Administrator (or a State acting pursuant to a permit program approved under subchapter V) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

(B) An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

(C) The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

(D) For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to subsection (f) and the Administrator shall, for the purpose of determining whether a standard under subsection (f) is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

(E) With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

**(6) Other reductions**

Notwithstanding the requirements of this section, no existing source that has installed—

(A) best available control technology (as defined in section 7479(3) of this title), or

(B) technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

**(7) Extension for new sources**

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) shall not be required to comply with the emission standard under subsection (f) until the date 10 years after the date construction or reconstruction is commenced.

**(8) Coke ovens**

(A) Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C), subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) until January 1, 2020.

(B)(i) Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than—

(I) 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

(II) 1 per centum leaking lids;

(III) 4 per centum leaking offtakes; and

(IV) 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

(ii) If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be—

(I) 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

(II) 1 per centum leaking lids;

(III) 4 per centum leaking offtakes; and

(IV) 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

(C) Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission

limitations for existing coke oven batteries shall be January 1, 2010.

(D) At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under subsection (f) with respect to such coke oven battery as of January 1, 2003. If no such emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) for such coke oven battery.

(E) Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f).

(F) Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

### (j) Equivalent emission limitation by permit

#### (1) Effective date

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V in such State, but not prior to the date 42 months after November 15, 1990.

#### (2) Failure to promulgate a standard

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3), and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

#### (3) Applications

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a vio-

lation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

#### (4) Review and approval

Permit applications submitted under this subsection shall be reviewed and approved or disapproved according to the provisions of section 7661d of this title. In the event that the Administrator (or the State) disapproves a permit application submitted under this subsection or determines that the application is incomplete, the applicant shall have up to 6 months to revise the application to meet the objections of the Administrator (or the State).

#### (5) Emission limitation

The permit shall be issued pursuant to subchapter V and shall contain emission limitations for the hazardous air pollutants subject to regulation under this section and emitted by the source that the Administrator (or the State) determines, on a case-by-case basis, to be equivalent to the limitation that would apply to such source if an emission standard had been promulgated in a timely manner under subsection (d). In the alternative, if the applicable criteria are met, the permit may contain an emissions limitation established according to the provisions of subsection (i)(5). For purposes of the preceding sentence, the reduction required by subsection (i)(5)(A) shall be achieved by the date on which the relevant standard should have been promulgated under subsection (d). No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i).

#### (6) Applicability of subsequent standards

If the Administrator promulgates an emission standard that is applicable to the major source prior to the date on which a permit application is approved, the emission limitation in the permit shall reflect the promulgated standard rather than the emission limitation determined pursuant to paragraph (5), provided that the source shall have the compliance period provided under subsection (i). If the Administrator promulgates a standard under subsection (d) that would be applicable to the source in lieu of the emission limitation established by permit under this subsection after the date on which the permit has been issued, the Administrator (or the State) shall revise such permit upon the next renewal to reflect the standard promulgated by the Administrator providing such source a reasonable time to comply, but no longer than 8 years after such standard is promulgated or 8

years after the date on which the source is first required to comply with the emissions limitation established by paragraph (5), whichever is earlier.

**(k) Area source program**

**(1) Findings and purpose**

The Congress finds that emissions of hazardous air pollutants from area sources may individually, or in the aggregate, present significant risks to public health in urban areas. Considering the large number of persons exposed and the risks of carcinogenic and other adverse health effects from hazardous air pollutants, ambient concentrations characteristic of large urban areas should be reduced to levels substantially below those currently experienced. It is the purpose of this subsection to achieve a substantial reduction in emissions of hazardous air pollutants from area sources and an equivalent reduction in the public health risks associated with such sources including a reduction of not less than 75 per centum in the incidence of cancer attributable to emissions from such sources.

**(2) Research program**

The Administrator shall, after consultation with State and local air pollution control officials, conduct a program of research with respect to sources of hazardous air pollutants in urban areas and shall include within such program—

(A) ambient monitoring for a broad range of hazardous air pollutants (including, but not limited to, volatile organic compounds, metals, pesticides and products of incomplete combustion) in a representative number of urban locations;

(B) analysis to characterize the sources of such pollution with a focus on area sources and the contribution that such sources make to public health risks from hazardous air pollutants; and

(C) consideration of atmospheric transformation and other factors which can elevate public health risks from such pollutants.

Health effects considered under this program shall include, but not be limited to, carcinogenicity, mutagenicity, teratogenicity, neurotoxicity, reproductive dysfunction and other acute and chronic effects including the role of such pollutants as precursors of ozone or acid aerosol formation. The Administrator shall report the preliminary results of such research not later than 3 years after November 15, 1990.

**(3) National strategy**

(A) Considering information collected pursuant to the monitoring program authorized by paragraph (2), the Administrator shall, not later than 5 years after November 15, 1990, and after notice and opportunity for public comment, prepare and transmit to the Congress a comprehensive strategy to control emissions of hazardous air pollutants from area sources in urban areas.

(B) The strategy shall—

(i) identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas and that are or will be listed pursuant to subsection (b), and

(ii) identify the source categories or subcategories emitting such pollutants that are or will be listed pursuant to subsection (c). When identifying categories and subcategories of sources under this subparagraph, the Administrator shall assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards pursuant to subsection (d).

(C) The strategy shall include a schedule of specific actions to substantially reduce the public health risks posed by the release of hazardous air pollutants from area sources that will be implemented by the Administrator under the authority of this or other laws (including, but not limited to, the Toxic Substances Control Act [15 U.S.C. 2601 et seq.], the Federal Insecticide, Fungicide and Rodenticide Act [7 U.S.C. 136 et seq.] and the Resource Conservation and Recovery Act [42 U.S.C. 6901 et seq.]) or by the States. The strategy shall achieve a reduction in the incidence of cancer attributable to exposure to hazardous air pollutants emitted by stationary sources of not less than 75 per centum, considering control of emissions of hazardous air pollutants from all stationary sources and resulting from measures implemented by the Administrator or by the States under this or other laws.

(D) The strategy may also identify research needs in monitoring, analytical methodology, modeling or pollution control techniques and recommendations for changes in law that would further the goals and objectives of this subsection.

(E) Nothing in this subsection shall be interpreted to preclude or delay implementation of actions with respect to area sources of hazardous air pollutants under consideration pursuant to this or any other law and that may be promulgated before the strategy is prepared.

(F) The Administrator shall implement the strategy as expeditiously as practicable assuring that all sources are in compliance with all requirements not later than 9 years after November 15, 1990.

(G) As part of such strategy the Administrator shall provide for ambient monitoring and emissions modeling in urban areas as appropriate to demonstrate that the goals and objectives of the strategy are being met.

**(4) Areawide activities**

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants

emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

**(5) Report**

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

**(l) State programs**

**(1) In general**

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r). A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

**(2) Guidance**

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b).

**(3) Technical assistance**

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health

and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

**(4) Grants**

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k).

**(5) Approval or disapproval**

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that—

(A) the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

(B) adequate authority does not exist, or adequate resources are not available, to implement the program;

(C) the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

(D) the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

**(6) Withdrawal**

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The

Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

**(7) Authority to enforce**

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

**(8) Local program**

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

**(9) Permit authority**

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V.

**(m) Atmospheric deposition to Great Lakes and coastal waters**

**(1) Deposition assessment**

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall—

(A) monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

(B) investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

(C) conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

(D) evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act [33 U.S.C. 1251 et seq.] and drinking water standards established pursuant to the Safe Drinking Water Act [42 U.S.C. 300f et seq.]; and

(E) sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

**(2) Great Lakes monitoring network**

The Administrator shall oversee, in accordance with Annex 15 of the Great Lakes Water Quality Agreement, the establishment and operation of a Great Lakes atmospheric deposition network to monitor atmospheric deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) to the Great Lakes.

(A) As part of the network provided for in this paragraph, and not later than December 31, 1991, the Administrator shall establish in each of the 5 Great Lakes at least 1 facility capable of monitoring the atmospheric deposition of hazardous air pollutants in both dry and wet conditions.

(B) The Administrator shall use the data provided by the network to identify and track the movement of hazardous air pollutants through the Great Lakes, to determine the portion of water pollution loadings attributable to atmospheric deposition of such pollutants, and to support development of remedial action plans and other management plans as required by the Great Lakes Water Quality Agreement.

(C) The Administrator shall assure that the data collected by the Great Lakes atmospheric deposition monitoring network is in a format compatible with databases sponsored by the International Joint Commission, Canada, and the several States of the Great Lakes region.

**(3) Monitoring for the Chesapeake Bay and Lake Champlain**

The Administrator shall establish at the Chesapeake Bay and Lake Champlain atmospheric deposition stations to monitor deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) within the Chesapeake Bay and Lake Champlain watersheds. The Administrator shall determine the role of air deposition in the pollutant loadings of the Chesapeake Bay and Lake Champlain, investigate the sources of air pollutants deposited in the watersheds, evaluate the health and environmental effects of such pollutant loadings, and shall sample such pollutants in biota, fish and wildlife within the watersheds, as necessary to characterize such effects.

**(4) Monitoring for coastal waters**

The Administrator shall design and deploy atmospheric deposition monitoring networks for coastal waters and their watersheds and shall make any information collected through such networks available to the public. As part of this effort, the Administrator shall conduct research to develop and improve deposition monitoring methods, and to determine the relative contribution of atmospheric pollutants to pollutant loadings. For purposes of this subsection, "coastal waters" shall mean estuaries selected pursuant to section 320(a)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. 1330(a)(2)(A)] or listed pursuant to section 320(a)(2)(B) of such Act [33 U.S.C. 1330(a)(2)(B)] or estuarine research reserves designated pursuant to section 1461 of title 16.

**(5) Report**

Within 3 years of November 15, 1990, and biennially thereafter, the Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall submit to the Congress a report on the results of any monitoring, studies, and investigations conducted pursuant to this subsection. Such report shall include, at a minimum, an assessment of—

(A) the contribution of atmospheric deposition to pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

(B) the environmental and public health effects of any pollution which is attributable to atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

(C) the source or sources of any pollution to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters which is attributable to atmospheric deposition;

(D) whether pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain or coastal waters cause or contribute to exceedances of drinking water standards pursuant to the Safe Drinking Water Act [42 U.S.C. 300f et seq.] or water quality standards pursuant to the Federal Water Pollution Control Act [33 U.S.C. 1251 et seq.] or, with respect to the Great Lakes, exceedances of the specific objectives of the Great Lakes Water Quality Agreement; and

(E) a description of any revisions of the requirements, standards, and limitations pursuant to this chapter and other applicable Federal laws as are necessary to assure protection of human health and the environment.

**(6) Additional regulation**

As part of the report to Congress, the Administrator shall determine whether the other provisions of this section are adequate to prevent serious adverse effects to public health and serious or widespread environmental effects, including such effects resulting from indirect exposure pathways, associated with atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters of hazardous air pollutants (and their atmospheric transformation products). The Administrator shall take into consideration the tendency of such pollutants to bioaccumulate. Within 5 years after November 15, 1990, the Administrator shall, based on such report and determination, promulgate, in accordance with this section, such further emission standards or control measures as may be necessary and appropriate to prevent such effects, including effects due to bioaccumulation and indirect exposure pathways. Any requirements promulgated pursuant to this paragraph with respect to coastal waters shall only apply to the coastal waters of the States which are subject to section 7627(a) of this title.

**(n) Other provisions**

**(1) Electric utility steam generating units**

(A) The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.

(B) The Administrator shall conduct, and transmit to the Congress not later than 4 years after November 15, 1990, a study of mercury emissions from electric utility steam generating units, municipal waste combustion units, and other sources, including area sources. Such study shall consider the rate and mass of such emissions, the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies.

(C) The National Institute of Environmental Health Sciences shall conduct, and transmit to the Congress not later than 3 years after November 15, 1990, a study to determine the threshold level of mercury exposure below which adverse human health effects are not expected to occur. Such study shall include a threshold for mercury concentrations in the tissue of fish which may be consumed (including consumption by sensitive populations) without adverse effects to public health.

**(2) Coke oven production technology study**

(A) The Secretary of the Department of Energy and the Administrator shall jointly undertake a 6-year study to assess coke oven production emission control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities. In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens as well as alternatives to existing coke oven production design.

(B) The Secretary and the Administrator are authorized to enter into agreements with persons who propose to develop, install and operate coke production emission control technologies which have the potential for significant emissions reductions of hazardous air pollutants provided that Federal funds shall not exceed 50 per centum of the cost of any project assisted pursuant to this paragraph.

(C) On completion of the study, the Secretary shall submit to Congress a report on the results of the study and shall make recommendations to the Administrator identifying practicable and economically viable control technologies for coke oven production facili-

ties to reduce residual risks remaining after implementation of the standard under subsection (d).

(D) There are authorized to be appropriated $5,000,000 for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph.

**(3) Publicly owned treatment works**

The Administrator may conduct, in cooperation with the owners and operators of publicly owned treatment works, studies to characterize emissions of hazardous air pollutants emitted by such facilities, to identify industrial, commercial and residential discharges that contribute to such emissions and to demonstrate control measures for such emissions. When promulgating any standard under this section applicable to publicly owned treatment works, the Administrator may provide for control measures that include pretreatment of discharges causing emissions of hazardous air pollutants and process or product substitutions or limitations that may be effective in reducing such emissions. The Administrator may prescribe uniform sampling, modeling and risk assessment methods for use in implementing this subsection.

**(4) Oil and gas wells; pipeline facilities**

(A) Notwithstanding the provisions of subsection (a), emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units, whether or not such units are in a contiguous area or under common control, to determine whether such units or stations are major sources, and in the case of any oil or gas exploration or production well (with its associated equipment), such emissions shall not be aggregated for any purpose under this section.

(B) The Administrator shall not list oil and gas production wells (with its associated equipment) as an area source category under subsection (c), except that the Administrator may establish an area source category for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, if the Administrator determines that emissions of hazardous air pollutants from such wells present more than a negligible risk of adverse effects to public health.

**(5) Hydrogen sulfide**

The Administrator is directed to assess the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources. To the extent practicable, the assessment shall build upon and not duplicate work conducted for an assessment pursuant to section 8002(m) of the Solid Waste Disposal Act [42 U.S.C. 6982(m)] and shall reflect consultation with the States. The assessment shall include a review of existing State and industry control standards, techniques and enforcement. The Administrator shall report to the Congress within 24 months after November 15, 1990, with the findings of

such assessment, together with any recommendations, and shall, as appropriate, develop and implement a control strategy for emissions of hydrogen sulfide to protect human health and the environment, based on the findings of such assessment, using authorities under this chapter including sections[3] 7411 of this title and this section.

**(6) Hydrofluoric acid**

Not later than 2 years after November 15, 1990, the Administrator shall, for those regions of the country which do not have comprehensive health and safety regulations with respect to hydrofluoric acid, complete a study of the potential hazards of hydrofluoric acid and the uses of hydrofluoric acid in industrial and commercial applications to public health and the environment considering a range of events including worst-case accidental releases and shall make recommendations to the Congress for the reduction of such hazards, if appropriate.

**(7) RCRA facilities**

In the case of any category or subcategory of sources the air emissions of which are regulated under subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6921 et seq.], the Administrator shall take into account any regulations of such emissions which are promulgated under such subtitle and shall, to the maximum extent practicable and consistent with the provisions of this section, ensure that the requirements of such subtitle and this section are consistent.

**(o) National Academy of Sciences study**

**(1) Request of the Academy**

Within 3 months of November 15, 1990, the Administrator shall enter into appropriate arrangements with the National Academy of Sciences to conduct a review of—

(A) risk assessment methodology used by the Environmental Protection Agency to determine the carcinogenic risk associated with exposure to hazardous air pollutants from source categories and subcategories subject to the requirements of this section; and

(B) improvements in such methodology.

**(2) Elements to be studied**

In conducting such review, the National Academy of Sciences should consider, but not be limited to, the following—

(A) the techniques used for estimating and describing the carcinogenic potency to humans of hazardous air pollutants; and

(B) the techniques used for estimating exposure to hazardous air pollutants (for hypothetical and actual maximally exposed individuals as well as other exposed individuals).

**(3) Other health effects of concern**

To the extent practicable, the Academy shall evaluate and report on the methodology for assessing the risk of adverse human health effects other than cancer for which safe thresholds of exposure may not exist, includ-

---

[3] So in original. Probably should be "section".

ing, but not limited to, inheritable genetic mutations, birth defects, and reproductive dysfunctions.

**(4) Report**

A report on the results of such review shall be submitted to the Senate Committee on Environment and Public Works, the House Committee on Energy and Commerce, the Risk Assessment and Management Commission established by section 303 of the Clean Air Act Amendments of 1990 and the Administrator not later than 30 months after November 15, 1990.

**(5) Assistance**

The Administrator shall assist the Academy in gathering any information the Academy deems necessary to carry out this subsection. The Administrator may use any authority under this chapter to obtain information from any person, and to require any person to conduct tests, keep and produce records, and make reports respecting research or other activities conducted by such person as necessary to carry out this subsection.

**(6) Authorization**

Of the funds authorized to be appropriated to the Administrator by this chapter, such amounts as are required shall be available to carry out this subsection.

**(7) Guidelines for carcinogenic risk assessment**

The Administrator shall consider, but need not adopt, the recommendations contained in the report of the National Academy of Sciences prepared pursuant to this subsection and the views of the Science Advisory Board, with respect to such report. Prior to the promulgation of any standard under subsection (f), and after notice and opportunity for comment, the Administrator shall publish revised Guidelines for Carcinogenic Risk Assessment or a detailed explanation of the reasons that any recommendations contained in the report of the National Academy of Sciences will not be implemented. The publication of such revised Guidelines shall be a final Agency action for purposes of section 7607 of this title.

**(p) Mickey Leland National Urban Air Toxics Research Center**

**(1) Establishment**

The Administrator shall oversee the establishment of a National Urban Air Toxics Research Center, to be located at a university, a hospital, or other facility capable of undertaking and maintaining similar research capabilities in the areas of epidemiology, oncology, toxicology, pulmonary medicine, pathology, and biostatistics. The center shall be known as the Mickey Leland National Urban Air Toxics Research Center. The geographic site of the National Urban Air Toxics Research Center should be further directed to Harris County, Texas, in order to take full advantage of the well developed scientific community presence on-site at the Texas Medical Center as well as the extensive data previously compiled for the comprehensive monitoring system currently in place.

**(2) Board of Directors**

The National Urban Air Toxics Research Center shall be governed by a Board of Directors to be comprised of 9 members, the appointment of which shall be allocated pro rata among the Speaker of the House, the Majority Leader of the Senate and the President. The members of the Board of Directors shall be selected based on their respective academic and professional backgrounds and expertise in matters relating to public health, environmental pollution and industrial hygiene. The duties of the Board of Directors shall be to determine policy and research guidelines, submit views from center sponsors and the public and issue periodic reports of center findings and activities.

**(3) Scientific Advisory Panel**

The Board of Directors shall be advised by a Scientific Advisory Panel, the 13 members of which shall be appointed by the Board, and to include eminent members of the scientific and medical communities. The Panel membership may include scientists with relevant experience from the National Institute of Environmental Health Sciences, the Center for Disease Control, the Environmental Protection Agency, the National Cancer Institute, and others, and the Panel shall conduct peer review and evaluate research results. The Panel shall assist the Board in developing the research agenda, reviewing proposals and applications, and advise on the awarding of research grants.

**(4) Funding**

The center shall be established and funded with both Federal and private source funds.

**(q) Savings provision**

**(1) Standards previously promulgated**

Any standard under this section in effect before the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990] shall remain in force and effect after such date unless modified as provided in this section before the date of enactment of such Amendments or under such Amendments. Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before such date shall not be affected by such Amendments unless modified as provided in this section before such date or under such Amendments. Each such standard shall be reviewed and, if appropriate, revised, to comply with the requirements of subsection (d) within 10 years after the date of enactment of the Clean Air Act Amendments of 1990. If a timely petition for review of any such standard under section 7607 of this title is pending on such date of enactment, the standard shall be upheld if it complies with this section as in effect before that date. If any such standard is remanded to the Administrator, the Administrator may in the Administrator's discretion apply either the requirements of this section, or those of this section as in effect before the date of enactment of the Clean Air Act Amendments of 1990.

**(2) Special rule**

Notwithstanding paragraph (1), no standard shall be established under this section, as amended by the Clean Air Act Amendments of 1990, for radionuclide emissions from (A) elemental phosphorous plants, (B) grate calcination elemental phosphorous plants, (C) phosphogypsum stacks, or (D) any subcategory of the foregoing. This section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], shall remain in effect for radionuclide emissions from such plants and stacks.

**(3) Other categories**

Notwithstanding paragraph (1), this section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], shall remain in effect for radionuclide emissions from non-Department of Energy Federal facilities that are not licensed by the Nuclear Regulatory Commission, coal-fired utility and industrial boilers, underground uranium mines, surface uranium mines, and disposal of uranium mill tailings piles, unless the Administrator, in the Administrator's discretion, applies the requirements of this section as modified by the Clean Air Act Amendments of 1990 to such sources of radionuclides.

**(4) Medical facilities**

Notwithstanding paragraph (1), no standard promulgated under this section prior to November 15, 1990, with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990, unless the Administrator makes a determination pursuant to a rulemaking under subsection (d)(9). If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of this section shall fully apply to such facilities. If the Administrator determines that such regulatory program does provide an ample margin of safety to protect the public health, the Administrator is not required to promulgate a standard under this section for such facilities, as provided in subsection (d)(9).

**(r) Prevention of accidental releases**

**(1) Purpose and general duty**

It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance. The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as section 654 of title 29 to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur. For purposes of this

paragraph, the provisions of section 7604 of this title shall not be available to any person or otherwise be construed to be applicable to this paragraph. Nothing in this section shall be interpreted, construed, implied or applied to create any liability or basis for suit for compensation for bodily injury or any other injury or property damages to any person which may result from accidental releases of such substances.

**(2) Definitions**

(A) The term "accidental release" means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

(B) The term "regulated substance" means a substance listed under paragraph (3).

(C) The term "stationary source" means any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur.

(D) The term "retail facility" means a stationary source at which more than one-half of the income is obtained from direct sales to end users or at which more than one-half of the fuel sold, by volume, is sold through a cylinder exchange program.

**(3) List of substances**

The Administrator shall promulgate not later than 24 months after November 15, 1990, an initial list of 100 substances which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment. For purposes of promulgating such list, the Administrator shall use, but is not limited to, the list of extremely hazardous substances published under the Emergency Planning and Community Right-to-Know[4] Act of 1986 [42 U.S.C. 11001 et seq.], with such modifications as the Administrator deems appropriate. The initial list shall include chlorine, anhydrous ammonia, methyl chloride, ethylene oxide, vinyl chloride, methyl isocyanate, hydrogen cyanide, ammonia, hydrogen sulfide, toluene diisocyanate, phosgene, bromine, anhydrous hydrogen chloride, hydrogen fluoride, anhydrous sulfur dioxide, and sulfur trioxide. The initial list shall include at least 100 substances which pose the greatest risk of causing death, injury, or serious adverse effects to human health or the environment from accidental releases. Regulations establishing the list shall include an explanation of the basis for establishing the list. The list may be revised from time to time by the Administrator on the Administrator's own motion or by petition and shall be reviewed at least every 5 years. No air pollutant for which a national primary ambient air quality standard has been established shall be included on any such list. No substance, practice, process, or activity regulated

_____
[4]So in original. Probably should be "Right-To-Know".

need for revision, or implementation of any plan or plan revision required under this Act.".

(e) NEW SOURCE STANDARDS OF PERFORMANCE.—(1) Section 111(b)(1)(B) of the Clean Air Act (42 U.S.C. 7411(b)(1)(B)) is amended as follows:

(A) Strike "120 days" and insert "one year".

(B) Strike "90 days" and insert "one year".

(C) Strike "four years" and insert "8 years".

(D) Immediately before the sentence beginning "Standards of performance or revisions thereof" insert "Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard.".

(E) Add the following at the end: "When implementation and enforcement of any requirement of this Act indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.".

(2) Section 111(f)(1) of the Clean Air Act (42 U.S.C. 7411(f)(1)) is amended to read as follows:

"(1) For those categories of major stationary sources that the Administrator listed under subsection (b)(1)(A) before the date of the enactment of the Clean Air Act Amendments of 1990 and for which regulations had not been proposed by the Administrator by such date, the Administrator shall—    *Regulations.*

"(A) propose regulations establishing standards of performance for at least 25 percent of such categories of sources within 2 years after the date of the enactment of the Clean Air Act Amendments of 1990;

"(B) propose regulations establishing standards of performance for at least 50 percent of such categories of sources within 4 years after the date of the enactment of the Clean Air Act Amendments of 1990; and

"(C) propose regulations for the remaining categories of sources within 6 years after the date of the enactment of the Clean Air Act Amendments of 1990.".

(f) SAVINGS CLAUSE.—Section 111(a)(3) of the Clean Air Act (42 U.S.C. 7411(f)(1)) is amended by adding at the end: "Nothing in title II of this Act relating to nonroad engines shall be construed to apply to stationary internal combustion engines.".

(g) REGULATION OF EXISTING SOURCES.—Section 111(d)(1)(A)(i) of the Clean Air Act (42 U.S.C. 7411(d)(1)(A)(i)) is amended by striking "or 112(b)(1)(A)" and inserting "or emitted from a source category which is regulated under section 112".

(h) CONSULTATION.—The penultimate sentence of section 121 of the Clean Air Act (42 U.S.C. 7421) is amended to read as follows: "The Administrator shall update as necessary the original regulations required and promulgated under this section (as in effect immediately before the date of the enactment of the Clean Air Act Amendments of 1990) to ensure adequate consultation.".    *Regulations.*

(i) DELEGATION.—The second sentence of section 301(a)(1) of the Clean Air Act (42 U.S.C. 7601(a)(1)) is amended by inserting "subject to section 307(d)" immediately following "regulations".

and sources subject to the provisions of this section and shall include aggregate information from the database in each annual report. The report shall include, but not be limited to—

"(1) a status report on standard-setting under subsections (d) and (f);

"(2) information with respect to compliance with such standards including the costs of compliance experienced by sources in various categories and subcategories;

"(3) development and implementation of the national urban air toxics program; and

"(4) recommendations of the Chemical Safety and Hazard Investigation Board with respect to the prevention and mitigation of accidental releases.".

### SEC. 302. CONFORMING AMENDMENTS.

42 USC 7411.

(a) Section 111(d)(1) of the Clean Air Act is amended by striking "112(b)(1)(A)" and inserting in lieu thereof "112(b)".

(b) Section 111 of the Clean Air Act is amended by striking paragraphs (g)(5) and (g)(6) and redesignating the succeeding paragraphs accordingly. Such section is further amended by striking "or section 112" in paragraph (g)(5) as redesignated in the preceding sentence.

42 USC 7414.

(c) Section 114(a) of the Clean Air Act is amended by striking "or" after "section 111," and by inserting ", or any regulation of solid waste combustion under section 129," after "section 112".

42 USC 7418.

(d) Section 118(b) of the Clean Air Act is amended by striking "112(c)" and inserting in lieu thereof "112(i)(4)".

42 USC 7602.

(e) Section 302(k) of the Clean Air Act is amended by adding before the period at the end thereof ", and any design, equipment, work practice or operational standard promulgated under this Act.".

42 USC 7604.

(f) Section 304(b) of the Clean Air Act is amended by striking "112(c)(1)(B)" and inserting in lieu thereof "112(i)(3)(A) or (f)(4)".

42 USC 7607.

(g) Section 307(b)(1) is amended by striking "112(c)" and inserting in lieu thereof "112".

(h) Section 307(d)(1) is amended by inserting—

"(D) the promulgation of any requirement for solid waste combustion under section 129,"

after subparagraph (C) and redesignating the succeeding subparagraphs accordingly.

42 USC 7412 note.

### SEC. 303. RISK ASSESSMENT AND MANAGEMENT COMMISSION.

(a) ESTABLISHMENT.—There is hereby established a Risk Assessment and Management Commission (hereafter referred to in this section as the "Commission"), which shall commence proceedings not later than 18 months after the date of enactment of the Clean Air Act Amendments of 1990 and which shall make a full investigation of the policy implications and appropriate uses of risk assessment and risk management in regulatory programs under various Federal laws to prevent cancer and other chronic human health effects which may result from exposure to hazardous substances.

(b) CHARGE.—The Commission shall consider—

(1) the report of the National Academy of Sciences authorized by section 112(o) of the Clean Air Act, the use and limitations of risk assessment in establishing emission or effluent standards, ambient standards, exposure standards, acceptable concentration levels, tolerances or other environmental criteria for hazardous substances that present a risk of carcinogenic effects

stance acting alone. Yet current Government risk assessment policies do not take above-average sensitivity into account.

Likewise, some portion of the population is exposed to much higher levels of toxic chemicals due to their residential location, work exposure, food and water consumption, the co-location of pollution sources, and other factors. Current Government policies are inconsistent in taking these factors into account in order to assure that risk estimates represent the danger to the most exposed persons.

It is the intent of the managers in this legislation, as in all of the landmark public health and environmental protection laws, that protecting public health means protecting the health of the people who are most sensitive to and most exposed to toxic chemicals. The Commission shall bear this fundamental policy in mind in all of its studies and recommendations.

The PRESIDING OFFICER. Who yields time?

The Senator from Rhode Island.

Mr. CHAFEE. I yield 3 minutes to the distinguished Senator from California.

The PRESIDING OFFICER. The Senator from California.

Mr. WILSON. Mr. President, I will add to the swelling chorus of praise of those who have taken this bill over the long and arduous path to this moment when we are about to enact what I think will be truly a historic piece of legislation.

It is no secret that with others on this floor I sought amendments which would have strengthened it. I see the Senator from Colorado, with whom I fought one of those good fights. I think the happy thing is that in this two-House process, the final product, while perhaps not as strong as the Senator from Colorado and I might have wished, is nonetheless infinitely the best clean air bill that this country has ever seen. I am also persuaded that in the future we will find more and more a desire and a joining in the view that we have put forth on this floor that there is a need for America to move to alternative fuels, not simply because that will most dramatically clean our air but because it will remove the present dependency upon oil imports so sharply in focus because of the Persian Gulf crisis.

But there is much that we can be pleased about, and in a parochial way, on behalf of my fellow Californians, we are grateful for the wisdom of allowing a preemption in the Federal law that will allow California to be in the vanguard of what many regard as a great experiment to bring clean air to what is the most polluted air in this country. We are also aided in that by a provision which has transferred the authority for the regulation of ambient air quality over offshore rigs to the Environmental Protection Agency. It removes the inherent conflict of interest that was that of the Department of the Interior in seeking to impose a less stringent standard which inevitably became the ambient air quality onshore because of prevailing winds. The effect of that was inevitably to preclude greater opportunity for small businesses ashore to gain permits.

Mr. President, I particularly thank my friend from Rhode Island, who has been a pioneer in this area, and to say that he has been valiant and courageous and tenacious understates this man's role in crafting this legislation. But many have enjoyed a role. There has been given and take. I think it has been the best debate, certainly one of the best that I have seen in my time in the Senate, an honest debate between people from sharply differing points of view, a compromise reached that inevitably is going to mean a cleaner and healthier America. I commend them.

The PRESIDING OFFICER. Who yields time?

Mr. CHAFEE. Mr. President, I commend the Senator from California for his efforts in connection with two particular areas, the reduction of ozone around the country, of which he was particularly concerned, especially as it dealt with southern California, and also his vigorous efforts in curbing offshore oil rig emissions off the California coast, an area that is of deep concern to him. So he stayed there tenaciously in connection with those two particular areas and did outstanding work, and I think we and all Californians owe him a deep debt of gratitude.

Last night I had the opportunity to speak on this measure and thank those who were involved, but I do particularly want to talk, once again, about several people. First of all, the President, as we mentioned last evening, and the majority leader, who has been so active and tenacious over a long period of time, and obviously without his support and that of the President we would not be where we are; and my colleague and counterpart, Senator BAUCUS, who has really been remarkable in connection with this and a whole series of environmental measures. The key staff people we mentioned last evening, Mike Shields, but I also want to join in the tribute to Kate Kimball, who was remarkable in all her work, and Bob Hurley and Katie Kudlipp, Jimmie Powell, Steve Shimberg, Steve Roady, who have been absolutely superb.

Mr. President, you might say, well, the clean air bill looks like it is going to pass, and what do we do next?

Well, there are a whole series of environmental problems. We have not run out of challenges. We have cut disposal of waste, solid waste, and hazardous waste, particularly the toxics.

We have the interstate problems with hazardous waste and solid waste. We have the wetlands. We have endangered species. We have global warming, problems, that we are yet to face.

I am very very pleased that in this legislation we start trying to tackle the global warming problem. That, of course, is no connection with the ozone-depleting chemicals which are not only a great danger to the Nation and to the world because of the depletion of the ozone layer, but also the CFC's contribute about 20 percent to the whole global warming problem.

So, Mr. President, I am delighted that we have come this far, I look forward to completion of this. But I do not think anybody should think it is all over, and there are no challenges left. There is plenty of work left to do.

## CLEAN AIR ACT AMENDMENTS OF 1990 CHAFEE-BAUCUS STATEMENT OF SENATE MANAGERS

Mr. President, the conference report that is before us includes some 800 pages of legislative language and less than 40 pages—double spaced—of explanatory text. Due to time constraints, we do not have a particularly useful statement of managers.

To help rectify this problem, we have prepared a detailed explanation of five important titles. The explanation is in the form of a traditional statement of managers. It has not been reviewed or approved by all of the conferees but it is our best effort to provide the agency and the courts with the guidance that they will need in the course of implementing and interpreting this complex act.

The titles covered by the "Chafee-Baucus Statement of Senate Managers" are: title I on nonattainment; title II on mobile sources; title V on permits; title VI on stratospheric ozone; and title VII on enforcement.

Mr. President, I ask unanimous consent that this document be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

CHAFEE-BAUCUS STATEMENT OF SENATE MANAGERS, S. 1630, THE CLEAN AIR ACT AMENDMENTS OF 1990

Title I—Provisions for Attainment and Maintenance of National Ambient Air Quality Standards.

Title II—Mobile Sources.
Title V—Permits.
Title VI—Stratospheric Ozone Protection.
Title VII—Enforcement.

TITLE I—PROVISIONS FOR ATTAINMENT AND MAINTENANCE OF NATIONAL AMBIENT AIR QUALITY STANDARDS

Section 101—General Planning Requirements

*Senate bill.* In sections 101 and 104 the Senate bill amends the Clean Air Act with respect to processes for designating areas of the country based on air quality and with respect to requirements for preparation, contents, submittal, and review of State implementation plans.

USCA Case #19-1140    Document #1838666    Filed: 04/17/2020    Page 85 of 99

drops the terms "reasonable fees" and "charges" as an elaboration of the phrase "economic incentives".

(5) With respect to emissions from vessels, the conference agreement clarifies the types of vessels covered and the role and authority of the Coast Guard in assuring the safety of emissions control systems.

While the conference agreement gives priority to TSDFs for the establishment of a CTG, it does not intend to disrupt nor duplicate the EPA's ongoing efforts to set air emissions standards under section 3004(n) of the Solid Waste Disposal Act, in response to amendments to that Act passed in 1984. Nor does the conference agreement suggest that a lesser level of VOC control is appropriate in any area of the country. To the extent that criteria for CTGs under the Clean Air Act could result in a less stringent level of control than will be imposed under the Solid Waste Disposal Act, the standard for which is "necessary to protect human health and the environment," the Solid Waste Disposal Act standard should govern.

With respect to Federal regulation of consumer and commercial products, new section 183(e) of the Clean Air Act requires the Administrator to regulate categories which account for at least 80 percent of the VOC emissions, on a reactivity-adjusted basis, in ozone nonattainment areas. Credit toward the 80 percent threshold should be given to emission reductions from any consumer or commercial products made after enactment of the Clean Air Act Amendments of 1990, not solely from products that would otherwise be regulated. Subsection (e)(9) requires consultation with EPA when a State plans to regulate VOC emissions from consumer or commercial products. The provision is intended to create a clearinghouse of information to encourage national uniformity. It does not preempt or otherwise limit the national uniformity. It does not preempt or otherwise limit the authority of States to propose or adopt regulations affecting such products, either before or after EPA adopts regulations.

The conference agreement emphasizes the importance of implementation of reasonably available control technology in all nonattainment areas. The reference in section 182(a)(2) to guidance issued by EPA under section 108 of the Act is intended to cover control techniques guidelines, guidance on the applicability of RACT, and guidance covering the correction of deficiencies in State rules.

Section 182(b)(1)(A) requires ozone nonattainment areas to obtain a 15 percent reduction in VOC emissions within six years of enactment. These reductions are to be calculated from emissions levels in the year of enactment, and growth must be accounted for so that the required reductions from 1990 levels are actually achieved.

### Section 104—Additional Provisions for Carbon Monoxide Nonattainment Areas

*Senate bill.* Section 108 of the Senate bill provides for classification of carbon monoxide (CO) areas as moderate or serious, depending on the severity of CO pollution, deadlines for attaining the primary ambient air quality standard for CO, requirements applicable to nonattainment areas based on their classification, and consequences for failure to comply with requirements or meet applicable deadlines.

*House amendment.* The House amendment is similar to the Senate bill in structure and content but differs in several specific provisions.

*Conference agreement.* The Senate recedes to the House except that, by reference to the provisions in section 103 of the agreement, transportation control requirements applicable in severe ozone nonattainment areas—including the requirement applicable to employers of 100 or more employees—are also applied in serious CO nonattainment areas.

### Section 105—Additional Provisions for Particular Matters (PM-10) Nonattainment Areas

*Senate bill.* Section 109 of the Senate bill provides for classification of PM-10 areas based on the severity of pollution, deadlines for attaining the PM-10 primary standard, requirements applicable to PM-10 nonattainment areas depending on their classification, and consequences for failure to comply with requirements or meet deadlines.

*House amendment.* The House amendment is similar in structure and content to the Senate bill but differs in details.

*Conference agreement.* The Senate recedes to the House.

### Section 107 Provisions Related to Indian Tribes

*Senate bill.* Section 113 of the Senate bill authorizes the Administrator to treat Indian tribes as States under the Clean Air Act and requires the Administrator to issue regulations that specify which provisions of the Act may be administered by Indian tribes.

*House amendment.* The House amendment provides similar authority and directives to the Administrator regarding treatment of Indian tribes.

*Conference agreement.* The Senate recedes to the House.

### Section 108—Miscellaneous Provisions

*Senate bill.* Section 103 the Senate bill revises sections 108 (e) and (f) of the Clean Air Act to require the Administrator and the Secretary of Transportation to update air quality/transportation planning guidance and to add to the transportation control measures to be evaluated by the Administrator after consultation, when appropriate, with the Secretary.

*House amendment.* The House amendment contains a similar provision to the one in the Senate bill regarding amendments to section 108 of the Clean Air Act. In addition, the House amendment contains provisions for a technology clearinghouse to be established by the Administrator, for amending section 111 of the Clean Air Act relating to new and existing stationary sources, for amending section 302 of the Clean Air Act which contains definitions, to provide a savings clause, to state that reports that are to be submitted to Congress are not subject to judicial review, and for other purposes.

*Conference agreement.* The Senate recedes to the House except that with respect to the requirement regarding judicial review of reports, the House recedes to the Senate and with respect to transportation planning, the House recedes to the Senate with certain modifications.

In striking the provision in the House amendment that stated that reports to Congress are not judicially reviewable, the conferees recognized that the issue of whether the contents of reports are judicially reviewable has already been satisfactorily addressed by a court in *NRDC v. Hodel* (D.C. Cir. 1988), which found that report contents are not subject to such review. The House provision was deleted so that there would be

no doubt that the failure of the Administrator to submit reports in a timely manner is subject to judicial review.

In the language on transportation planning, the notice and comment requirements in sections 108 (e) and (f) do not create a formal, Administrative Procedure Act review requirement for the Administrator. The guidance to be issued under subsection (f) is guidance and not a regulation requiring a formal rulemaking process. However, EPA must provide public notice of its intent to issue guidance and solicit ideas and comments from State and local officials and other interested parties as the guidance is being prepared.

### Section 109—Interstate Pollution

*Senate bill.* In section 110 of the Senate bill amends section 126 and section 302(h) of the Clean Air Act to strengthen prohibitions on emissions that result in interstate pollution.

*House bill.* The House amendment is similar to the Senate provision.

*Conference agreement.* The Senate recedes to the house.

### Section 110—Conforming Amendments

*Senate bill.* No provision.

*House bill.* The House amendment contained provisions amending various sections in title I and title III of the Clean Air Act to conform to provisions elsewhere in the House amendment.

*Conference agreement.* The Senate recedes to the House.

## TITLE II—PROVISIONS RELATING TO MOBILE SOURCES

### Section 201—Heavy-Duty Trucks

*Senate bill.* The Senate bill codifies particulate matter standards for heavy-duty trucks scheduled to take effect in 1991 and 1994 under EPA regulations. The standard for oxides of nitrogen scheduled to take effect in 1991 would be codified, and tightened in 1998. Averaging credits for emissions reductions was allowed between engine families of the same manufacturer and among manufacturers.

*House amendment.* The House amendment does not specify standards for heavy duty trucks, rather it authorizes the Administrator of EPA to set technology-forcing emission standards, considering cost, energy, and safety factors.

*Conference agreement.* The conference agreement adopts the House provisions, modified to retain the Senate oxides of nitrogen ($NO_x$) standard for heavy-duty engines effective in model year 1998, and to reinstate the four year lead time and three year stability provisions in current law.

The conference agreement deletes language from the Senate bill that would have authorized EPA to establish regulations permitting heavy-duty engine manufacturers to undertake averaging, banking, or trading of emission reduction credits for particulate matter, nitrogen oxides, and other pollutants. It is the intent of the managers that the emission standards specified for heavy-duty engines in the final legislation shall be met without averaging, banking, or trading.

### Section 202—Control of Vehicle Refueling Emissions

*Senate bill.* The Senate bill requires all motor vehicles to be equipped with onboard devices capable of recapturing 95 percent of evaporative emissions during refueling. This provision takes effect in 1993 for light duty vehicles, and at the earliest feasible date, as determined by EPA, for other vehicles.

SAVINGS PROVISION

Section 16 of Pub. L. 91–604 provided that:

"(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

"(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

"(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter]."

FEDERAL ENERGY ADMINISTRATOR

The "Federal Energy Administrator", for purposes of this chapter, to mean the Administrator of the Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until the Federal Energy Administrator takes office and after the Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

The Federal Energy Administration was terminated and functions vested by law in the Administrator thereof were transferred to the Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 6211, 6215, 7405, 7407, 7411, 7413, 7414, 7415, 7419, 7420, 7425, 7426, 7475, 7476, 7491, 7501, 7502, 7504, 7506, 7545, 7607, 7613, 7619, 7625–1, 8374, 9601 of this title.

§ 7411. Standards of performance for new stationary sources

(a) Definitions

For purposes of this section:

(1) The term "standard of performance" means—

(A) with respect to any air pollutant emitted from a category of fossil fuel fired stationary sources to which subsection (b) of this section applies, a standard—

(i) establishing allowable emission limitations for such category of sources, and

(ii) requiring the achievement of a percentage reduction in the emissions from such category of sources from the emissions which would have resulted from the use of fuels which are not subject to treatment prior to combustion,

(B) with respect to any air pollutant emitted from a category of stationary sources (other than fossil fuel fired sources) to which subsection (b) of this section applies, a standard such as that referred to in subparagraph (A)(i); and

(C) with respect to any air pollutant emitted from a particular source to which subsection (d) of this section applies, a standard which the State (or the Administrator under the conditions specified in subsection (d)(2) of this section) determines is applicable to that source and which reflects the degree of emission reduction achievable through the application of the best system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated for that category of sources.

For the purpose of subparagraphs (A)(i) and (ii) and (B), a standard of performance shall reflect the degree of emission limitation and the percentage reduction achievable through application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. For the purpose of subparagraph (1)(A)(ii), any cleaning of the fuel or reduction in the pollution characteristics of the fuel after extraction and prior to combustion may be credited, as determined under regulations promulgated by the Administrator, to a source which burns such fuel.

(2) The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant.

(4) The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term "existing source" means any stationary source other than a new source.

(7) The term "technological system of continuous emission reduction" means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii) of this title, shall not be deemed to be a modification for purposes of paragraphs (2) and (4) of this subsection.

**(b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards**

(1)(A) The Administrator shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

(B) Within 120 days after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within 90 days after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every four years, review and, if appropriate, revise such standards following the procedure required by this subsection for promulgation of such standards. Standards of performance or revisions thereof shall become effective upon promulgation.

(2) The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards.

(3) The Administrator shall, from time to time, issue information on pollution control techniques for categories of new sources and air pollutants subject to the provisions of this section.

(4) The provisions of this section shall apply to any new source owned or operated by the United States.

(5) Except as otherwise authorized under subsection (h) of this section, nothing in this section shall be construed to require, or to authorize the Administrator to require, any new or modified source to install and operate any particular technological system of continuous emission reduction to comply with any new source standard of performance.

(6) The revised standards of performance required by enactment of subsection (a)(1)(A)(i) and (ii) of this section shall be promulgated not later than one year after August 7, 1977. Any new or modified fossil fuel fired stationary source which commences construction prior to the date of publication of the proposed revised standards shall not be required to comply with such revised standards.

**(c) State implementation and enforcement of standards of performance**

(1) Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located in such State. If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards.

(2) Nothing in this subsection shall prohibit the Administrator from enforcing any applicable standard of performance under this section.

**(d) Standards of performance for existing sources; remaining useful life of source**

(1) The Administrator shall prescribe regulations which shall establish a procedure similar to that provided by section 7410 of this title under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for any existing source for any air pollutant (i) for which air quality criteria have not been issued or which is not included on a list published under section 7408(a) or 7412(b)(1)(A) of this title but (ii) to which a standard of performance under this section would apply if such existing source were a new source, and (B) provides for the implementation and enforcement of such standards of performance. Regulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies.

(2) The Administrator shall have the same authority—

(A) to prescribe a plan for a State in cases where the State fails to submit a satisfactory plan as he would have under section 7410(c) of this title in the case of failure to submit an implementation plan, and

(B) to enforce the provisions of such plan in cases where the State fails to enforce them as he would have under sections 7413 and 7414 of this title with respect to an implementation plan.

In promulgating a standard of performance under a plan prescribed under this paragraph, the Administrator shall take into consideration, among other factors, remaining useful lives of the sources in the category of sources to which such standard applies.

**(e) Prohibited acts**

After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of

any new source to operate such source in violation of any standard of performance applicable to such source.

**(f) New source standards of performance**

(1) Not later than one year after August 7, 1977, the Administrator shall promulgate regulations listing under subsection (b)(1)(A) of this section the categories of major stationary sources which are not on August 7, 1977, included on the list required under subsection (b)(1)(A) of this section. The Administrator shall promulgate regulations establishing standards of performance for the percentage of such categories of sources set forth in the following table before the expiration of the corresponding period set forth in such table:

| Percentage of source categories required to be listed for which standards must be established: | Period by which standards must be promulgated after date list is required to be promulgated: |
|---|---|
| 25 | 2 years. |
| 75 | 3 years. |
| 100 | 4 years. |

(2) In determining priorities for promulgating standards for categories of major stationary sources for the purpose of paragraph (1), the Administrator shall consider—

(A) the quantity of air pollutant emissions which each such category will emit, or will be designed to emit;

(B) the extent to which each such pollutant may reasonably be anticipated to endanger public health or welfare; and

(C) the mobility and competitive nature of each such category of sources and the consequent need for nationally applicable new source standards of performance.

(3) Before promulgating any regulations under this subsection or listing any category of major stationary sources as required under this subsection, the Administrator shall consult with appropriate representatives of the Governors and of State air pollution control agencies.

**(g) Revision of regulations**

(1) Upon application by the Governor of a State showing that the Administrator has failed to specify in regulations under subsection (f)(1) of this section any category of major stationary sources required to be specified under such regulations, the Administrator shall revise such regulations to specify any such category.

(2) Upon application of the Governor of a State, showing that any category of stationary sources which is not included in the list under subsection (b)(1)(A) of this section contributes significantly to air pollution which may reasonably be anticipated to endanger public health or welfare (notwithstanding that such category is not a category of major stationary sources), the Administrator shall revise such regulations to specify such category of stationary sources.

(3) Upon application of the Governor of a State showing that the Administrator has failed to apply properly the criteria required to be considered under subsection (f)(2) of this section, the Administrator shall revise the list under subsection (b)(1)(A) of this section to apply properly such criteria.

(4) Upon application of the Governor of a State showing that—

(A) a new, innovative, or improved technology or process which achieves greater continuous emission reduction has been adequately demonstrated for any category of stationary sources, and

(B) as a result of such technology or process, the new source standard of performance in effect under this section for such category no longer reflects the greatest degree of emission limitation achievable through application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) has been adequately demonstrated,

the Administrator shall revise such standard of performance for such category accordingly.

(5) Upon application by the Governor of a State showing that the Administrator has failed to list any air pollutant which causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness as a hazardous air pollutant under section 7412 of this title the Administrator shall revise the list of hazardous air pollutants under such section to include such pollutant.

(6) Upon application by the Governor of a State showing that any category of stationary sources of a hazardous air pollutant listed under section 7412 of this title is not subject to emission standards under such section, the Administrator shall propose and promulgate such emission standards applicable to such category of sources.

(7) Unless later deadlines for action of the Administrator are otherwise prescribed under this section or section 7412 of this title, the Administrator shall, not later than three months following the date of receipt of any application by a Governor of a State, either—

(A) find that such application does not contain the requisite showing and deny such application, or

(B) grant such application and take the action required under this subsection.

(8) Before taking any action required by subsection (f) of this section or by this subsection, the Administrator shall provide notice and opportunity for public hearing.

**(h) Design, equipment, work practice, or operational standard; alternative emission limitation**

(1) For purposes of this section, if in the judgment of the Administrator, it is not feasible to prescribe or enforce a standard of performance, he may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof, which reflects the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) the Administrator determines has been adequately demon-

strated. In the event the Administrator promulgates a design or equipment standard under this subsection, he shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

(2) For the purpose of this subsection, the phrase "not feasible to prescribe or enforce a standard of performance" means any situation in which the Administrator determines that (A) a pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State, or local law, or (B) the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations.

(3) If after notice and opportunity for public hearing, any person establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such air pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

(4) Any standard promulgated under paragraph (1) shall be promulgated in terms of standard of performance whenever it becomes feasible to promulgate and enforce such standard in such terms.

(5) Any design, equipment, work practice, or operational standard, or any combination thereof, described in this subsection shall be treated as a standard of performance for purposes of the provisions of this chapter (other than the provisions of subsection (a) of this section and this subsection).

(i) Country elevators

Any regulations promulgated by the Administrator under this section applicable to grain elevators shall not apply to country elevators (as defined by the Administrator) which have a storage capacity of less than two million five hundred thousand bushels.

(j) Innovative technological systems of continuous emission reduction

(1)(A) Any person proposing to own or operate a new source may request the Administrator for one or more waivers from the requirements of this section for such source or any portion thereof with respect to any air pollutant to encourage the use of an innovative technological system or systems of continuous emission reduction. The Administrator may, with the consent of the Governor of the State in which the source is to be located, grant a waiver under this paragraph, if the Administrator determines after notice and opportunity for public hearing, that—

(i) the proposed system or systems have not been adequately demonstrated,

(ii) the proposed system or systems will operate effectively and there is a substantial likelihood that such system or systems will achieve greater continuous emission reduction than that required to be achieved under the standards of performance which would otherwise apply, or achieve at least an equivalent reduction at lower cost in terms of energy, economic, or nonair quality environmental impact,

(iii) the owner or operator of the proposed source has demonstrated to the satisfaction of the Administrater that the proposed system will not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation, function, or malfunction, and

(iv) the granting of such waiver is consistent with the requirements of subparagraph (C).

In making any determination under clause (ii), the Administrator shall take into account any previous failure of such system or systems to operate effectively or to meet any requirement of the new source performance standards. In determining whether an unreasonable risk exists under clause (iii), the Administrator shall consider, among other factors, whether and to what extent the use of the proposed technological system will cause, increase, reduce, or eliminate emissions of any unregulated pollutants; available methods for reducing or eliminating any risk to public health, welfare, or safety which may be associated with the use of such system; and the availability of other technological systems which may be used to conform to standards under this section without causing or contributing to such unreasonable risk. The Administrator may conduct such tests and may require the owner or operator of the proposed source to conduct such tests and provide such information as is necessary to carry out clause (iii) of this subparagraph. Such requirements shall include a requirement for prompt reporting of the emission of any unregulated pollutant from a system if such pollutant was not emitted, or was emitted in significantly lesser amounts without use of such system.

(B) A waiver under this paragraph shall be granted on such terms and conditions as the Administrator determines to be necessary to assure—

(i) emissions from the source will not prevent attainment and maintenance of any national ambient air quality standards, and

(ii) proper functioning of the technological system or systems authorized.

Any such term or condition shall be treated as a standard of performance for the purposes of subsection (e) of this section and section 7413 of this title.

(C) The number of waivers granted under this paragraph with respect to a proposed technological system of continuous emission reduction shall not exceed such number as the Administrator finds necessary to ascertain whether or not such system will achieve the conditions specified in clauses (ii) and (iii) of subparagraph (A).

(D) A waiver under this paragraph shall extend to the sooner of—

(i) the date determined by the Administrator, after consultation with the owner or op-

erator of the source, taking into consideration the design, installation, and capital cost of the technological system or systems being used, or

(ii) the date on which the Administrator determines that such system has failed to—

(I) achieve at least an equivalent continuous emission reduction to that required to be achieved under the standards of performance which would otherwise apply, or

(II) comply with the condition specified in paragraph (1)(A)(iii),

and that such failure cannot be corrected.

(E) In carrying out subparagraph (D)(i), the Administrator shall not permit any waiver for a source or portion thereof to extend beyond the date—

(i) seven years after the date on which any waiver is granted to such source or portion thereof, or

(ii) four years after the date on which such source or portion thereof commences operation,

whichever is earlier.

(F) No waiver under this subsection shall apply to any portion of a source other than the portion on which the innovative technological system or systems of continuous emission reduction is used.

(2)(A) If a waiver under paragraph (1) is terminated under clause (ii) of paragraph (1)(D), the Administrator shall grant an extension of the requirements of this section for such source for such minimum period as may be necessary to comply with the applicable standard of performance under this section. Such period shall not extend beyond the date three years from the time such waiver is terminated.

(B) An extension granted under this paragraph shall set forth emission limits and a compliance schedule containing increments of progress which require compliance with the applicable standards of performance as expeditiously as practicable and include such measures as are necessary and practicable in the interim to minimize emissions. Such schedule shall be treated as a standard of performance for purposes of subsection (e) of this section and section 7413 of this title.

(July 14, 1955, ch. 360, title I, § 111, as added Dec. 31, 1970, Pub. L. 91–604, § 4(a), 84 Stat. 1683, and amended Nov. 18, 1971, Pub. L. 92–157, title III, § 302(f), 85 Stat. 464; Aug. 7, 1977, Pub. L. 95–95, title I, § 109(a)–(d)(1), (e), (f), title IV, § 401(b), 91 Stat. 697–703, 791; Nov. 16, 1977, Pub. L. 95–190, § 14(a)(7)–(9), 91 Stat. 1399; Nov. 9, 1978, Pub. L. 95–623, § 13(a), 92 Stat. 3457.)

REFERENCES IN TEXT

Such Act, referred to in subsec. (a)(8), means Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, known as the Energy Supply and Environmental Coordination Act of 1974, which is classified principally to chapter 16C (§ 791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

CODIFICATION

Section was formerly classified to section 1857c–6 of this title.

PRIOR PROVISIONS

A prior section 111 of act July 14, 1955, was renumbered section 118 by Pub. L. 91–604, and is classified to section 7418 of this title.

AMENDMENTS

1978—Subsecs. (d)(1)(A)(ii), (g)(4)(B). Pub. L. 95–623, § 13(a)(2), substituted "under this section" for "under subsection (b) of this section".

Subsec. (h)(5). Pub. L. 95–623, § 13(a)(1), added par. (5).

Subsec. (j). Pub. L. 95–623, § 13(a)(3), substituted in pars. (1)(A) and (2)(A) "standards under this section" and "under this section" for "standards under subsection (b) of this section" and "under subsection (b) of this section", respectively.

1977—Subsec. (a)(1). Pub. L. 95–95, § 109(c)(1)(A), added subpars. (A), (B), and (C), substituted "For the purpose of subparagraphs (A)(i) and (ii) and (B), a standard of performance shall reflect" for "a standard for emissions of air pollutants which reflects", "and the percentage reduction achievable" for "achievable", and "technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any nonair quality health and environment impact and energy requirements)" for "system of emission reduction which (taking into account the cost of achieving such reduction)" in existing provisions, and inserted provision that, for the purpose of subparagraph (1)(A)(ii), any cleaning of the fuel or reduction in the pollution characteristics of the fuel after extraction and prior to combustion may be credited, as determined under regulations promulgated by the Administrator, to a source which burns such fuel.

Subsec. (a)(7). Pub. L. 95–95, § 109(c)(1)(B), added par. (7) defining "technological system of continuous emission reduction".

Pub. L. 95–95, § 109(f), added par. (7) directing that under certain circumstances a conversion to coal not be deemed a modification for purposes of pars. (2) and (4).

Subsec. (a)(7), (8). Pub. L. 95–190, § 14(a)(7), redesignated second par. (7) as (8).

Subsec. (b)(1)(A). Pub. L. 95–95, § 401(b), substituted "such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger" for "such list if he determines it may contribute significantly to air pollution which causes or contributes to the endangerment of".

Subsec. (b)(1)(B). Pub. L. 95–95, § 109(c)(2), substituted "shall, at least every four years, review and, if appropriate," for "may, from time to time,".

Subsec. (b)(5), (6). Pub. L. 95–95, § 109(c)(3), added pars. (5) and (6).

Subsec. (c)(1). Pub. L. 95–95, § 109(d)(1), struck out "(except with respect to new sources owned or operated by the United States)" after "implement and enforce such standards".

Subsec. (d)(1). Pub. L. 95–95, § 109(b)(1), substituted "standards of performance" for "emission standards" and inserted provisions directing that regulations of the Administrator permit the State, in applying a standard of performance to any particular source under a submitted plan, to take into consideration, among other factors, the remaining useful life of the existing source to which the standard applies.

Subsec. (d)(2). Pub. L. 95–95, § 109(b)(2), provided that, in promulgating a standard of performance under a plan, the Administrator take into consideration, among other factors, the remaining useful lives of the sources in the category of sources to which the standard applies.

Subsecs. (f) to (i). Pub. L. 95–95, § 109(a), added subsecs. (f) to (i).

Subsecs. (j), (k). Pub. L. 95–190, § 14(a)(8), (9), redesignated subsec. (k) as (j) and, as so redesignated, substituted "(B)" for "(8)" as designation for second subpar. in par. (2). Former subsec. (j), added by Pub. L. 95–95, § 109(e), which related to compliance with applicable standards of performance, was struck out.

Pub. L. 95–95, § 109(e), added subsec. (k).

1971—Subsec. (b)(1)(B). Pub. L. 92–157 substituted in first sentence "publish proposed" for "propose".

### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, sec section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### TRANSFER OF FUNCTIONS

Enforcement functions of Administrator or other official in the Environmental Protection Agency related to compliance with new source performance standards under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas were transferred to the Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, until the first anniversary of date of initial operation of the Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, eff. July 1, 1979, §§ 102(a), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, set out in the Appendix to Title 5, Government Organization and Employees.

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 7410, 7412, 7413, 7414, 7416, 7417, 7418, 7420, 7422, 7425, 7475, 7479, 7501, 7604, 7607, 7608, 7616, 7617, 7618, 7625–1, 9601 of this title.

## § 7412. National emission standards for hazardous air pollutants

### (a) Definitions

For purposes of this section—

(1) The term "hazardous air pollutant" means an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness.

(2) The term "new source" means a stationary source the construction or modification of which is commenced after the Administrator proposes regulations under this section establishing an emission standard which will be applicable to such source.

(3) The terms "stationary source", "modification", "owner or operator" and "existing source" shall have the same meaning as such terms have under section 7411(a) of this title.

### (b) List of hazardous air pollutants; emission standards; pollution control techniques

(1)(A) The Administrator shall, within 90 days after December 31, 1970, publish (and shall from time to time thereafter revise) a list which includes each hazardous air pollutant for which he intends to establish an emission standard under this section.

(B) Within 180 days after the inclusion of any air pollutant in such list, the Administrator shall publish proposed regulations establishing emission standards for such pollutant together with a notice of a public hearing within thirty days. Not later than 180 days after such publication, the Administrator shall prescribe an emission standard for such pollutant, unless he finds, on the basis of information presented at such hearings, that such pollutant clearly is not a hazardous air pollutant. The Administrator shall establish any such standard at the level which in his judgment provides an ample margin of safety to protect the public health from such hazardous air pollutant.

(C) Any emission standard established pursuant to this section shall become effective upon promulgation.

(2) The Administrator shall, from time to time, issue information on pollution control techniques for air pollutant subject to the provisions of this section.

### (c) Prohibited acts; exemption

(1) After the effective date of any emission standard under this section—

(A) no person may construct any new source or modify any existing source which in the Administrator's judgment, will emit an air pollutant to which such standard applies unless the Administrator finds that such source if properly operated will not cause emissions in violation of such standard, and

(B) no air pollutant to which such standard applies may be emitted from any stationary source in violation of such standard, except that in the case of an existing source—

(i) such standard shall not apply until 90 days after its effective date, and

(ii) the Administrator may grant a waiver permitting such source a period of up to two years after the effective date of a standard to comply with the standard, if he finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

– SA34 –

§ 7412         TITLE 42—THE PUBLIC HEALTH AND WELFARE         Page 570

(2) The President may exempt any stationary source from compliance with paragraph (1) for a period of not more than two years if he finds that the technology to implement such standards is not available and the operation of such source is required for reasons of national security. An exemption under this paragraph may be extended for one or more additional periods, each period not to exceed two years. The President shall make a report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(d) State implementation and enforcement**

(1) Each State may develop and submit to the Administrator a procedure for implementing and enforcing emission standards for hazardous air pollutants for stationary sources located in such State. If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards.

(2) Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard under this section.

**(e) Design, equipment, work practice, and operational standards**

(1) For purposes of this section, if in the judgment of the Administrator, it is not feasible to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, he may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in his judgment is adequate to protect the public health from such pollutant or pollutants with an ample margin of safety. In the event the Administrator promulgates a design or equipment standard under this subsection, he shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

(2) For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that (A) a hazardous pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State, or local law, or (B) the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations.

(3) If after notice and opportunity for public hearing, any person establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such air pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

(4) Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it becomes feasible to promulgate and enforce such standard in such terms.

(5) Any design, equipment, work practice, or operational standard, or any combination thereof, described in this subsection shall be treated as an emission standard for purposes of the provisions of this chapter (other than the provisions of this subsection).

(July 14, 1955, ch. 360, title I, § 112, as added Dec. 31, 1970, Pub. L. 91–604, § 4(a), 84 Stat. 1685, and amended Aug. 7, 1977, Pub. L. 95–95, title I, §§ 109(d)(2), 110, title IV, § 401(c), 91 Stat. 701, 703, 791; Nov. 9, 1978, Pub. L. 95–623, § 13(b), 92 Stat. 3458.)

CODIFICATION

Section was formerly classified to section 1857c–7 of this title.

AMENDMENTS

1978—Subsec. (e)(5). Pub. L. 95–623 added par. (5).

1977—Subsec. (a)(1). Pub. L. 95–95, § 401(c), substituted "causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" for "may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness".

Subsec. (d)(1). Pub. L. 95–95, § 109(d)(2), struck out "(except with respect to stationary sources owned or operated by the United States)" after "implement and enforce such standards".

Subsec. (e). Pub. L. 95–95, § 110, added subsec. (e).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 7411, 7413, 7414, 7416, 7417, 7418, 7420, 7422, 7479, 7604, 7607, 7608, 7616, 7618, 7625–1, 9601 of this title.

| 95TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| 1st Session | | No. 95–564 |

## CLEAN AIR ACT AMENDMENTS OF 1977

AUGUST 3, 1977.—Ordered to be printed

Mr. STAGGERS, from the committee of conference, submitted the following

## CONFERENCE REPORT

[To accompany H.R. 6161]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 6161) to amend the Clean Air Act, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment insert the following:

*SHORT TITLE AND TABLE OF CONTENTS*

SECTION 1. *This Act, together with the following table of contents, may be cited as the "Clean Air Act Amendments of 1977".*

### TABLE OF CONTENTS

SEC. 1. *Short title and table of contents.*

TITLE I—AMENDMENTS RELATING PRIMARILY TO TITLE I OF THE CLEAN AIR ACT

Sec. 101. *Training.*
Sec. 102. *Waiver of maintenance of effort requirement.*
Sec. 103. *Air quality control regions.*
Sec. 104. *Criteria and control techniques.*
Sec. 105. *Transportation planning and guidelines.*
Sec. 106. *Air quality standards.*
Sec. 107. *Energy or economic emergency authority.*
Sec. 108. *Implementation plans.*
Sec. 109. *New source standards of performance.*
Sec. 110. *Standards for hazardous air pollutants.*
Sec. 111. *Enforcement provisions.*
Sec. 112. *Compliance orders (including coal conversion).*
Sec. 113. *Notice to State in case of certain inspections, etc.*

183

*House bill*

There are authorized to be appropriated to carry out this act, other than sections 327, 103(b)(5), and authorities providing for research and development, $200,000,000 for each of three fiscal years beginning after the date of enactment of these amendments.

*Senate amendment*

There are authorized to be appropriated to carry out this act, other than sections 103(f) and (d), 104, 110(h)(7), 150 through 157, 212, 315, and 403, not to exceed $147,805,000 for fiscal year 1977, and $200,-000,000 for each of fiscal years 1978, 1979, and 1980.

There are authorized to be appropriated for carrying out research, development, and demonstration under sections 103 and 104, $120,000,-000 for fiscal year 1978.

There are authorized to be appropriated to carry out transportation planning requirements of this act $75,000,000 beginning fiscal year 1978 to be available until expended, and $17 million for the National Commission on Air Quality.

*Conference agreement*

The conferees agreed to authorize $200,000,000 for fiscal year 1978 (as in the Senate bill) and for each of the three succeeding fiscal years (as in the House bill), for purposes other than research and development, training, the National Commission on Air Quality, transportation-related planning grants and public notification grants.

The conferees also agreed to accept the Senate authorization of $75 million for transportation-related planning; to provide a $10 million authorization for the National Commission on Air Quality, and to accept the Senate provision authorizing $1 million to EPA for contract authority to assist in starting up the National Commission; and to authorize $4 million for FY 1978 and each of the three succeeding fiscal years for the public notification grants to States.

The research and development authorization is excluded because it is included in other legislation.

*House bill*

Provides a uniform standard of proof for EPA regulation of air pollutants which applies to the setting of (1) criteria for national ambient air quality standards under Section 108; (2) new stationary source performance standards under Section 111; (3) hazardous stationary source emission standards; (4) new auto emission standards under Section 202; (5) regulations of fuels and fuel additives under Section 211; (6) aircraft emission standards under Section 231.

In all future rulemaking in these areas, the Administrator could regulate any air pollutant from those sources, the emissions of which "in his judgment cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare."

This section also requires that unregulated radioactive pollutants, cadmium, arsenic, polycyclic organic material be automatically listed

184

under Section 198 thus requiring issuance of air quality criteria for those pollutants.

*Senate amendment*

No comparable provision.

*Conference agreement*

The Senate concurs in the House provision with an amendment to delete reference to Section 120 (unregulated pollutants).

### INTERAGENCY COOPERATION ON PREVENTION OF ENVIRONMENTAL CANCER, HEART AND LUNG DISEASE

*House bill*

Requires the creation of an interagency task force to promote increased cooperation between EPA and HEW to quantify the relationship between environmental pollution and cancer, heart and lung disease and to find methods for preventing environmentally induced cancer, heart and lung disease.

*Senate amendment*

No comparable provision.

*Conference agreement*

The Senate concurs in the House provision with amendments to (1) make the Environmental Protection Agency the lead agency for the Task Force; (2) include representatives of the National Institute for Occupational Safety and Health on the Task Force; (3) delete the requirement that the Task Force coordinate control efforts of EPA and HEW; (4) require an annual report one year after enactment and annually thereafter; and (5) other minor and clarifying amendments.

### FINE PARTICULATE STUDY

*House bill*

The Administrator shall study and report to Congress in 18 months on the health hazards and means of controlling fine particulates. The National Academy of Sciences shall also participate in this study.

*Senate amendment*

No comparable provision.

*Conference agreement*

The Senate concurs in the House provision with and amendment to delete the reference to the degree of "hazards" to public health, and to substitute for it "endangerment" to public health.

### ODOR STUDY

*House bill*

No provision.

*Senate amendment*

This provision requires the Administrator to conduct a study and report to Congress no later than January 1, 1979, on the public health and welfare effects of odorous emissions, their sources, and measures available to control such emissions.

*Conference agreement*

The House concurs in the Senate provision.

| 94TH CONGRESS<br>*2d Session* } | HOUSE OF REPRESENTATIVES | { REPORT<br>No. 94–1175 |
| --- | --- | --- |

# CLEAN AIR ACT AMENDMENTS OF 1976

---

# REPORT

BY THE

# COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE

[To accompany H.R. 10498]

together with

# ADDITIONAL, SEPARATE, OPPOSING, AND MINORITY VIEWS



MAY 15, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

**U.S. GOVERNMENT PRINTING OFFICE**
WASHINGTON · 1976

70–888 O

it occurs; to emphasize the predominant value of protection of public health;

B. To authorize the Administrator to weigh risks and make reasonable projections of future trends; thus, to find a middle road between those who would impose a nearly impossible standard of proof on the Administrator before he may move to protect public health and those who would shift the burden of proof for all pollutants to make the pollution source prove the safety of its emissions as a condition of operation;[2]

C. To assure consideration of the cumulative impact of all sources of a pollutant in setting ambient and emission standards, not just the extent of the risk from the emissions from a single source or class of sources of the pollutant; to require consideration of cumulative or synergistic effects of multiple pollutants to mandate evaluations of total body burden of contaminants;[3]

D. To provide the same standard of proof for regulation of any air pollutant, whether that pollutant comes from stationary or mobile sources, or both, and to make the vehicle and fuel industries equally responsible for cleaning up vehicle exhaust emissions;

E. To assure that the health of susceptible individuals, as well as healthy adults, will be encompassed in the term "public health", regardless of the section of the Act under which the Administrator proceeds;

F. To reflect awareness of the uncertainties and limitations in the data which will be available to the Administrator in the foreseeable future to enable him to execute his rulemaking duties under this Act, because of the limitations on research resources and the fact that decision-making about the risks to public health from air pollution falls on "the frontiers of scientific and medical knowledge"; to provide for adequate judicial review of the reasonableness of the Administrator's judgment in assessing risks, while restraining the courts from attempting to act "as the equivalent of a combined Ph.D. in chemistry, biology, and statistics" or from applying a standard of review which is appropriate only to review of adjudications or formal fact-finding.

To achieve these purposes, the Committee has used a standardized basis for future rulemaking to protect the public health: the Administrator may regulate a pollutant, emissions of "which in his judgment cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare".

This same basic formula is used in proposed ned sections 108 (criteria for national ambient air quality standards); 111 (new source

---

[2] This determination of the Committee is consistent with, and supportive of, the views expressed by the Court in *Amoco Oil Co.* v. *EPA*, 501 F. 2d 722, (D.C. Cir. 1974). While projections, estimates, and assessment of risks are authorized, they are "subject to the restraints of reasonableness and cannot be based on 'crystal ball' inquiry". *Portland Cement Assn.* v. *Ruckelshaus*, 486 F. 2d 375, 391 (D.C. Cir. 1973).

[3] The Committee's determination to require application of these factors to standard-setting under all sections of the Act again reflects the recommendations of the National Academy of Sciences—National Academy of Engineering: "The concept of total body burden should be the significant indicator of exposure, rather than burden acquired in one or another part of the environment or from one or another toxic material. People who work in a factory in which dangerous substances are handled in high concentration, may live in an adjacent area in which the same or other substances are dispersed, thus increasing overall exposure. More than one organ may be attacked because the offending substance is transported by two or more media. Synergistic effects among two or more substances, by which the combined effect is more than the sum of the separate effects, should be considered. NASNAE. "Man, Materials, and Environment: A Report to the National Commission on Materials Policy," (March 1973), p. 12. See also pp. 25, 35, 73, 80."

**CERTIFICATE OF COMPLIANCE**

The brief complies with the word limit in the Court's order because it contains 8,496 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typographic requirements of Federal Rule of Appellate Procedure 32(a) because it is typeset in proportionally spaced 14 point Calisto MT type.

*/s/ Robert D. Cheren*
Robert D. Cheren

April 17, 2020

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Coal Industry Petitioners Opening Brief, Standing Addendum, and Statutory Addendum and accompanying certificates have been filed using the CM/ECF system.

/s/ *Robert D. Cheren*
Robert D. Cheren

April 17, 2020