**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 19-1140 (and consolidated cases)

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

AMERICAN LUNG ASSOCIATION, *et al.*,

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents.*

_____

**On Petition for Review of Final Agency Action of the**
**U.S. Environmental Protection Agency**

_____

**PROOF BRIEF OF STATE AND INDUSTRY**
**INTERVENORS FOR RESPONDENT**
**REGARDING AFFORDABLE CLEAN ENERGY RULE**

_____

Thomas A. Lorenzen
Elizabeth B. Dawson
Leland P. Frost
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
tlorenzen@crowell.com

*Counsel for National Rural Electric*
*Cooperative Association*


**DATED: JULY 16, 2020**

Patrick Morrisey
  ATTORNEY GENERAL OF WEST
  VIRGINIA
Lindsay S. See
  Solicitor General
  *Counsel of Record*
Thomas T. Lampman
Benjamin E. Fischer
  Assistant Solicitors General
State Capitol Building 1, Rm. 26-E
Charleston, WV 25305
Tel: (304) 558-2021
Fax: (304) 558-0140
Lindsay.s.see@wvago.gov

*Counsel for State of West Virginia*

*Additional counsel listed at end*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.**    **Parties, Intervenors, and *Amici Curiae***

The parties and intervenors are listed in the brief for the State and Municipal Petitioners. The amici are listed in the brief for the Respondent U.S. Environmental Protection Agency.

**B.**    **Rulings Under Review**

The ruling under review is the final action by EPA entitled: "Repeal of the Clean Power Plan; Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units; Revisions to Emission Guidelines Implementing Regulations," published at 84 Fed. Reg. 32,520 (July 8, 2019).

**C.**    **Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

# CORPORATE DISCLOSURE STATEMENTS

Non-governmental Petitioners submit the following statements pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1:

**AEP Generating Company** owns a portion of fossil fuel-fired electric generating facilities located in Indiana. It is a wholly owned subsidiary of American Electric Power Company, Inc. There is no parent and no 10-percent-or-greater owner of American Electric Power Company, Inc.

**AEP Generation Resources Inc.** owns fossil fuel-fired electric generating facilities located in Ohio. It is a wholly owned subsidiary of AEP Energy Supply, LLC, which is a wholly owned subsidiary of American Electric Power Company, Inc. There is no parent and no 10-percent-or-greater owner of American Electric Power Company, Inc.

**America's Power** is a nonprofit membership corporation organized under the laws of the District of Columbia and is recognized as a tax-exempt trade association by the Internal Review Service under Section 501(c)(6) of the Internal Revenue Code. Its members are companies that are involved in the production of electricity from coal. As the only national trade association whose sole mission is to advocate at the federal and state levels on behalf of coal-fueled electricity and the coal fleet, America's Power recognizes the inextricable linkage between energy, the economy, and our environment. Toward that end, America's Power supports policies that promote the wise use of coal, one of America's largest domestically produced energy resources, to ensure a reliable, resilient, and affordable supply of electricity to meet our nation's demand for energy. America's Power is a "trade association" within the meaning of Circuit Rule 26.1(b). It has no parent corporation, and no publicly held company owns a 10% or greater interest in America's Power.

**Appalachian Power Company** provides wholesale and retail electric services to customers and owns fossil fuel-fired generating facilities in Virginia and West Virginia. It is a wholly owned subsidiary of American Electric Power Company, Inc. There is no parent and no 10-percent-or-greater owner of American Electric Power Company, Inc.

**Basin Electric Power Cooperative** (Basin Electric) is a not-for-profit regional wholesale electric generation and transmission cooperative owned by over 100 member cooperatives. Basin Electric provides wholesale power to member rural electric systems in nine States, with electric generation facilities in North Dakota,

South Dakota, Wyoming, Montana, and Iowa serving approximately 2.9 million customers. Basin Electric has no parent companies. There are no publicly held corporations that have a 10% or greater ownership interest in Basin Electric.

**Chamber of Commerce of the United States of America** (the Chamber) is the world's largest business federation. The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies, state and local chambers, and trade associations of every size, in every industry sector, and from every region of the country. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

**Georgia Power Company** is a wholly-owned subsidiary of Southern Company, which is a publicly held corporation. Other than Southern Company, no publicly-held company owns 10% or more of Georgia Power Company's stock. Southern Company is traded publicly on the New York Stock Exchange under the symbol "SO."

**Indiana Energy Association** (IEA) is a continuing association of investor-owned electric and gas utilities and a Public Charitable Trust gas utility. The role of IEA is to advocate for and promote the general interests of its members including those that own or operate electric generators. IEA has no outstanding shares or debt securities in the hand of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in IEA.

**Indiana Michigan Power Company** provides wholesale and retail electric service in Indiana and Michigan and owns a fossil fuel-fired generating facility in Indiana. It is a wholly owned subsidiary of American Electric Power Company, Inc. There is no parent and no 10-percent-or-greater owner of American Electric Power Company, Inc.

**Indiana Utility Group** (IUG) is a continuing association of individual electric generating companies operated for the purpose of promoting the general interests of the membership of electric generators. IUG has no outstanding shares or debt securities in the hand of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in IUG.

**International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO** (IBB) is a non-profit national labor organization with headquarters in Kansas City, Kansas. IBB's members are active and retired members engaged in various skilled trades of welding and fabrication of boilers, ships, pipelines, and other industrial facilities and equipment in the United States and Canada, and

workers in other industries in the United States organized by the IBB. The IBB provides collective bargaining representation and other membership services on behalf of its members. As a professional association, the IBB is not required by FRAP Rule 26.1 or Circuit Rule 26.1 to provide a list of its members. The IBB is affiliated with the American Federation of Labor-Congress of Industrial Organizations. The IBB and its affiliated lodges own approximately 60 percent of the outstanding stock of Brotherhood Bancshares, Inc., the holding company of the Bank of Labor. Bank of Labor's mission is to serve the banking and other financial needs of the North American labor movement. No entity owns 10 percent or more of the IBB.

**International Brotherhood of Electrical Workers, AFL-CIO** (IBEW) is a non-profit national labor organization whose members are active and retired skilled electricians and related professionals engaged in a broad array of U.S. industries, including the electrical utility, coal mining, and railroad transportation sectors. IBEW provides collective bargaining representation and other membership services and benefits on behalf of its members. IBEW is affiliated with the American Federation of Labor-Congress of Industrial Organizations. IBEW has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

**Kentucky Power Company** provides wholesale and retail electric service in Kentucky and owns fossil fuel-fired electric generating facilities in Kentucky and West Virginia. It is a wholly owned subsidiary of American Electric Power Company, Inc. There is no parent and no 10-percent-or-greater owner of American Electric Power Company, Inc.

**Murray Energy Corporation** has no parent corporation and no publicly held corporation 10% or more of its stock. Murray Energy Corporation is the largest privately-held coal company and largest underground coal mine operator in the United States.

**National Mining Association** (NMA) is a nonprofit incorporated national trade association whose members include the producers of most of America's coal, metals, and industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry. NMA has no parent corporation, and no publicly held corporation owns any portion of NMA.

**National Rural Electric Cooperative Association** (NRECA) is the national trade association representing nearly 900 local electric cooperatives and other rural utilities that provide electric service to 42 million Americans across 56 percent of the nation's landscape and in 48 states. NRECA has no parent corporation. No publicly held

corporation owns any portion of NRECA, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Nevada Gold Energy LLC** owns and operates the TS Power Plant, which provides energy for Nevada Gold Mines LLC's mining operations in northern Nevada and operates under a Power Purchase Sales Agreement with NV Energy, a regional utility. Nevada Gold Energy LLC is a wholly-owned subsidiary of Nevada Gold Mines LLC.

**Nevada Gold Mines LLC** is a limited liability corporation engaged in mining and processing of gold and other ores in northern Nevada. NGM is a joint venture between Barrick Gold Corporation and Newmont Goldcorp Corporation, both of which are publicly-traded corporations. Barrick Nevada Holding LLC and Newmont USA Limited are parent companies of Nevada Gold Mines.

**PowerSouth Energy Cooperative** is a generation and transmission company. PowerSouth Energy Cooperative has no parent corporation. No publicly held corporation owns any portion of PowerSouth Energy Cooperative, and it is not a subsidiary or an affiliate of any publicly owned corporation.

**Public Service Company of Oklahoma** provides wholesale and retail electric service and owns fossil fuel-fired generating facilities in Oklahoma. It is a wholly owned subsidiary of American Electric Power Company, Inc. There is no parent and no 10-percent-or-greater owner of American Electric Power Company, Inc.

**Southwestern Electric Power Company** provides wholesale and retail electric service and owns fossil fuel-fired generating facilities in Texas, Arkansas, and Louisiana. It is a wholly owned subsidiary of American Electric Power Company, Inc. There is no parent and no 10-percent-or-greater owner of American Electric Power Company, Inc.

**United Mine Workers of America, AFL-CIO** ("UMWA") is a non-profit national labor organization whose members are active and retired miners engaged in the extraction of coal and other minerals in the United States and Canada, and workers in other industries in the United States organized by the UMWA. UMWA provides collective bargaining representation and other membership services on behalf of its members. UMWA is affiliated with the American Federation of Labor-Congress of Industrial Organizations. UMWA has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

**Westmoreland Mining Holdings LLC** has no parent corporation and no publicly held corporation owns 10% or more of its stock. The company has an extensive portfolio of coal mining operations in the United States and Canada.

**Wheeling Power Company** provides retail electric service and owns a fossil fuel-fired generating facility in West Virginia. It is a wholly owned subsidiary of American Electric Power Company, Inc. There is no parent and no 10-percent-or-greater owner of American Electric Power Company, Inc.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ............................................................................................i

    A.    Parties, Intervenors, and *Amici Curiae* .......................................i

    B.    Rulings Under Review ..................................................................i

    C.    Related Cases ................................................................................i

CORPORATE DISCLOSURE STATEMENTS ..................................... ii

TABLE OF AUTHORITIES ................................................................. ix

GLOSSARY OF TERMS ..................................................................... xiii

INTRODUCTION ................................................................................... 1

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ........................................................................................... 4

I.    EPA'S CONCLUSION THAT BSER FOR EXISTING COAL-
    FIRED ELECTRIC-GENERATING UNITS IS A SUITE OF
    HEAT-RATE IMPROVEMENTS APPROPRIATELY STAYS
    WITHIN STATUTORY BOUNDS ................................................ 4

    A.    BSER Must Improve Individual Source Performance. ........... 5

        1.    *EPA Correctly Reads the Statute.* .......................................... 5

        2.    *Petitioners' Contrary, Results-Driven Arguments Fail.* .......... 6

    B.    EPA Reasonably Concluded that BSER for Coal-Fired
        Units Comprises Certain Heat-Rate Improvement
        Measures. ................................................................................. 8

        1.    *EPA Set a BSER that Is "Adequately Demonstrated,"*
            *"Available," and "Achievable."* ............................................. 9

        2.    *Petitioners' Criticisms Lack Merit.* ...................................... 11

    C.    EPA's Decision to Reject Other Systems Was Reasonable. ............... 14

        1.    *EPA Reasonably Concluded that Co-Firing Is Not the*
            *"Best."* ................................................................................. 15

        2.    *EPA Reasonably Concluded that CCS Is Not the "Best."* .................. 17

        3.    *EPA's Conclusions on Co-Firing and CCS Are Consistent*
            *with Its Conclusions on Heat-Rate Improvements.* ................................ 20

II.    THE ACE RULE'S PROCEDURES FOR STATE PLANS
       RESPECT THE EXPLICIT LIMITS CONGRESS PLACED
       ON EPA'S AUTHORITY AS WELL AS CONGRESS'S
       COOPERATIVE-FEDERALISM APPROACH TO EXISTING
       SOURCE REGULATION. ...................................................................21

       A.    EPA Correctly Identified a Range of Expected Heat-Rate-
             Improvement Percentages as the Degree of Emission
             Limitation Achievable Through Application of BSER.........................23

             1.    *A Degree of Emission Limitation Expressed as a Range*
                   *Appropriately Respects the States' Primacy in Developing*
                   *Standards of Performance for Existing Sources.* ....................................24

             2.    *The Degree of Emission Limitation EPA Identified Accords*
                   *with the Statutory and Regulatory Text and Structure.*..........................26

       B.    This Court Should Reject Petitioners' Unripe Request That
             It Interpret §7411(d) and §7416 as Authorizing States to
             Revive the CPP in Their State Plans. .......................................................28

III.   EPA IS PROPERLY CONTINUING TO EVALUATE DATA
       TO DETERMINE APPROPRIATE EMISSION
       GUIDELINES FOR NATURAL GAS- AND OIL-FIRED
       UNITS..............................................................................................................30

CONCLUSION ...............................................................................................................37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ............................................................. 29

*Ctr. for Biological Diversity v. EPA,*
  749 F.3d 1079 (D.C. Cir. 2014) ......................................... 34

*Essex Chem. Corp. v. Ruckelshaus,*
  486 F.2d 427 (D.C. Cir. 1973) ........................................ 9, 25

*Hazardous Waste Treatment Council v. EPA,*
  861 F.2d 277 (D.C. Cir. 1988) ...................................... 31, 36

*Hercules Inc. v. EPA,*
  938 F.2d 276 (D.C. Cir. 1991) ................................... 31, 33, 36

*Lignite Energy Council v. EPA,*
  198 F.3d 930 (D.C. Cir. 1999) ............................................ 26

*Mexichem Specialty Resins, Inc. v. EPA,*
  787 F.3d 544 (D.C. Cir. 2015) ............................................ 34

*Miss. Comm'n on Envtl. Quality v. EPA,*
  790 F.3d 138 (D.C. Cir. 2015) ................................... 4, 10, 34

*Nat'l Lime Ass'n v. EPA,*
  627 F.2d 416 (D.C. Cir. 1980) ............................................. 9

*Nat'l-Southwire Aluminum Co. v. EPA,*
  838 F.2d 835 (6th Cir. 1988) ........................................... 6, 8

*Portland Cement Ass'n v. EPA,*
  665 F.3d 177 (D.C. Cir. 2011) ...................................... 36, 37

*Sierra Club v. Costle,*
  657 F.2d 298 (D.C. Cir. 1981) ...................................... 23, 26

*State Farm Mut. Auto. Ins. Co. v. Dole,*
  802 F.2d 474 (D.C. Cir. 1986) ............................................ 29

*Texas v. United States,*
    523 U.S. 296 (1998) ........................................................................ 29

*U.S. Sugar Corp. v. EPA,*
    830 F.3d 579 (D.C. Cir. 2016) ...................................................... 36

*Util. Air Regulatory Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................................ 6

**Statutes**

42 U.S.C. §7402(k) ................................................................................ 11

42 U.S.C. §7409-10 ................................................................................ 7

42 U.S.C. §7410 .................................................................................... 22

42 U.S.C. §7410(a)(1) .......................................................................... 22

42 U.S.C. §7411 ................................................ 5, 6, 7, 11, 12, 13, 15, 21, 23, 33

42 U.S.C. §7411(a) ......................................................................... 15, 23

42 U.S.C. §7411(a)(1) ................................................................ 2, 10, 21, 30

42 U.S.C. §7411(a)(3) ............................................................................ 2

42 U.S.C. §7411(b)(1)(A)-(B) ............................................................... 32

42 U.S.C. §7411(b)(1)(B) ....................................................................... 2

42 U.S.C. §7411(b)(6) .......................................................................... 32

42 U.S.C. §7411(d) ...................................... 1, 2, 3, 7, 8, 9, 11, 13, 19, 21, 22, 23,
                                    ........................ 24, 26, 27, 28, 29, 30, 31, 32, 34, 36, 37

42 U.S.C. §7411(d)(1) .................................................................. 2, 21, 27

42 U.S.C. §7411(f)(1)(A)-(C) ............................................................... 32

42 U.S.C. §7411(g)(5) .......................................................................... 32

42 U.S.C. §7411(j)(1)(E)(i)-(ii) ........................................................... 32

42 U.S.C. §7411(j)(2)(A) ...................................................................... 32

42 U.S.C. §7412 ....................................................................... 16

42 U.S.C. §7416 ..........................................................28, 29, 30

42 U.S.C. §7607 ....................................................................... 29

42 U.S.C. §7607(d)(9)(A) ...................................................... 15

**Regulations**

40 C.F.R. §60.22a(a) ............................................................... 32

40 C.F.R. §60.22a(b)(2) .......................................................... 32

40 C.F.R. §60.22a(b)(5) .......................................................... 37

40 C.F.R. §60.23a .................................................................... 34

40 C.F.R §60.23a(a)(1) ........................................................... 32

40 C.F.R. §60.23a(a)(1) .......................................................... 33

40 C.F.R. §60.23a(b) ............................................................... 33

40 C.F.R. §60.24(f) .................................................................. 27

40 C.F.R. §60.24a(e) ............................................................... 27

40 C.F.R. §60.31d ................................................................... 11

40 C.F.R. §60.42Da(e) ........................................................... 11

**Other Authorities**

40 Fed. Reg. 53,340 (Nov. 17, 1975) ................................ 7, 27

44 Fed. Reg. 33,580 (June 11, 1979) ..................................... 26

65 Fed. Reg. 76,378 (Dec. 6, 2000) ....................................... 33

74 Fed. Reg. 51,950 (Oct. 8, 2009) ........................................ 33

77 Fed. Reg. 49,490 (Aug. 16, 2012) ..................................... 33

80 Fed. Reg. 64,662 (Oct. 23, 2015) ........................................... 7, 11, 14, 15, 19, 25

84 Fed. Reg. 32,520 (July 8, 2019) ........................................ 1, 2, 5, 6, 9, 10, 12, 13, 15, 16,
.......................................................... 19, 20, 21, 22, 23, 26, 28, 29, 30, 31, 36

# GLOSSARY OF TERMS

| | |
|---|---|
| ACE Rule | "Repeal of the Clean Power Plan; Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units; Revisions to Emission Guidelines Implementing Regulations," 84 Fed. Reg. 32,520 (July 8, 2019). |
| Act | Clean Air Act, 42 U.S.C. §§7601-7671q |
| BSER | Best system of emission reduction |
| CCS | Carbon capture and sequestration |
| $CO_2$ | Carbon dioxide |
| CPP or Clean Power Plan | "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units," 80 Fed. Reg. 64,662 (Oct. 23, 2015) |
| EPA or the Agency | U.S. Environmental Protection Agency |
| JA | Joint Appendix |
| NAAQS | National Ambient Air Quality Standard |

## INTRODUCTION

Petitioners' demand that the U.S. Environmental Protection Agency (EPA or the Agency) impose more stringent limits on carbon dioxide ($CO_2$) emissions from existing coal-fired power plants finds no basis in the limited authority Congress gave EPA in 42 U.S.C. §7411(d).[1] Rather, EPA appropriately stayed within the narrow bounds of its delegated authority when it promulgated the "Affordable Clean Energy Rule" or "ACE Rule." After EPA jettisoned the unlawful and now-repealed Clean Power Plan (CPP), EPA promulgated a reasoned "best system of emission reduction" (BSER) and guidelines under §7411(d) for States to establish standards of performance for existing coal-fired electric-generating units (units) that emit $CO_2$. "Repeal of the Clean Power Plan; Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units; Revisions to Emission Guidelines Implementing Regulations," 84 Fed. Reg. 32,520 (July 8, 2019). The ACE Rule must be upheld as both lawful based on the Act and reasonable based on the record.

## SUMMARY OF ARGUMENT

EPA's ACE Rule represents the Agency's return to the limited statutory ambit of §7411(d)'s standard-of-performance program for existing sources.

---

[1]      Unless otherwise noted, all statutory citations are to Title 42, U.S. Code.

The Clean Air Act (CAA) requires EPA to list categories of "stationary source[s]" whose pollutants endanger public health or welfare; "standard[s] of performance" must then be set for new sources in each listed category under §7411(b), and for existing sources in those cases where §7411(d) so requires. *See also* §7411(a)(1), (3) (defining "standard of performance" and "stationary source"). *EPA* establishes nationally applicable standards of performance for new stationary sources. §7411(b)(1)(B). By contrast, *States* establish standards of performance for existing sources after considering various "factors," including each individual source's "remaining useful life," and then submit those standards to EPA to confirm they are satisfactory. §7411(d)(1). To assist States in this task, EPA develops the procedure for state-plan submission and guidelines identifying what EPA deems to be BSER and the "degree of emission limitation achievable" through that BSER for the subject pollutant in the particular existing-source category. §7411(a)(1), (d)(1).

In determining BSER and promulgating guidelines for existing sources, EPA must account for their nature and diversity. This diversity takes many forms, including age, capacity, operational and design differences, and geographic location. 84 Fed. Reg. at 32,535 n.167. More so than new sources, existing sources face significant operational, physical, and fiscal constraints in meeting new regulatory requirements

through the installation of retrofit controls or other measures.[2] EPA's carefully calibrated application of the statutory requirements in the ACE Rule reflects these practical realities. This Court should deny the Petitions for Review.

**I.**     EPA properly determined that seven specific heat-rate improvement measures comprise the best system to control $CO_2$ emissions from existing coal-fired units. In stark contrast to the unlawful CPP, the ACE Rule properly confines BSER to measures "applicable to" the individual regulated stationary source as a continuous means of emission reduction. The Rule also correctly reflects that BSER targets improvements to a source's emissions *performance*, not a reduction in total emissions from a source or source category. As such, EPA rightly excluded from BSER "generation shifting," which would have forced curtailment or shutdown of some sources in favor of others, as outside the scope of the authority Congress gave EPA. EPA also correctly excluded measures such as natural-gas co-firing and carbon capture and sequestration (CCS) based on the record before the Agency.

**II.**    The Rule also gives proper effect to Congress's direction that, under §7411(d), the States, not EPA, have the central role in setting the standards of performance applicable to each individual source. To guide the States in establishing these standards, EPA identified a degree of emission limitation achievable, expressed

---

[2]     *See* JA_[NRECA_CPP_Repeal_Comments_2_(EPA-HQ-OAR-2017-0355-19875)].

as a range of heat-rate-improvement percentages from the seven measures EPA

determined comprise BSER for existing coal-fired electricity-generating sources.

EPA's provision of a range complements EPA's BSER that identifies heat-rate-

improvement options and requires the States' reasoned judgment to determine which

best apply to each source. Petitioners' speculation about how States may apply these

seven heat-rate-improvement measures to particular sources and what EPA may or

may not deem satisfactory once state plans are submitted is unripe.

    **III.**    EPA reasonably exercised its discretion not to finalize a rule establishing

BSER for oil- and natural-gas fired units, where EPA concluded that it lacked

sufficient information to do so.

## ARGUMENT

## I.    EPA's Conclusion that BSER for Existing Coal-Fired Electric-Generating Units Is a Suite of Heat-Rate Improvements Appropriately Stays within Statutory Bounds.

    EPA repealed the CPP because EPA lacked statutory authority to promulgate

it. *See* Proof Brief of State and Industry Intervenors for Respondent Regarding Clean

Power Plan Repeal (Repeal Br.) 11-20. The statutory language mandating the CPP's

repeal also controls EPA's determination of the proper BSER in the ACE Rule.

Petitioners' contrary arguments amount to willful disregard of the plain statutory text,

not disagreement with EPA's technical conclusions—for which the Agency receives

"an extreme degree of deference." *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d

138, 150 (D.C. Cir. 2015).

*First*, EPA correctly rejected as BSER any measures that could not be applied to an individual stationary source, or that would not serve as a continuous means of emission reduction. The goal of BSER is to improve each existing source's performance, not to limit total emissions of a particular source or source category.

*Second*, after a thorough and reasoned review of the record, and consistent with a proper reading of the statute, EPA appropriately identified as BSER a suite of seven heat-rate-improvement measures, widely available to existing electricity-generation sources across the country, which lower the emission rate of an individual unit.

*Third*, EPA rightly rejected as BSER natural-gas co-firing and CCS. Such measures, although applicable to a stationary source, in EPA's expert judgment are too costly or too limited in availability to be the "best" systems for reducing $CO_2$ emissions from existing coal-fired stationary sources.

## A. BSER Must Improve Individual Source Performance.

### 1. *EPA Correctly Reads the Statute.*

As thoroughly explained in both EPA's Opening Brief (EPA Br.) and State and Industry Respondent-Intervenors' Repeal Brief, EPA correctly concluded that the statute "unambiguously limits the BSER to those systems that can be put into operation *at* a building, structure, facility or installation." 84 Fed. Reg. at 32,524 (emphasis in original). Therefore, it excludes measures the source's owner or operator (or anyone else) would apply at some other location, such as generation shifting to low- or non-emitting sources, which §7411 does not authorize EPA to require. *Id.*; *see*

5

*also* EPA Br. 58-65; Repeal Br. 12-17. States use the EPA-determined BSER to develop a "standard of performance" for each source; BSER, therefore, should improve the source's *performance* as it operates. Accordingly, EPA also appropriately determined that the performance improvement resulting from application of BSER at coal-fired units should be expressed as an emissions rate per amount of electricity generated, not an overall tonnage limitation or "cap" on emissions. 84 Fed. Reg. at 32,555.

### 2.    *Petitioners' Contrary, Results-Driven Arguments Fail.*

Petitioners argue that EPA was required to consider the global problem of climate change, identify a level of $CO_2$ reduction necessary for the domestic existing coal-fired unit source category, and use that level to reverse-engineer BSER. *See* Initial Opening Brief of Public Health and Environmental Petitioners (Env. Br.) 7-8, 10-11, 27; State and Municipal Petitioners' Opening Brief (State Pets. Br.) 58, 60.

But this approach puts the cart before the horse. EPA may not identify a problem and then effectively rewrite its statutory authority to allow it to solve that problem. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014). That role is reserved to Congress. *See* Repeal Br. §II.A. EPA has only the authority Congress expressly gives it. And in §7411, Congress directed EPA to set "standard[s] of performance," not any particular emission target or cap for any air pollutant or any stationary source. *See Nat'l-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 837 n.3 (6th

Cir. 1988) (explaining that performance standards like those in §7411 "specif[y] the maximum *rate*" for individual-source emissions (emphasis added)).

Similarly, Petitioners focus on "overall emissions" and "absolute reductions" in emissions to support an argument that EPA failed to set what they perceive to be the "best" system of emission reduction (*i.e.*, generation shifting). Env. Br. 22, 40. Petitioners overlook that identification of the "best" system cannot be divorced from the plain statutory language and its context—EPA cannot simply say what is "best" in a vacuum. The express purpose of §7411 is to improve the emissions performance of sources, not to achieve "absolute reductions" through limitations on those sources' hours of operation, actual production, or intended function through generation shifting or reduced utilization. EPA has long recognized this, explaining when it promulgated regulations in 1975 that §7411(d) would focus on emissions "control," not emissions "reduction." *See* State Plans for the *Control* of Certain Pollutants from Existing Facilities, 40 Fed. Reg. 53,340 (Nov. 17, 1975) (emphasis added); *see also* 80 Fed. Reg. 64,662, 64,779 (Oct. 23, 2015) (recognizing that "nothing in [§7411] requires a particular amount—or, for that matter, any amount—of emission reductions from each and every existing source").

In this respect, it is worth noting the difference between the regulatory framework of §7411 and that of §§7409-10, the National Ambient Air Quality Standard (NAAQS) program. Under the NAAQS, EPA sets specific standards governing air quality that are then implemented through state implementation plans.

Notably, the NAAQS regulatory process requires States to achieve overall emissions reductions, which are typically expressed as a maximum volumetric concentration of a pollutant in the air. By contrast, a "standard of performance" by its terms focuses on *performance* of the affected facility without regard to hours of operation or levels of production or the ultimate concentration of a pollutant in the air. EPA's approach is thus consistent with *National-Southwire Aluminum Co. v. EPA*, 838 F.2d at 837 n.3, in which the Sixth Circuit explained: "An ambient air quality standard differs from an emission or performance standard" because "[a]n ambient air quality standard specifies a maximum pollutant concentration in the ambient air, while a performance standard specifies the maximum rate at which an individual source may emit pollution." Petitioners improperly conflate the two frameworks.

At root, Petitioners' concerns about climate change cannot overcome the limits Congress placed on EPA's authority in §7411(d).

### B.    EPA Reasonably Concluded that BSER for Coal-Fired Units Comprises Certain Heat-Rate Improvement Measures.

Having established the general statutory framework within which EPA could regulate, and after thoroughly examining the record evidence, EPA reasonably concluded that BSER for existing coal-fired units is a suite of seven generally available heat-rate improvements. Petitioners do not contest the technical accuracy of EPA's determinations; instead, they take issue with what they perceive to be insufficient total emission reductions from existing sources. But to succeed in their arguments against

EPA's choice of the seven heat-rate improvements as BSER, Petitioners must show

EPA acted unreasonably, which they have not done and cannot do.

> 1.    *EPA Set a BSER that Is "Adequately Demonstrated," "Available," and "Achievable."*

In addition to respecting the clear limits Congress set on EPA's authority in

§7411(d), BSER must be "reasonably reliable, reasonably efficient, … [not]

exorbitantly costly in an economic or environmental way," and "within the realm of

the adequately demonstrated system's efficiency." *Essex Chem. Corp. v. Ruckelshaus*, 486

F.2d 427, 433-34 (D.C. Cir. 1973). EPA may not select a BSER that is "purely

theoretical or experimental," nor may it base its feasibility assessment on "its

subjective understanding of the problem or a crystal ball inquiry." *Id.* (citation

omitted). Rather, EPA must show that its BSER "reflects consideration of the range

of relevant variables." *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 431 n.46, 433 (D.C. Cir.

1980). EPA has fulfilled these requirements here.

a.    EPA concluded that "BSER for $CO_2$ emissions from existing coal-fired

[units] is [heat-rate improvements], in the form of a specific set of technologies and

operating and maintenance practices that can be applied at and to certain existing

coal-fired [units]." 84 Fed. Reg. at 32,532. Heat-rate improvements increase unit

efficiency, thereby reducing emissions by reducing the amount of coal combusted to

produce a given amount of electricity. In other words, these measures reduce the

amount of $CO_2$ emitted per megawatt-hour generated. 84 Fed. Reg. at 32,535. The

specific heat-rate improvements EPA identified as BSER are:

- Neural Network/Intelligent Sootblowers;
- Boiler Feed Pumps;
- Air Heater and Duct Leakage Control;
- Variable Frequency Drives;
- Blade Path Upgrade (Steam Turbine);
- Redesign/Replace Economizer; and
- Improved Operating and Maintenance Practices.

*Id.* at 32,537. To identify these measures, EPA first explained that "a large number of

[heat-rate improvement] measures have been identified in a variety of studies

conducted by government agencies and outside groups." *Id.* at 32,536. Out of that

large number, EPA identified the heat-rate improvements that were likely to be "most

impactful," and then evaluated whether they were sufficiently available, achievable,

and economical for inclusion in BSER. *Id.* at 32,535-56. EPA found that these seven

heat-rate improvements fit the bill, and on this score, EPA deserves "extreme"

deference. *Miss. Comm'n*, 790 F.3d at 150.

      b.     Because the BSER EPA selected improves the heat-*rate* performance of

the units—reducing $CO_2$ emissions per megawatt-hour of electricity generated—EPA

logically determined the standard of performance for that BSER should similarly be

expressed as a *rate* reflecting those improvements, *i.e.*, pounds of $CO_2$ emitted per

megawatt-hour. 84 Fed. Reg. at 32,555. This rate-based standard also aligns with the

statutory definition of "standard of performance," §7411(a)(1), which includes the

term "emission limitation"—itself defined as a limitation on "quantity, rate, or concentration," §7402(k). Notably, EPA's approach is consistent with other §7411 rules setting rate-based standards, such as those for particulate matter at fossil-fuel-fired units, 40 C.F.R. §60.42Da(e) (0.090 lb/MWh gross energy output or 0.097 lb/MWh net energy output), and sulfur dioxide at sulfuric acid production units, *id.* §60.31d (0.25 grams sulfuric acid mist per kilogram of sulfuric acid produced).

> 2.    *Petitioners' Criticisms Lack Merit.*

Petitioners make no serious argument that EPA erred in its technical assessment of BSER. Indeed, doing so would be difficult because, even in Petitioners' preferred (though unlawful) CPP, EPA concluded the identified heat-rate improvements "fit the criteria for the BSER." 80 Fed. Reg. at 64,727. Petitioners instead build on their theme that EPA should have required a reduction in *total* emissions by claiming that EPA discounted the possibility of a "rebound effect," alleging increased unit efficiency could enhance economic competitiveness of the unit, thereby leading to increased demand for that unit's electricity along with a net increase in total emissions because the unit would run more hours per year. *See* Env. Br. 28-30. This criticism is misplaced.

a.    As explained above, EPA appropriately determined that its proper focus in setting BSER, consistent with the purpose of and limited authority granted in §7411(d), is an improvement in the emissions *performance* of the unit. A unit performs better when it is more efficient, *i.e.*, when it has an improved heat rate per unit of

output. Nothing in §7411 speaks to imposing a quantitative emissions cap which could limit demand for a source's product (whether that product is widgets or electricity), how many hours per day a source may operate, or how much of the product the unit may produce; or which could result in another type of source producing the product instead. *See* 84 Fed. Reg. at 32,529. Therefore, EPA appropriately concluded that concerns of a "rebound effect" did not alter its conclusion that efficiency improvements are BSER. *Id.* at 32,542-43.

> b.      In any event, Petitioners' arguments amount to speculating about how States will use BSER to set standards of performance, attributing to the ACE Rule conclusions that EPA did not draw, and attacking a strawman instead of actually showing that EPA did not appropriately determine BSER. Petitioners rely heavily on a study (published *after* conclusion of the notice-and-comment period) that presumes a "more-aggressive" approach to heat-rate improvements than EPA's estimates. Env. Br. 29. Petitioners then selectively pluck from EPA's data to argue that, at most, in four years out of the next 30, existing units' emissions of certain pollutants may increase. Env. Br. 28-29. But Petitioners do not contest EPA's conclusion that "*aggregate* $CO_2$ emissions from the group of designated facilitates are anticipated to decrease," 84 Fed. Reg. at 32,543 (emphasis added)—indeed, emissions already have declined, Repeal Br. 45-46. This uncontested conclusion undermines not only Petitioners' arguments about the rebound effect, but also the argument that EPA gave insufficient attention to overall emissions decreases.

Petitioners also claim EPA insufficiently accounted for how the seven heat-rate improvements would be applied, highlighting in particular blade-path and economizer upgrades. Env. Br. 29-30. As a general matter, EPA fully acknowledged that certain combinations of these technologies, or certain technologies alone in a given unit, might not be feasible, and thus anticipated less utilization of those measures in the final ACE Rule than assumed in the original proposal. 84 Fed. Reg. at 32,555. But that does not mean EPA erred in identifying those technologies as BSER. The performance of any given technology at any given unit will depend upon many factors, and under §7411(d) it is the States' responsibility to evaluate the technologies on a case-by-case basis along with the source operator and determine for each what combination is appropriate and consistent with the statutory standard and EPA's guidelines to improve that source's performance. Petitioners' speculation cannot override EPA's reasoned consideration.

c.    Finally, Petitioners attempt to gain traction by comparing the ACE Rule's conclusions regarding BSER with EPA's conclusions regarding the workability of similar technologies in the context of the CPP, claiming that EPA did not adequately explain its change in interpretation. *See* State Pets. Br. 60; Env. Br. 27-28. Such arguments miss the point. The ACE Rule is no mere change in interpretation— the CPP *far* exceeded the constraints on EPA's authority inherent in the plain language of §7411, and proceeded on the lawless theory that EPA has discretion to commandeer and direct the electricity market, an area of traditional state power. *See,*

13

*e.g.*, 80 Fed. Reg. at 64,745. In the ACE Rule, EPA returned to the correct statutory framework—one it has applied for decades.

### C.    EPA's Decision to Reject Other Systems Was Reasonable.

Petitioners primarily attack EPA for failing to adopt CPP-style generation shifting and reduced utilization as BSER. While Petitioners address "reduced utilization" separately, as if it were a distinct alternative that could be "'put into operation at' an individual source," Env. Br. 38-40, there is no difference in principle or reality between "reduced utilization" and "generation shifting." The electricity grid must constantly balance power supply and demand; thus, "reduced utilization" of one resource requires increased utilization of another—in short, generation shifting. 80 Fed. Reg. at 64,677. Indeed, reduced consumption of fossil fuels by power plants with the corresponding reduction in emissions was the entire purpose of generation shifting in the CPP. *Id.* at 64,709. For reasons identified in Respondent-Intervenors' and EPA's briefs, mandating generation shifting exceeds the authority Congress granted to EPA.

In contrast, the two other measures Petitioners seek to add to BSER—CCS and gas co-firing—are systems within the realm Congress directed EPA to consider, because they can be applied at and to an individual "stationary source." The standard of review for EPA's rejection of those two alternatives is different than that applicable to EPA's rejection of generation shifting, a rejection mandated by statute. This Court reviews EPA's determination that CCS and co-firing are not among the "best"

14

systems using the highly deferential standard of review applicable to an agency's technical judgments. Section 7411 directs EPA to consider certain factors in exercising its discretion, such as cost, availability, achievability, and other impacts and requirements of the systems under review, §7411(a), but a rational choice made after adequate review of these factors must be upheld, §7607(d)(9)(A) (arbitrary-and-capricious standard of review). Under this standard, Petitioners must show EPA's rejection of CCS and co-firing was arbitrary or capricious, or that EPA failed to consider key facts that might justify their selection as BSER. Far from it, EPA's rejection of CCS and co-firing has been explained twice: in the CPP that many Petitioners supported, and in the ACE Rule they now attack. *See* 84 Fed. Reg. at 32,543 (citing the CPP preamble to summarize the reasons why EPA rejected co-firing and CCS even in that rule).

### 1.    *EPA Reasonably Concluded that Co-Firing Is Not the "Best."*

In both the CPP and ACE, EPA considered the relevant facts and concluded that natural gas co-firing is not BSER for reducing $CO_2$ from power plants. 80 Fed. Reg. at 64,727-28; 84 Fed. Reg. at 32,544-46. Petitioners cite various facts to argue EPA's decision was arbitrary, but those references are either inaccurate or incomplete.

Petitioners, for example, incorrectly claim that 170 coal boilers have converted to gas since 2012. Env. Br. 31 (citing 84 Fed. Reg. at 32,546). The Federal Register language they quote shows EPA actually said *only 39* boilers have recently converted to gas. (There were 170 gas boilers *total* in 2017.)

15

JA_[EPA_Memorandum,_*2017_Fuel_Usage_at_Affected_Coal-fired_EGUs*_3-4_(June_2019)_(EPA-HQ-OAR-2017-0355-26709)]. EPA considered that fact and reasonably determined that the vast majority of conversions were performed at units with extremely low operating levels (2.1 percent on average, *id.* at JA_[*id.*_at_4]) and only as a means to avoid the high cost of complying with the Mercury and Air Toxics Standard (MATS) (an emissions control rule under §7412) that those marginal units could not justify. Even after the conversions, the average capacity factor of all 170 gas boilers remained under 10 percent, *id.*, confirming that gas conversions were just a survival strategy, not a viable means of reducing emissions.

Petitioners' arguments also paint an incomplete picture. For instance, while Petitioners are correct that 35 percent of coal units have some access to gas already, Env. Br. 31 (citing 84 Fed. Reg. at 32,544), that statistic overlooks the fact that only four percent actually co-fire significant amounts of natural gas to generate electricity, 84 Fed. Reg. at 32,544. The rest merely use gas as a startup fuel or to comply with MATS,[3] and thus do not engage in the co-firing for electricity generation Petitioners seek. *Id.*

---

[3]     Even MATS—a standard requiring "maximum achievable control technology," with most standards set at a highly stringent "floor" regardless of cost or availability—did not require co-firing or even natural gas on startup. *See* 40 C.F.R Part 63, Subpart UUUUU, Table 3.

16

Even if Petitioners' preferred statistics were accurate, those numbers would still mean that two-thirds of coal units would need new access to gas at a cost of $1 million per mile of new gas pipeline. EPA Br. 211. Moreover, all of that new access would need to be guaranteed available at all times—or "firm"—to ensure compliance, and "firm" access is even more expensive and less available than the form of access that is currently far more common at existing coal units. *See* JA_[Great_River_Energy_Comments_3_(Oct._31,_2018)_(EPA-HQ-OAR-2017-0355-23734)]. Petitioners' assumption that all coal units could suddenly begin co-firing gas also ignores the potential impacts on the gas market and ignores the fact that gas is often unavailable at certain times of year. *See* JA_[Duke_Energy_Business_Services_LLC_Comments,_12-13_(Aug._31,_2018)_(EPA-HQ-OAR-2017-0355-24821)]. EPA took these reliability concerns into account in rejecting co-firing as BSER, JA_[EPA_Emission_Guidelines_Response_to_Comments_Ch._4,_7_(EPA-HQ-OAR-2017-0355-26741)], and its decision was reasonable.

2.      *EPA Reasonably Concluded that CCS Is Not the "Best."*

Incomplete facts pervade Petitioners' CCS arguments as well. Petitioners cite the two existing units retrofitted with CCS, reports of "dropping" cost estimates, and EPA's own sensitivity modeling. Env. Br. 32-34. But like their co-firing arguments, Petitioners' CCS arguments have previously been considered by EPA, and what Petitioners leave out is telling.

17

*First*, EPA is well aware that there are only two operating CCS facilities worldwide, and has studied them extensively in this rulemaking and others. JA_[EPA Emission_Guidelines_Response_to_Comments_Ch._4,_at_3-6_(EPA-HQ-OAR-2017-0355-26741)]; *see also* EPA Memorandum, *Review of the current status of the Carbon Capture and Sequestration projects referenced in the Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units* (Mar. 2018) (EPA-HQ-OAR-2013-0495-11947). The more complete story confirms those two projects are less "successful" than Petitioners claim. For example, the only CCS-equipped unit in the United States, named "Petra Nova," is a *partial* application, and even that requires an entirely separate power plant to function. JA_[CATF/NRDC_Comments,_at_16-17_(Oct._31,_2018)_(EPA-HQ-OAR-2017-0355-24266)]. EPA also recognized that both operating CCS facilities rely heavily on revenues from selling captured $CO_2$ for "enhanced oil recovery," as well as financial assistance from the government. JA_[EPA_Emission_Guidelines_Response_to_Comments_Ch._4,_at_3-6_(EPA-HQ-OAR-2017-0355-26741)]. Without both, neither project would be economic. EPA also determined that 19 States lack significant enhanced-oil-recovery storage capacity. *Id.* at JA_[*id._*at_4].

*Second*, the only reports of "dropping" CCS cost estimates cited by Petitioners were prepared by the owners of the two projects currently in operation, Env. Br. 32 n.44, who have an interest in touting the technology. However, Petitioners omit

evidence suggesting that even those owners are not convinced—as noted by EPA in

its related rulemaking under §7411(b), SaskPower has canceled its planned retrofits at

additional units at the Boundary Dam facility "due to high costs." 83 Fed. Reg. at

65,436 n.61. In addition, even if accurate, the cost estimates relied upon by Petitioners

do not consider the multitude of other costs EPA considered in selecting BSER, such

as the cost of new $CO_2$ pipelines that would be needed for CCS. 84 Fed. Reg. at

32,549.

*Third*, Petitioners claim EPA failed to understand or consider its own sensitivity

modeling. Env. Br. 33. Petitioners' arguments demonstrate a lack of understanding of

the purpose and conclusions of that analysis. As EPA explained, sensitivity modeling

is not an actual prediction, but a hypothetical result meant to help evaluate the relative

importance of various factors—in this case, the potential effect of even more

governmental assistance for CCS. JA_[ACE_Rule_Regulatory_Impact_Analysis,_3-

2_(EPA-HQ-OAR-2017-0355-26743)] ("The analysis is *not* meant to reflect what the

EPA believes can be undertaken …." (emphasis in original)). Notably, even in that

analysis, EPA recognized all of the units modeled to install CCS would require

enhanced-oil-recovery revenues to be economic—revenues that are likely unavailable

for power plants across major portions of the country.

3.    *EPA's Conclusions on Co-Firing and CCS Are Consistent with Its Conclusions on Heat-Rate Improvements.*

In a final effort to salvage their co-firing and CCS-related claims, Petitioners claim EPA has arbitrarily treated those technologies inconsistently from the seven heat-rate improvements EPA determined comprise BSER because all nine can, in theory, be evaluated and applied on a unit-by-unit basis. Env. Br. 35-36. Petitioners search for an inconsistency that simply is not there.

Every existing unit can identify measures to ensure that it can operate as efficiently as possible to minimize emissions. That holds true even if, for an individual source, the best it can do is maintain current efficiency levels, either because it has recently made all available and cost-effective upgrades or it plans to retire soon and no upgrades would be cost-effective. EPA appropriately recognized the same cannot be said for co-firing and CCS. *See, e.g.*, 84 Fed. Reg. at 32,545. Those systems of emission reduction would be far out of reach for the vast majority of stationary sources in the industry. EPA reasonably determined that requiring States to consider applying these systems of emission reduction at every individual source would not be the "best" approach and properly guided States toward more available and cost-effective measures. *See id.* at 32,536. That conclusion is entitled to deference.

In a variation of the same argument, Petitioners also assert EPA should have created subcategories for any units that might be "well-suited" to co-firing or CCS. Env. Br. 27. But as EPA explains in its brief, it has significant discretion in deciding

whether to subcategorize, and it exercised that authority reasonably. EPA Br. 212-14. Moreover, Petitioners' argument inherently assumes that a lack of availability was the only reason EPA rejected co-firing and CCS from BSER. That is not the case. As noted above, EPA also concluded those systems are not the "best" due to potential cost and other energy impacts—concerns that apply equally even where the systems might be theoretically available. As long as EPA's BSER is reasonable, its decision not to subcategorize for other non-BSER systems must also be deemed reasonable.

## II. The ACE Rule's Procedures for State Plans Respect the Explicit Limits Congress Placed on EPA's Authority as Well as Congress's Cooperative-Federalism Approach to Existing Source Regulation.

EPA's next statutorily-required task was to promulgate "procedures" for States to establish standards of performance reflecting "the degree of emission limitation achievable through the application of" BSER to each existing source within their borders, based on an assessment of which of the seven heat-rate improvements each individual existing source can reasonably use. §7411(a)(1), (d)(1). EPA ably discharged this duty, respecting the express cooperative federalism structure of §7411(d). The emission guidelines EPA established in the ACE Rule provide adequate guidance for States in developing their own standards of performance, while recognizing the flexibility required in the context of existing sources.[4]

---

[4]    Reflected in these guidelines, EPA reasonably decided to amend its §7411 implementing regulations to lengthen the timeframe for state-plan submissions. 84 Fed. Reg. at 32,568. As EPA explains, no Petitioner sufficiently preserved an (Continued...)

*First*, EPA correctly determined that the degree of emission limitation achievable was best demonstrated by identifying a range of heat-rate-improvement percentages based on the size of the unit. 84 Fed. Reg. at 32,537. The decision not to impose one fixed numerical emission reduction requirement follows from the statute's focus on individual existing sources and comports with a BSER that includes numerous distinct technologies and processes with different expectations vis-à-vis efficiency improvement.

*Second*, Petitioners' challenge to what they perceive as an EPA decision restricting the contents of state plans is premature; Petitioners must await EPA's approval or disapproval of a state plan to challenge EPA's policy in this regard. 84 Fed. Reg. at 32,560.

In sum, this Court should uphold the guidelines EPA promulgated to aid States in discharging their responsibility under §7411(d).

---

argument that EPA's revised implementing regulations are arbitrary or capricious. EPA Br. 268 (citing Env. Br. 13). Even assuming *arguendo* that they had done so, such a challenge would fail. Section 7411(d) requires EPA's implementation regulations to establish a procedure for State plans similar to that of §7410 for state implementation plans under the NAAQS program, which gives States up to three years to develop an implementation plan after EPA issues an air quality standard. §7410(a)(1). EPA has now aligned these timeframes, *see* 84 Fed. Reg. at 32,568, allowing for the reasoned analysis necessary for States to establish standards of performance on a unit-by-unit basis.

A.    **EPA Correctly Identified a Range of Expected Heat-Rate-Improvement Percentages as the Degree of Emission Limitation Achievable Through Application of BSER.**

Section 7411(a) defines "standard of performance" as a source-specific standard reflecting the "degree of emission limitation achievable through application of" BSER to that source. For existing sources, Congress directed States to take the emission guidelines provided by EPA, which set forth the degree of emission limitation achievable through application of BSER, and develop standards that "reflect" these guidelines. §7411(a), (d). But Congress also gave States the ability to depart from these guidelines, taking into consideration the remaining useful life of the existing source and "other factors," consistent with the focus of §7411 on performance standards that are achievable, cost-effective, and based on adequately demonstrated technology. Indeed, this Court has interpreted very similar pre-1990-amendment text of §7411(a) as "far different from the words Congress would have chosen to mandate that EPA set standards at the *maximum* degree of pollution control technologically achievable." *Sierra Club v. Costle*, 657 F.2d 298, 330 (D.C. Cir. 1981) (emphasis added).

In the ACE Rule, EPA determined that the degree of emission limitation achievable was best illustrated by identifying a range of heat-rate-improvement percentages based on the size of the unit. 84 Fed. Reg. at 32,537. Petitioners' argument that EPA was required to constrain States by establishing one presumptive fixed numerical standard in the emission guidelines lacks merit. State Pets. Br. 61-65;

23

Env. Br. 19-24. As with BSER, Petitioners do not claim that EPA's factual

determinations are incorrect; rather, they take issue with the approach. But Petitioners

have not established that this approach was unreasonable or divorced from the

statutory text.

        1.    *A Degree of Emission Limitation Expressed as a Range Appropriately Respects the States' Primacy in Developing Standards of Performance for Existing Sources.*

In demanding that EPA set a presumptive emission standard for States to

follow instead of a range of potential outcomes, Petitioners conflate EPA's duties

under §7411(b) with those under §7411(d): Under §7411(b), *EPA* applies BSER to set

the standard of performance, and *EPA* therefore establishes limits specific to all new

units. But under §7411(d), *States* apply BSER to set the standard of performance;

*States*, therefore, establish limits applicable to individual existing units based on EPA's

guidelines. EPA's approach in the ACE Rule appropriately reflects that critical

statutory division of labor. EPA respected the statute's structure by not establishing a

fixed numerical emissions rate as the minimum degree of emission limitation.

Because States have the statutory authority to determine the standard of

performance applicable to each particular existing unit, EPA's provision of a range of

expected heat-rate-improvement percentages as the degree of emission limitation

achievable through application of BSER comports with EPA's statutory authority and

role in this program. Moreover, this approach is consistent with the broad discretion

§7411(d) provides States to adjust the stringency of the performance standard based

on each source's remaining useful life, cost, and other factors.[5] *See Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 439 (D.C. Cir. 1973); *see also* JA_[NRECA_CPP_Repeal_Comments_10-14_(EPA-HQ-OAR-2017-0355-19875)]. It makes little sense for EPA to identify a presumptive standard if States will have to adjust that standard for every unit because of unit-specific considerations. EPA correctly declined to impose a uniform standard in the ACE Rule.

Petitioners' claim that EPA's guidelines provide insufficient boundaries within which States may establish standards of performance is similarly unfounded. *E.g.*, Env. Br. 27. It is *always* the case that, regardless of the manner in which EPA expresses the degree of emission limitation achievable, States have the statutory authority to determine that a particular source cannot meet it. That EPA provided a range of expected improvement in lieu of a single value does not depart from the statutory structure. The emission guidelines are just that—*guidelines*. Ultimately, each State's plan is subject to EPA's review, and to judicial review. *See* JA_[Comment_of_W._Va._et_al._(EPA-HQ-OAR-2017-0355-24627)]. EPA's reasoned decision not to set one presumptive standard in the guidelines changes none of this.

---

[5]     Indeed, EPA also recognized this in Petitioners' preferred CPP, when discussing the application of heat-rate improvements to individual units. 80 Fed. Reg. at 64,792-93.

2.    *The Degree of Emission Limitation EPA Identified Accords with the Statutory and Regulatory Text and Structure.*

a.    The ACE Rule's identification of a range of expected heat-rate-improvement percentages in lieu of a presumptive numerical emission standard flows directly from the statute. Both BSER and the range of reductions EPA identified appropriately recognize that the focus of §7411(d)'s regulatory requirements is on the individual "existing source," and do not presume that one standard will fit all sources. This Court has already approved this approach in a similar context, *i.e.*, where units burned fuel with varying chemical content. *Sierra Club*, 657 F.2d at 317 (upholding "variable" standard of performance for such units); *see also Lignite Energy Council v. EPA*, 198 F.3d 930, 933 (D.C. Cir. 1999) (noting EPA's "past practice of setting a *range* of standards based on boiler and fuel type" (citing 44 Fed. Reg. 33,580 (June 11, 1979) (emphasis added))).

This Court has already reasoned that "Congress surely could not have meant to bind the agency to issuance of a uniform standard" for *new* sources, given that the definition of "standard of performance" requires EPA to "balance multiple concerns." *Costle*, 657 F.2d at 319. That the ACE Rule governs *existing* sources lends even more force to the application of that reasoning here. Given the wide diversity of coal-fired units, and States' primary role in establishing standards, a presumptive limit is inappropriate for the entire existing coal-fired-source category. *See* 84 Fed. Reg. at 32,538.

b.      EPA's approach in the ACE Rule also finds support in EPA's first

promulgation of §7411(d) procedures for State plans. EPA explained that emission

guidelines "will not have the purpose or effect of national emission standards[,]…

[and] will not be requirements enforceable against any source[;] they will only be

criteria for judging the adequacy of State plans." 40 Fed. Reg. at 53,343.

Environmental Petitioners thus wrongly cite (at 24) 40 C.F.R. §60.24(f) and §60.24a(e)

to argue that States may "only" deviate from a presumptive standard if they

demonstrate a need to do so. First, §60.24(f) does not apply to the ACE Rule (rather,

only to prior §7411(d) rules). Second, §60.24a(e) simply repeats the statutory language

and then provides examples of "other factors" States may consider.[6] To be sure,

States must set standards of performance satisfactory to EPA. But Petitioners point to

nothing that presupposes a benchmark from which States may depart only in limited

circumstances.

Petitioners similarly err in characterizing §7411(d)'s standard-setting process as

authorizing a "variance" that "presupposes a generally applicable rule." Env. Br. 24.

Again, Petitioners ignore the statute's focus on setting a standard for each "existing

source" and that, in so doing, States take into consideration source-specific factors

such as remaining useful life. §7411(d)(1). In fact, the text (besides not including the

---

[6]        Petitioners have waived any argument regarding the newly promulgated
regulation at 40 C.F.R. §60.24a(e), for the reasons EPA explains. EPA Br. 268-69.

word "variance") demonstrates the flexibility Congress allowed States when setting standards of performance for individual existing sources. By suggesting two different approaches for States to set performance standards, EPA's guidelines dispel any notion that States' flexibility is merely an exception or a "variance." States may proceed step-wise, first identifying the emission limitations achievable through BSER-application, and second, at the State's discretion, evaluating remaining useful life and other source-specific factors. Or, States may employ a "hybridized" approach, blending "BSER and associated stringency with consideration of remaining useful life and other factors in one step." 84 Fed. Reg. at 32,550-51; *see also* JA_[EPA_Emission_Guidelines_Response_to_Comments_Ch.3,_15-16_(EPA-HQ-OAR-2017-0355-26741)]; JA_[NRECA_BSER_Comments_30]. Petitioners' attempt to limit States' flexibility by manufacturing nonexistent statutory requirements thus fails here as elsewhere.

### B. This Court Should Reject Petitioners' Unripe Request That It Interpret §7411(d) and §7416 as Authorizing States to Revive the CPP in Their State Plans.

Relevant in both the CPP repeal (Repeal Br. 12-17) and in the ACE Rule is whether EPA correctly concluded that §7411(d) forecloses the CPP's approach of a BSER based upon generation shifting and emissions trading. Not content with defending the CPP and attacking the ACE Rule, Petitioners also ask this Court to pre-approve a backdoor ramp for States to revive the unlawful CPP through their state plans. Petitioners argue that even if this Court rejects their core argument, this Court

should nevertheless preemptively bless their view that §7411(d) and §7416 permit

States to impose *federally-enforceable* state plans based upon the CPP's methodology—

such as an approach that requires generation shifting or trading and averaging outside

of the regulated source category—so long as that State secures the *amount* of

emissions reductions EPA calculated under the Agency-determined BSER. *See* State

Pets. Br. 65-68; Opening Brief of Petitioners Consolidated Edison, Inc. *et al.* (Con.

Ed. Br.) 23-31. This Court should reject this request.

      As a threshold matter, Petitioners' argument is unripe, failing two prongs of the

ripeness test. *See Abbott Labs. v. Gardner*, 387 U.S. 136 (1967), *abrogated on other grounds*

*by Califano v. Sanders*, 430 U.S. 99 (1977); *Texas v. United States*, 523 U.S. 296, 300

(1998); *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C. Cir. 1986). First,

this issue is not "fit[]" for judicial review because no State has submitted a state plan

to EPA under ACE. So, deciding this issue now would "entangle" this Court in

"abstract disagreements," *Abbott*, 387 U.S. at 148, as the argument here "rests upon

contingent future events that may not occur as anticipated, or indeed may not occur at

all," *Texas*, 523 U.S. at 300; *accord* 84 Fed. Reg. at 32,559. If a State submits a state plan

that is not based upon the EPA-determined BSER, and EPA thereafter disapproves

that plan, the State can then challenge that disapproval. *See generally* §7607. Second,

Petitioners have not explained what "immediate, direct, and significant" hardship,

*State Farm*, 802 F.2d at 490, they would suffer prior to a court deciding this issue only

when and if reviewing an actual state plan.

If this Court does reach this issue on the merits, it should reject Petitioners' categorical argument that EPA must approve as federally-enforceable *any* state plan that achieves the same or greater level of emission reduction as does application of the EPA-determined BSER, including a plan that relies on the CPP's unlawful methodology. *See, e.g.*, Con. Ed. Br. 24-29. Petitioners focus on the definition of "standard of performance" in §7411(a)(1), Con. Ed. Br. 24-26, but this is just a restatement of the same core arguments Petitioners make in defense of the CPP's generation-shifting approach. Petitioners' argument here thus rises and falls entirely with their primary legal argument in this case. 84 Fed. Reg. at 32,559.

Finally, Petitioners' invocation of §7416 is an irrelevant distraction. *See* State Pets. Br. 67-68; Con. Ed. Br. 29-31. Section 7416 is a States' rights savings clause, not an expansion of the types of state plans that EPA can approve, and thus make federally enforceable, under §7411(d). *See* §7416 (stating "nothing in this chapter shall preclude or deny the right[s]" of States). To the extent that State regulation is not preempted by, or otherwise contrary to, federal law, §7416 allows States to impose their own rules under *state* law. But States cannot misuse §7416's inapposite provisions to federalize otherwise-unlawful §7411(d) plans.

## III. EPA Is Properly Continuing to Evaluate Data to Determine Appropriate Emission Guidelines for Natural Gas- and Oil-Fired Units.

In the ACE Rule, EPA explains that, although it sought information on technologies that could be considered BSER for natural gas- and oil-fired units, it

30

"currently does not have adequate information to determine a BSER for these [sources] …." 84 Fed. Reg. at 32,533. The Agency determined that it will "continue to collect additional data and information on the available systems for emission reduction for [these units]," JA_[EPA_Emission_Guidelines_Response_to_Comments_Ch._2,_22], and depending on the result of that inquiry "will address GHG emissions from these [sources] in a future rulemaking," 84 Fed. Reg. at 32,533. Thus, the ACE Rule plainly does not "exempt[]" natural gas- or oil-fired units, as Petitioners would have it. State Pets. Br. 2. Nor did EPA conclude as final agency action that "there is no [BSER] for these plants." *Id.* at 19. Instead, EPA determined to proceed with finalizing BSER for coal-fired units and to "address [the] problem one step at a time." *Hercules Inc. v. EPA*, 938 F.2d 276, 282 (D.C. Cir. 1991) (quoting *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277 (D.C. Cir. 1988)).

Contrary to the basic tenet of Petitioners' argument, §7411(d) contains no "mandate" for EPA to set standards of performance for existing sources. *Compare*, Env. Br. 41. As discussed in §II.A.1, this contradicts the structure of §7411(d): *States* set the standards for existing sources, subject to EPA's satisfaction. In accordance with the regulations EPA has codified to discharge its statutory obligation under §7411(d), EPA "will [publish an] emission guideline containing information pertinent to control of the designated pollutant" "[c]oncurrently upon or *after* proposal of standards of performance for the control of a designated pollutant from [new sources]

31

….” 40 C.F.R. §60.22a(a) (emphasis added). Neither the statute nor the regulations include any timeline, deadline, or date certain by which EPA must provide the States such guidance. Nor does either prevent EPA from sharing with the States the information it has, while continuing to collect information it does not. *Cf. id.* §60.22a(b)(2) (emission guidelines will provide a "description of [those] systems of emission reduction which, *in the judgment of the Administrator*, have been adequately demonstrated") (emphasis added).

Accordingly, the Agency's decision not to finalize a BSER for natural gas- and oil-fired units at the same time that it acted for coal-fired units does not stray from any statutory obligation placed on EPA under §7411(d). *Compare* State Pets. Br. 69-70; Env. Br. 40-41. Nor is EPA's approach in the ACE Rule inconsistent with any statutory obligation placed on the States; §7411(d) prescribes no timeframe, deadline, or date certain by which the States must adopt plans to establish standards of performance for existing sources within their borders. Even a cursory review shows that Congress intentionally did not include deadlines in §7411(d), because §7411(d) stands in stark contrast to the quite specific range of deadlines otherwise expressed. *See, e.g.,* §7411(b)(1)(A)-(B), (6) (deadlines of 90 days, 8 years, and 1 year, respectively); §7411(f)(1)(A)-(C) (deadlines of 2 years, 4 years, and 6 years, respectively); §7411(g)(5) (deadline of 3 months); §7411(j)(1)(E)(i)-(ii), (2)(A) (deadlines of 7 years, 4 years, and 3 years, respectively). Instead, States are obligated to adopt standards for existing sources on the timeline EPA has set out in its Subpart Ba regulations. *See* 40 C.F.R

32

§60.23a(a)(1). But this deadline only applies with respect to facilities "to which the emission guideline applies." *See id.* §60.23a(a)(1), (b).

Thus, Petitioners cannot point to any statutory or regulatory provision to support their dissatisfaction with EPA's decision to "address [the] problem one step at a time," rather than identifying BSER for all existing sources at once. *Hercules Inc.*, 938 F.2d at 282 (citation omitted). Such an approach is consistent with prior EPA prior actions under §7411. *See, e.g.,* 77 Fed. Reg. 49,490, 49,516 (Aug. 16, 2012) (deferring regulation of hydraulically fractured oil wells because EPA did "not have sufficient data"); 74 Fed. Reg. 51,950, 51,959 (Oct. 8, 2009) (deferring regulation of petroleum coking activities "because of the limited amount of currently available data"); 65 Fed. Reg. 76,378, 76,379 (Dec. 6, 2000) (establishing emission guidelines for small municipal waste combustors *after* EPA had previously established guidelines for large municipal waste combustors).

Petitioners couch EPA's decision to proceed with guidelines for coal-fired units while continuing to collect and evaluate information with respect to natural gas- and oil-fired units as "deregulation" in a manner "impermissible under the statute" and without "good reason." Env. Br. 41-42. But EPA did not finalize any sort of exemption that would result in "deregulation" of natural gas- and oil-fired units.[7]

---

[7]    Of course, repeal of the CPP was not only "permissible"; it was *required* by the statute. *See generally* Repeal Br.; EPA Br. 55-161. Further, the CPP was stayed, (Continued...)

Rather, EPA provided "good reasons" for continuing to collect information on existing oil- and gas-fired units that could lead it to establish a BSER in the future. Lack of sufficient information is plainly a sound reason not to announce a premature BSER. *See, e.g.*, *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 559 (D.C. Cir. 2015) (finding EPA's determination that it did not have sufficient data to be reasonable basis not to take specific action). Certainly, regulation in the absence of sufficient record support would have been inherently arbitrary and capricious. *Ctr. for Biological Diversity v. EPA*, 749 F.3d 1079, 1087 (D.C. Cir. 2014) ("If, as EPA found, the available information was insufficient to permit a reasoned judgment [regarding a standard] …, promulgating that standard would have been arbitrary and capricious.").

Whether EPA has sufficient information with respect to demonstrated systems of emission reduction for oil- or gas-fired sources is expressly left to "the judgment of the administrator." 40 C.F.R. §60.23a. Petitioners ask this Court to limit the discretion EPA commands on this matter, but EPA's technical judgment must receive an "extreme degree of deference." *Miss. Comm'n*, 790 F.3d at 150. EPA, as the expert agency with particularized knowledge, has the expertise and discretion to prioritize its resources to "address [the] problem one step at a time," addressing coal-fired units first and then determining how best to address natural gas- and oil-fired units

_____

and no State ever adopted a final state plan; therefore, these units were never subject to a "regulation" under §7411(d) in the first place.

(including whether it has sufficient data to develop emission guidelines for that subcategory at this point in time) as it has done here.

Petitioners would substitute their judgment for EPA's and argue that EPA should have concluded that it has sufficient information to identify BSER for existing natural gas- and oil-fired units, Env. Br. 42, but their argument is unavailing. Although EPA previously evaluated heat rate data for the subcategory of gas-fired units as a whole, this was just a "statistical analysis to estimate broadly the extent of [heat-rate improvement] that *may* be available at [gas-fired] units." JA_[EPA_Emission_Guidelines_Response_to_Comments_Ch._2,_27] (emphasis in original). EPA "has not undertaken any unit-level analysis" for these types of units as it has deemed necessary and, therefore, has determined that additional information is needed. *Id.* Petitioners' claim that Environmental Defense Fund and Sierra Club have provided EPA reports on potential heat-rate improvements at gas-fired units is of little value. Env. Br. 42-43. EPA did not ignore these reports or information from prior rulemakings, as Petitioners claim. *Id.* Rather, EPA explicitly recognized this information but, nonetheless, determined that more data were needed. JA_[EPA_Emission_Guidelines_Response_to_Comments_Ch._2,_21-22]. Specifically, EPA determined the available data were insufficient for EPA to identify the complete "range of emission reductions and costs" in order "to provide the states with sufficient guidance," JA_, _[EPA_Emission_Guidelines_Response_to_Comments_Ch._2,_16-17,_22], where

EPA had adopted a policy of identifying a range as its approach to supplying guidance for States, *see* 84 Fed. Reg. at 32,537.

Petitioners press that EPA has an obligation to regulate natural gas- and oil-fired units *now*, and therefore has an obligation to have "collect[ed] the data it needs." Env. Br. 44-45 (quoting *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 644 (D.C. Cir. 2016)). But Petitioners' reliance on *Sugar Corp.* highlights the flaw in this argument. 830 F.3d 579. In that case, the statute contained an express timeline for action. *Id.* at 643-44. Section 7411(d) contains no deadline, and neither do EPA's regulations. Only if EPA faced a statutory or regulatory deadline to act and failed to meet such deadline would the ACE Rule "be deemed the agency's complete response in compliance with the statutory requirements." *Hercules*, 938 F.2d at 282 (cleaned up).

Ultimately, Petitioners are "argu[ing] that the Agency should have promulgated rules that it has not promulgated." *Hazardous Waste Treatment Council*, 861 F.2d at 286. But "an agency's failure to regulate more comprehensively is not ordinarily a basis for concluding that the regulations already promulgated are invalid." *Hercules Inc.*, 938 F.3d at 282; *see also Portland Cement Ass'n v. EPA*, 665 F.3d 177, 194 (D.C. Cir. 2011) (An agency's decision to "continue the rulemaking process" is not a final agency action reviewable by this Court.). And as this Court has explained, "so long as the first step does not foreclose more comprehensive regulation, that step is not assailable merely because the agency failed to take a second." *Hercules Inc.*, 938 F.2d at 282 (cleaned up). Nothing in the ACE Rule prevents EPA from later developing emission

guidelines for natural gas- and oil-fired units under §7411(d), and, therefore, EPA's action in the ACE Rule is not arbitrary or capricious just because it establishes emission guidelines only for coal-fired units. §7411(d); *cf.* 40 C.F.R. §60.22a(b)(5) (EPA "may specify different ... compliance times" for physically different facilities.).

Regardless, Petitioners' assertion that EPA has failed in a mandatory duty to issue guidelines under Subpart Ba with respect to natural gas- and oil-fueled units is in the wrong forum. Even though no such mandatory duty exists, "if environmental petitioners are indeed challenging a 'refusal to act,' they should have brought their case in the district court." *Portland Cement Ass'n*, 665 F.3d at 194.

## CONCLUSION

For the reasons explained above, in EPA's Brief, and in Respondent-Intervenors' Repeal Brief, the Court should deny the petitions for review.

Dated:  July 16, 2020

/s/ Thomas A. Lorenzen
Thomas A. Lorenzen
Elizabeth B. Dawson
Leland P. Frost
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel:  (202) 624-2500
tlorenzen@crowell.com

Rae Cronmiller
Environmental Counsel
NATIONAL ASSOCIATION OF RURAL
ELECTRIC COOPERATIVES
4301 Wilson Blvd.
Arlington, VA 22203
Tel:  (703) 907-5500
rae.cronmiller@nreca.coop

*Counsel for National Rural Electric Cooperative Association*

Respectfully submitted,


Patrick Morrisey
  ATTORNEY GENERAL OF WEST
  VIRGINIA
Lindsay S. See
  Solicitor General
  *Counsel of Record*
Thomas T. Lampman
Benjamin E. Fischer
  Assistant Solicitors General
State Capitol Building 1, Rm. 26-E
Charleston, WV  25305
Tel:  (304) 558-2021
Fax:  (304) 558-0140
Lindsay.s.see@wvago.gov

*Counsel for State of West Virginia*

Kevin G. Clarkson
  ATTORNEY GENERAL OF ALASKA
Clyde Sniffen Jr.
  Chief of Staff
*Counsel of Record*
Alaska Department of Law
1031 W. 4th Ave. #200
Anchorage, AK  99501
Tel: (907) 269-5100
Ed.sniffen@alaska.gov

*Counsel for State of Alaska*


Leslie Rutledge
  ATTORNEY GENERAL OF ARKANSAS
Nicholas J. Bronni
  Solicitor General
*Counsel of Record*
Vincent M. Wagner
  Deputy Solicitor General
Dylan L. Jacobs
  Assistant Solicitor General
323 Center Street, Suite 200
Little Rock, AR  72201
Tel:  (501) 682-6302
Nicholas.bronni@arkansasag.gov

*Counsel for State of Arkansas*


Steve Marshall
  ATTORNEY GENERAL OF ALABAMA
Edmund G. LaCour Jr.
  Solicitor General
  *Counsel of Record*
501 Washington Avenue
Montgomery, AL  36130
Tel:  (334) 353-2196
elacour@ago.state.al.us

*Counsel for State of Alabama*

Christopher M. Carr
  ATTORNEY GENERAL OF GEORGIA
Andrew A. Pinson
  Solicitor General
  *Counsel of Record*
Office of the Attorney General
40 Capitol Square S.W.
Atlanta, GA 30334-1300
Tel: (404) 651-9453
Fax: (404) 657-8773
apinson@law.ga.gov

*Counsel for State of Georgia*

Curtis T. Hill, Jr.
  ATTORNEY GENERAL OF INDIANA
Thomas M. Fisher
  Solicitor General
  *Counsel of Record*
Office of the Attorney General
Indiana Government Ctr. South
Fifth Floor
302 West Washington Street
Indianapolis, IN 46205-2770
Tel: (317) 232-6255
Fax: (317) 232-7979
Tom.fisher@atg.in.gov

*Counsel for State of Indiana*

Derek Schmidt
  ATTORNEY GENERAL OF KANSAS
Jeffrey A. Chanay
  Chief Deputy Attorney General
  *Counsel of Record*
120 S.W. 10th Avenue, 3rd Floor
Topeka, KS 66612
Tel: (785) 368-8435
Fax: (785) 291-3767
jeff.chanay@ag.ks.gov

*Counsel for State of Kansas*

Andrew Beshear
  GOVERNOR OF KENTUCKY
S. Travis Mayo
Taylor Payne
Office of the Governor
Joseph A. Newberg, II
Energy & Environment Cabinet
700 Capital Avenue
Suite 100
Frankfort, KY 40601
Tel: (502) 564-2611
Fax: (502) 564-2517
travis.mayo@ky.gov

*Counsel for Commonwealth of Kentucky ex rel.
Office of the Governor*

Jeff Landry
 ATTORNEY GENERAL OF LOUISIANA
Elizabeth B. Murrill
 Solicitor General
 *Counsel of Record*
Harry J. Vorhoff
 Assistant Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA  70802
Tel: (225) 326-6085
Fax: (225) 326-6099
murrille@ag.louisiana.gov
vorhoffh@ag.louisiana.gov

*Counsel for State of Louisiana*


Todd E. Palmer
 *Counsel of Record*
William D. Booth
Obianuju Okasi
MICHAEL, BEST & FRIEDRICH LLP
601 Pennsylvania Ave., N.W.
Suite 700
Washington, D.C. 20004-2601
Tel: (202) 747-9560
Fax: (202) 347-1819
tepalmer@michaelbest.com
wdbooth@michaelbest.com
uokasi@michaelbest.com

*Counsel for Mississippi Public Service Commission*

Tate Reeves
 GOVERNOR OF THE STATE OF
 MISSISSIPPI
Joseph Anthony Scalfani
 *Counsel of Record*
Office of the Governor of Mississippi
550 High Street, Suite 1900
Post Office Box 139
Jackson, MS  39205
Tel:  (601) 576-2138
Fax:  (601) 576-2791
Joseph.Sclafani@GovReeves.ms.gov

*Counsel for Governor Tate Reeves of the State of Mississippi*


Eric S. Schmitt
 ATTORNEY GENERAL OF MISSOURI
D. John Sauer
 Solicitor General
 *Counsel of Record*
Julie Marie Blake
 Deputy Solicitor General
P.O. Box 899
207 W. High Street
Jefferson City, MO  65102
Tel:  (573) 751-1800
Fax:  (573) 751-0774
john.sauer@ago.mo.gov

*Counsel for State of Missouri*

Timothy C. Fox
  ATTORNEY GENERAL OF MONTANA
Matthew T. Cochenour
  Deputy Solicitor General
  *Counsel of Record*
215 North Sanders
Helena, MT  59620-1401
Tel:  (406) 444-2026
Mcochenour2@mt.gov

*Counsel for State of Montana*

Douglas J. Peterson
  ATTORNEY GENERAL OF NEBRASKA
James A. Campbell
  Solicitor General
Justin D. Lavene
  Assistant Attorney General
  *Counsel of Record*
2115 State Capitol
Lincoln, NE  68509
Tel:  (402) 471-2834
justin.lavene@nebraska.gov

*Counsel for State of Nebraska*

Wayne Stenehjem
ATTORNEY GENERAL
600 E. Boulevard Avenue #125
Bismarck, ND 58505
Tel:  (701) 328-3640
ndag@nd.gov
wstenehjem@nd.gov

Paul M. Seby
Special Assistant Attorney General
State of North Dakota
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
Tel:  (303) 572-6500
sebyp@gtlaw.com

*Counsel for State of North Dakota*

Dave Yost
  ATTORNEY GENERAL OF OHIO
Benjamin M. Flowers
  Solicitor General
  *Counsel of Record*
Cameron F. Simmons
30 E. Broad Street, 17th Floor
Columbus, OH  43215
Tel:  (614) 466-8980
bflowers@ohioattorneygeneral.gov

*Counsel for State of Ohio*

Mike Hunter
  ATTORNEY GENERAL OF OKLAHOMA
Mithun Mansinghani
  Solicitor General
313 N.E. 21st Street
Oklahoma City, OK  73105-4894
Tel:  (405) 521-3921
Mithun.mansinghani@oag.ok.gov

*Counsel for State of Oklahoma*


Jason R. Ravnsborg
  Attorney General of South
  Dakota
Steven R. Blair
  Assistant Attorney General
  *Counsel of Record*
1302 E. Highway 14, Suite 1
Pierre, SD  57501
Tel:  (605) 773-3215
steven.blair@state.sd.us

*Counsel for State of South Dakota*

Alan Wilson
  ATTORNEY GENERAL OF SOUTH
  CAROLINA
Robert D. Cook
  Solicitor General
James Emory Smith, Jr.
  Deputy Solicitor General
  *Counsel of Record*
P.O. Box 11549
Columbia, SC  29211
Tel:  (803) 734-3680
Fax: (803) 734-3677
esmith@scag.gov

*Counsel for State of South Carolina*


Ken Paxton
  Attorney General of Texas
Jeffrey C. Mateer
  First Assistant Attorney General
Ryan L. Bangert
  Deputy First Assistant Attorney
  General
Kyle D. Hawkins
  Solicitor General
  *Counsel of Record*
P.O. Box 12548
Austin, TX  78711-2548
Tel:  (512) 936-1700
Kyle.hawkins@texasattorneygeneral.gov

*Counsel for State of Texas*

Sean Reyes
   ATTORNEY GENERAL OF UTAH
Tyler R. Green
   Solicitor General
   *Counsel of Record*
Parker Douglas
   Federal Solicitor
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, UT  84114-2320
pdouglas@utah.gov

*Counsel for State of Utah*

Bridget Hill
   ATTORNEY GENERAL OF WYOMING
James Kaste
   Deputy Attorney General
   *Counsel of Record*
2320 Capitol Avenue
Cheyenne, WY  82002
Tel:  (307) 777-6946
Fax: (307) 777-3542
james.kaste@wyo.gov

*Counsel for State of Wyoming*

Carroll W. McGuffey III
TROUTMAN PEPPER HAMILTON SANDERS
LLP
600 Peachtree Street, NE
Suite 3000
Atlanta, GA  30308
Tel:  (404) 885-3698
Mack.mcguffey@troutman.com

Misha Tseytlin
TROUTMAN PEPPER HAMILTON SANDERS
LLP
227 West Monroe Street
Suite 3900
Chicago, IL  60606
Tel:  (312) 759-5947
Misha.tseytlin@troutman.com

*Counsel for National Mining Association*

C. Grady Moore, III
Julia Barber
BALCH & BINGHAM LLP
1901 6th Avenue North
Suite 1500
Birmingham, AL  35201
Tel:  (205) 251-8100

*Counsel for Powersouth Energy Cooperative*

F. William Brownell
Elbert Lin
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC  20037
(202) 955-1500
bbrownell@huntonAK.com
elin@huntonAK.com

Allison D. Wood
MCGUIREWOODS LLP
2001 K Street, N.W.
Suite 400
Washington, DC  20006
(202) 857-1700
awood@mcguirewoods.com

*Counsel for America's Power*

Scott A. Keller
Jeffrey H. Wood
Jeremy Evan Maltz
BAKER BOTTS LLP
700 K St. N.W.
Washington, DC  20001
Tel:  (202) 639-7837
Scott.keller@bakerbotts.com

Steven P. Lehotsky
Michael B. Schon
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
Tel:  (202) 463-5948

*Counsel for U.S. Chamber of Commerce*


Emily Church Schilling
HOLLAND & HART LLP
901 K Street NW
Suite 850
Washington, DC  20001
Tel:  (202) 393-6500
Fax: (202) 747-6574

Kristina R. Van Bockern
HOLLAND & HART LLP
555 17th Street
Suite 3200
Denver, CO  80202-3979
Tel:  (303) 295-8107
Fax:  (720) 545-9952

*Counsel for Basin Electric Power Cooperative*


David M. Flannery
Kathy G. Beckett
Edward L. Kropp
Amy M. Smith
STEPTOE & JOHNSON, PLLC
707 Virginia Street East
Charleston, WV  25326
Tel:  (304) 353-8000
Dave.flannery@steptoe-johnson.com
Kathy.beckett@steptoe-johnson.com
Skipp.kropp@steptoe-johnson.com
Amy.smith@steptoe-johnson.com

Janet J. Henry
Deputy General Counsel
AMERICAN ELECTRIC POWER SERVICE
CORP.
1 Riverside Plaza
Columbus, Ohio 43215
Tel:  (614) 716-1612
jjhenry@aep.com

*Counsel for Appalachian Power Company,
AEP Generating Company, AEP Generation
Resources Inc., Indiana Michigan Power
Company, Kentucky Power Company, Public
Service Company of Oklahoma, Southwestern
Electric Power Company, and Wheeling Power
Company*

Melissa Horne
TROUTMAN PEPPER HAMILTON SANDERS
LLP
600 Peachtree Street, NE
Suite 3000
Atlanta, GA  30308-2216

Angela Jean Levin
TROUTMAN PEPPER HAMILTON SANDERS
LLP
Three Embarcadero Center
Suite 800
San Francisco, CA 94111

*Counsel for Georgia Power Company*

Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 330133
Atlantic Beach, Florida 32233-0133
(301) 639-5238
emtrisko7@gmail.com

*Counsel for International Brotherhood of
Boilermakers, Iron Ship Builders, Blacksmiths,
Forgers & Helpers, AFL-CIO; International
Brotherhood of Electrical Workers; United
Mine Workers of America*

David M. Flannery
Kathy G. Beckett
Edward L. Kropp
Amy M. Smith
STEPTOE & JOHNSON, PLLC
707 Virginia Street East
Charleston, WV  25326
Tel:  (304) 353-8000
Dave.flannery@steptoe-johnson.com
Kathy.beckett@steptoe-johnson.com
Skipp.kropp@steptoe-johnson.com
Amy.smith@steptoe-johnson.com

*Counsel for Indiana Energy Association and
Indiana Utility Group*

John A. Rego
Reed W. Sirak
BENESCH FRIEDLANDER COPLAN &
ARONOFF, LLP
200 Public Square
Suite 2300
Cleveland, OH  44114-2378
Tel:  (216) 363-4500
Fax:  (216) 363-4588
jrego@beneschlaw.com
rsirak@beneschlaw.com

*Counsel for Murray Energy Corporation*

Michael A. Zody
Jacob Santini
PARSONS BEHLE & LATIMER
201 South Main Street
Suite 1800
Salt Lake City, UT  84111

*Counsel for Nevada Gold Mines LLC and
Nevada Gold Energy LLC*

Martin T. Booher
Robert D. Cheren
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio  44114
Tel:  (216) 621-0200
mbooher@bakerlaw.com
rcheren@bakerlaw.com

Mark W. DeLaquil
Andrew M. Grossman
BAKER & HOSTETLER LLP
Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel:  (202) 861-1731
Fax:  (202) 861-1783
mdelaquil@bakerlaw.com
agrossman@bakerlaw.com

*Counsel for Westmoreland Mining Holdings
LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Court's order of January 31, 2020 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this brief contains 8,635 words which, when combined with the Proof Brief of State and Industry Intervenors for Respondent Regarding Clean Power Plan Repeal, is less than 17,900 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

Dated:  July 16, 2020                    /s/ Thomas A. Lorenzen
                                         Thomas A. Lorenzen

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 16th day of July 2020, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF filing system. All counsel of record are registered CM/ECF users and will receive electronic service of this brief through the CM/ECF system.

/s/ Thomas A. Lorenzen
Thomas A. Lorenzen