ORAL ARGUMENT NOT YET SCHEDULED

Nos. 19-1176 & No. 19-1179 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

WESTMORELAND MINING HOLDINGS LLC and
THE NORTH AMERICAN COAL CORPORATION,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and ANDREW R. WHEELER, Administrator of the
United States Environmental Protection Agency,

*Respondents*.

On Petitions for Judicial Review of an Action of the
United States Environmental Protection Agency
84 Fed. Reg. 32520 (July 8, 2019)

## COAL INDUSTRY PETITIONERS' REPLY BRIEF

Shay Dvoretzky
Charles T. Wehland *
Robert E. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939

 * Not admitted in DC

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
One Cleveland Center
1375 East Ninth Street, Suite 1930
Cleveland, Ohio 44114
(216) 696-6700

*Counsel for*
*The North American Coal Corporation*

Mark W. DeLaquil
Andrew Grossman
BAKER & HOSTETLER LLP
Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 861-1500

Martin T. Booher
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 621-0200

*Counsel for*
*Westmoreland Mining Holdings LLC*

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ......................................................................... 1

ARGUMENT .................................................................................................... 1

I.  EPA Has Failed To Make The Necessary Endangerment Finding. .................... 1

    A.  EPA Cannot Evade Review On The Ground That Another Rule
        Suffers From The Same Flaw ..................................................................... 2

    B.  EPA Has Never Determined What An Endangerment Finding
        Would Require, Much Less Made Such A Finding Here. ........................... 6

II. Coal Power Plants Cannot be Regulated Under Section 111(d)(1) So
    Long As EPA Regulates Them Under Section 112. ..................................... 9

    A.  EPA's Textual Reinterpretation Fails ................................................... 10

    B.  Section 302(a) Cannot Justify EPA's Interpretation. ........................... 12

    C.  EPA Cannot Circumvent the Plain Meaning of Section
        7411(d)(1) ................................................................................................. 14

CONCLUSION ................................................................................................. 17

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*AEP v. Connecticut,*
   564 U.S. 410 (2011) .......................................................................................... 9, 16

*Biggerstaff v. FCC,*
   511 F.3d 178 (D.C. Cir. 2007) .......................................................................... 4

*Citizens to Save Spencer County v. EPA,*
   600 F.2d 844 (D.C. Cir. 1979) .................................................................... 13, 14

*Coal. for Responsible Regulation, Inc. v. EPA,*
   684 F.3d 102 (D.C. Cir. 2012) .......................................................................... 8

*Envtl. Def. Fund v. EPA,*
   852 F.2d 1316 (D.C. Cir. 1988) ...................................................................... 2, 4

*Envtl. Def. v. EPA,*
   467 F.3d 1329 (D.C. Cir. 2006) ........................................................................ 4

*Illinois Bell Tel. Co. v. FCC,*
   911 F.2d 776 (D.C. Cir. 1990) ...................................................................... 2, 15

*ISDA v. CFTC,*
   887 F.Supp.2d 259 (D.D.C. 2012) .................................................................... 4

*Murphy Expl. & Prod. Co. v. U.S. Dep't of Interior,*
   270 F.3d 957 (D.C. Cir. 2001) .......................................................................... 5

*Nat'l Min. Ass'n v. U.S. Dep't of Interior,*
   70 F.3d 1345 (D.C. Cir. 1995) .......................................................................... 4

*New Jersey v. EPA,*
   517 F.3d 574 (D.C. Cir. 2008) ...................................................................... 9, 17

*NRDC v. EPA*,
    513 F.3d 257 (D.C. Cir. 2008) .......................................................................... 5

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ....................................................................................8, 16

*Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008) ...................................................................... 4

*Sierra Club v. EPA*,
    815 F.3d 22 (D.C. Cir. 2016).......................................................................... 4

*United States Nat. Bank of Oregon v. Independent Insurance*
    *Agents of Am., Inc.*,
    508 U.S. 439 (1993)........................................................................................13

*Utility Air Regulatory Group v. EPA*,
    134 S.Ct. 2427 (2014)....................................................................................11

STATUTES

Clean Air Act, as amended
    42 U.S.C. §7411(d) ....................................... 9, 10, 11, 12, 13, 14, 15, 16
    42 U.S.C. § 7411(d)(1) ..........................................................9, 10, 14, 16
    42 U.S.C. §7412(c)(3) ...............................................................................14
    42 U.S.C. §7412(n)(1)...............................................................................14
    42 U.S.C. § 7475(a)....................................................................................11
    42 U.S.C. § 7479(1) ...................................................................................11

Pub. L. 101–549, § 108(g), 104 Stat. 2399, 2467 (1990) ..........................11, 12, 13

REGULATIONS AND OTHER AUTHORITIES

135 Cong. Rec. 15810 (July 24, 1989) ...............................................................12

Hearings Before the Subcomm. On Health & the Env't of the H.
    Comm. on Energy & Commerce, 101st Cong., at 557 (1990) ...........................12

*Revision of December 2000 Regulatory Finding on the Emissions of
Hazardous Air Pollutants From Electric Utility Steam Generating Units
and the Removal of Coal- and Oil-Fired Electric Utility Steam Generating
Units From the Section 112(c) List*
70 Fed. Reg. 15994 (2005).........................................................10, 13, 14

*Endangerment and Cause or Contribute Findings for Greenhouse Gases
Under Section 202(a) of the Clean Air Act*
74 Fed. Reg. 66496 (2009)............................................................. 7

*Standards of Performance for Greenhouse Gas Emissions From New,
Modified, and Reconstructed Stationary Sources: Electric Utility
Generating Units*
80 Fed. Reg. 64510 (2015).........................................................3, 8

*Repeal of the Clean Power Plan; Emission Guidelines for Greenhouse
Gas Emissions From Existing Electric Utility Generating Units; Revisions
to Emission Guidelines Implementing Regulations*
84 Fed. Reg. 32520 (2019).........................................................2, 16

## GLOSSARY

| | |
|---|---|
| ACE Rule or ACE | The Affordable Clean Energy Rule |
| APA | The Administrative Procedure Act |
| CAA or The Act | The Clean Air Act |
| CPP | The Clean Power Plan |
| $CO_2$ | Carbon Dioxide |
| EPA or The Agency | United States Environmental Protection Agency |
| NBCG | National Bituminous Coal Group |
| Power Plants | Electric Utility Steam Generating Units |
| Statutes at Large | The United States Statutes at Large |
| The Code | The Code of Laws of the United States |
| The Office | The Office of the Law Revision Counsel |

## SUMMARY OF ARGUMENT

**I.** The Opening Brief (at 7-19) explained that ACE must be vacated because EPA did not make a pollutant-specific endangerment finding. EPA no longer disputes that such findings are required, and falls back instead on two different arguments. First, EPA argues this is really an untimely challenge to EPA's earlier New Source Rule. But Coal Petitioners are challenging EPA's authority to promulgate ACE—not the New Source Rule—and EPA cannot insulate ACE from review on the ground that the Agency made the same error in the New Source Rule. Second, EPA argues that it did make a pollutant-specific endangerment finding. But the statement to which it points is patently insufficient to satisfy the APA because it does not address any of the questions that EPA has identified as relevant to the inquiry.

**II.** The plain text of the Act prohibits EPA from using Section 111(d) to regulate emissions "from a source category that is regulated under section 112." EPA's reinterpretation of the Act cannot be reconciled with the text or history of the Act, no matter how hard the Agency tries to rely on a cross-reference even it has called a drafting error. Nor can EPA escape the inexorable command of the text by reliance on erroneous citations to past precedent or alternative policy decisions that Congress could have, but did not, follow.

## ARGUMENT

## I.    EPA Has Failed To Make The Necessary Endangerment Finding.

EPA claimed authority to issue ACE based on two decades-old endangerment findings that addressed entirely different pollutants, on the

ground that the necessary "findings are category-specific and not pollutant-specific." 84 Fed. Reg. 32520, 32533. The Opening Brief (at 8-15) thoroughly rebutted that interpretation of Section 111, and EPA has now abandoned it. While Intervenors attempt to defend EPA's prior reasoning, they cannot raise arguments abandoned by the agency. *Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 785-86 (D.C. Cir. 1990).[1] The Agency's fallback arguments, meanwhile, cannot shield ACE from this Court's review.

### A.    EPA Cannot Evade Review On The Ground That Another Rule Suffers From The Same Flaw.

EPA seeks to evade judicial review by arguing that Coal Petitioners are mounting an untimely challenge to the New Source Rule. That is incorrect; these petitions are "not a 'back-door' challenge" to the New Source Rule, but "a timely, front-door challenge to" ACE. *Envtl. Def. Fund v. EPA*, 852 F.2d 1316, 1324 (D.C. Cir. 1988). Coal Petitioners are not asking this Court to take any action with respect to the New Source Rule; they are challenging ACE on the ground that it is not supported by the necessary endangerment finding.

---

[1] Intervenors' arguments also fail for the reasons stated in the Opening Brief. Coal Petitioners do not "seek to strip EPA's authority to regulate greenhouse gas emissions." States Br. 2. Coal Petitioners seek only to require EPA to make a statutorily-required finding. Intervenors fail to respond to the Opening Brief's textual analysis—ignoring, among other things, Section 111's repeated references to particular "pollutants" and "pollution." *See* Op.Br. 8-10. And Intervenors effectively concede that EPA's interpretation grants absurdly broad authority; they respond only with the belief that EPA would not abuse its authority. States Br. 18; Enviro. Br. 20.

EPA's characterization (at 168) of this claim as "time-barred" makes no sense on the actual facts. Though EPA does not mention it, Coal Petitioners *did* raise this issue through their trade associations in a timely challenge to the New Source Rule, but those petitions have been held in abeyance indefinitely ever since EPA proposed to amend the New Source Rule.[2] Coal Petitioners did not individually challenge the New Source Rule, and had no real interest in doing so, insofar as nobody is planning to build any new facilities affected by the New Source Rule, as EPA notes. *See* 80 Fed. Reg. 64510, 64515. Moreover, EPA's failure to make the necessary finding *only* has practical effect in the context of ACE: EPA itself has asserted that if there were any new facilities, they would likely meet the standards in the New Source Rule even if it were not in force. *Id.* Thus, contrary to EPA's suggestion, Coal Petitioners are indeed "affected by existing-source regulation, but not new-source regulation," EPA Br. 167, and are entitled to raise this issue here. Otherwise, ACE would go into effect without any court having an opportunity to decide whether EPA made a necessary predicate finding.

EPA's "timeliness" argument amounts to an assertion that the validity of ACE—a rule with actual concrete impact—can only be determined at some indeterminate future time in a challenge to a revised New Source Rule with no real-world impact at all. The law does not require that topsy-turvy result. While

---

[2] Coal Petitioners are members of the National Mining Association and the U.S. Chamber of Commerce, both of which filed petitions raising this claim. *See* Opening Brief of Non-State Petitioners at 63-69, *North Dakota v. EPA*, No. 15-1381 (D.C. Cir. Oct. 13, 2016).

EPA (at 164-65) claims not to be re-opening any issues related to the need to make an endangerment finding, the fact is that EPA put its statutory authority in issue by promulgating ACE. EPA cannot evade review of its authority by unilaterally declaring the issue closed. It is beside the point that EPA's failure to make the necessary finding also infects the New Source Rule; EPA cannot defend ACE on the ground that another rule is also invalid. *See, e.g.*, *ISDA v. CFTC*, 887 F.Supp.2d 259, 273-74 & n.5 (D.D.C. 2012). Moreover, by citing the New Source Rule in ACE as the basis for its authority, EPA gave "renewed effect" to the analysis in the New Source Rule, *Biggerstaff v. FCC*, 511 F.3d 178, 185 (D.C. Cir. 2007), in a manner that "necessarily raises the issue of whether" EPA erred. *Envtl. Def. Fund*, 852 F.2d at 1325; *see also Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008) (rule constructively reopened by subsequent action that "alters the stakes of judicial review"). Whether EPA purported to "re-open" the New Source Rule or not, there is no question that this Court can determine whether EPA made the necessary predicate finding for ACE.[3]

EPA does not actually dispute these principles, but would limit them to cases where a petitioner "accrued standing . . . for the first time" in the

---

[3] EPA, notably, does not cite any authority that supports its contrary position. *Sierra Club v. EPA*, 815 F.3d 22, 27-28 (D.C. Cir. 2016), specifically distinguishes situations where an action with "new legal consequences for petitioners" reopens the time for review. EPA's other cases, meanwhile, are easily distinguished. *See Envtl. Def. v. EPA*, 467 F.3d 1329, 1333 (D.C. Cir. 2006) (time to file challenge not extended by rule that "made only minor changes" to regulation); *Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1351-52 (D.C. Cir. 1995) (denial of petitions for rulemaking did not extend time to challenge regulation).

challenged agency action. EPA Br. 167. But the cases are not so limited. New final agency action creates a new opportunity to sue, without regard to whether the petitioner previously had standing on some other basis. *See Murphy Expl. & Prod. Co. v. U.S. Dep't of Interior*, 270 F.3d 957, 958 (D.C. Cir. 2001). And in any event, Coal Petitioners' standing is rooted in EPA's regulation of *existing* power plants, not new ones.

EPA is likewise wrong to complain (at 164) that Coal Petitioners are somehow seeking a "second bite at the apple." Such concerns are relevant to res judicata, collateral estoppel, and stare decisis, *see NRDC v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008), but EPA does not invoke those doctrines. In any event, Coal Petitioners had no interest in challenging the New Source Rule individually, given its lack of concrete effect, and challenges filed by their trade associations have not been adjudicated. Coal Petitioners are seeking a first opportunity for judicial review, not a "second bite."

EPA's position would burden agencies and courts with premature challenges to hypothetical harms, effectively imposing an obligation to challenge any regulation that is based on findings or conclusions that might conceivably be the predicate for future regulations, and would prejudice those who do not foresee every possible future use or impact of such findings. But petitioners are not required to sue based on possible future harm, and can obtain judicial review when such harm actually comes to pass.

### B.    EPA Has Never Determined What An Endangerment Finding Would Require, Much Less Made Such A Finding Here.

EPA also claims (at 168) that, as an alternate basis for the New Source Rule, it "made an endangerment finding . . . specific to $CO_2$ emissions from power plants." But as the Opening Brief explained (at 16-19), the cited analysis was little more than a sentence and did not provide the reasoned explanation of *significant* endangerment that Section 111 and the APA require.

EPA effectively concedes (at 170 n.48) that it made no effort to address "factors that might inform its future determinations whether emissions from [particular] source categories are significant." But EPA argues (at 169-70) that the contribution from coal plants is so great that it "obviated the need" for such analysis. EPA's own arguments belie this claim, as they rest on assumptions about the very questions that EPA has identified as relevant:

o   *First*, although EPA has acknowledged that it has not yet determined whether significance should be determined in the global or domestic context, *see* Op.Br. 17, EPA's arguments are based entirely on coal plants' share of *domestic* emissions.

o   *Second*, although EPA has asked whether the inquiry should involve a "simple percentage criterion" or some other metric, *see* Op.Br. 17, EPA here asserts that coal power plants are significant based entirely on a *percentage contribution* to domestic emissions.

o   *Third*, although EPA has not yet determined whether the analysis should consider historic trends and future projections, *see* Op.Br. 17, EPA's

arguments ignore such issues—including the fact that emissions from this sector represent a steeply declining share of the global whole.

EPA's *post hoc* arguments in this case impermissibly assume the answers to the questions that EPA failed to address.

EPA notably does not attempt to argue that the relevant emissions are significant in the global context. To the contrary, as the Opening Brief explained (at 18), EPA has previously recognized the difficulty of determining significance in the context of climate change, where "no single country and no single source category dominate or are even close to dominating on a global scale." 74 Fed. Reg. 66496, 66538. EPA seeks (at 171) to distinguish such statements in a prior aircraft-related rulemaking on the ground that aircraft make up a smaller share of emissions, but this ignores the fact that EPA also made such statements in its rulemaking for automobiles and trucks, whose share of domestic emissions has been roughly comparable to, and last year exceeded, emissions from coal-power plants. *See* 74 Fed. Reg. at 66506, 66499.[4] Having previously acknowledged that even large source categories may not be globally significant, EPA cannot now argue that the issue is so self-evident that it need not even be addressed.

Intervenors, meanwhile, attempt to supplement EPA's analysis by arguing that even a small (and decreasing) contribution to global emissions could be deemed "significant." States Br. 22-24. These kinds of *post hoc* arguments

---

[4] *See also* U.S. Energy Info. Admin., Monthly Energy Review (July 28, 2020), https://www.eia.gov/totalenergy/data/monthly/.

cannot be considered even when offered by an agency—and certainly not when offered by an intervenor. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). And these arguments would render "significance" meaningless; if a source "appears small" when "measured as a percentage of total greenhouse gas emissions," States Br. 22, then the source *is not significant* notwithstanding the alleged significance of climate change more broadly.

The Opening Brief (at 18) explained that emissions from U.S. coal-fired plants made up just 4.5% of global $CO_2$ emissions in 2013. Since then, U.S. coal emissions have dropped by approximately 38%, and, today, are eclipsed by emissions from natural gas and petroleum.[5] Moreover, climate modeling shows that eliminating emissions from all existing coal-fired power plants—a reduction no regulation contemplates—would have a mere $.01^0$C impact on global temperatures over thirty years.[6] "Significance" is not so obvious that a reasoned analysis was unnecessary.

The point is not that EPA was required to adopt a particular methodology—percentage threshold, modeled temperature change or otherwise—but rather that EPA failed to define significance in any way. *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 123 (D.C. Cir. 2012), is not to the contrary; while this Court held that EPA has flexibility to adopt various methodologies

---

[5] *Compare* 80 Fed. Reg. at 64989, *with* U.S. Energy Info. Admin., Emissions By Source And Sector, https://www.eia.gov/tools/faqs/faq.php?id=75&t=11.

[6] Comment of the Lignite Energy Council on Proposed Revised New Source Rule at 7 (Mar. 18, 2019), https://www.regulations.gov/document?D=EPA-HQ-OAR-2013-0495-12721.

for assessing endangerment, the Court did not suggest that EPA can avoid adopting any methodology at all.

ACE should be vacated and returned to EPA to consider whether the small contribution of U.S. coal plants to global $CO_2$ emissions is "significant." Until EPA conducts such an inquiry, it has not satisfied the prerequisite to regulation under Section 111.

## II. Coal Power Plants Cannot be Regulated Under Section 111(d)(1) So Long As EPA Regulates Them Under Section 112.

Section 111(d), as revised in the 1990 Amendments and codified at 42 U.S.C. §7411(d)(1), prohibits EPA from requiring states to submit plans that "establish[] standards for performance for any existing source for any air pollutant (1) for which air quality criteria have not been issued or which is not included on a list published under section 7408(a) of this title or emitted from a source category which is regulated under section 7412." The plain reading is that EPA may not require states to establish Section 111(d) standards for source categories regulated under Section 112.

This plain-language reading has been acknowledged by this Court and the Supreme Court. *AEP v. Connecticut*, 564 U.S. 410, 424 n.7 (2011) ("EPA may not employ § 7411(d) if existing stationary sources of the pollutant in question are regulated under...the 'hazardous air pollutants' program, § 7412."); *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008) (holding Section 111(d) "cannot be used to regulate sources listed under section 112."). And prior to this litigation, EPA repeatedly conceded that the text of §7411(d)(1) forecloses use of Section

111(d) to regulate emissions from sources categories which are regulated under Section 112. *See* NBCG Comment at 29–31 (JA___–____); *see also* 70 Fed. Reg. 15994, 16032 ("a literal reading of the House language would mean that EPA could not regulate HAP or non-HAP emitted from a source category regulated under section 112"). Because power plants are a "source category that is regulated under section 112," EPA is dispositively prohibited from also regulating them using Section 111(d).

### A.    EPA's Textual Reinterpretation Fails.

EPA's argument (at 176) that it has discretion to interpret the term "any air pollutant" in §7411(d)(1) as limited to "*hazardous* air pollutant" cannot be squared with the text or the history of the Amendments.

The term "air pollutant" only appears once in Section 7411(d)(1), and governs both the scope of the source category exclusion and the scope of permitted emission standards. *See* 42 U.S.C. §7411(d)(1) ("The Administrator shall prescribe regulations…under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for any existing source for *any air pollutant* (i) for which air quality criteria have not been issued or which is not…emitted from a source category which is regulated under section 7412 of this title….") (emphasis added). But EPA is attempting to read the term "air pollutant" to mean "hazardous air pollutant" for purposes of the source-category exclusion, but "any air pollutant" (*e.g.*, $CO_2$) for purposes of determining which emissions are subject to standards of performance. This interpretation cannot be correct.

– 10 –

In fact, EPA's interpretation would tacitly overturn the 1990 Amendments. Before 1990, the Act provided for three discrete exemptions from Section 111(d), one of which was a pollutant-based exclusion, prohibiting Section 111(d) from regulating any air pollutant regulated under Section 112. But the 1990 Amendments deleted that *pollutant-based* exclusion in favor of the *origin-based* exclusion included in the text "or emitted from a source category which is regulated under section 112." Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990); 42 U.S.C. §7411(d). The point of Congress's considered decision to revise this specific aspect of Section 111(d) cannot be that EPA has authority to revert to the prior statute.

EPA's argument finds no support in its primary authority, *Utility Air Regulatory Group v. EPA*, 134 S.Ct. 2427 (2014), which did not authorize interpreting the same statutory term, "air pollutant," differently for different subclauses in a single statutory subsection. Instead, *UARG* holds that the phrase "any air pollutant" in 42 U.S.C. §7479(1), without any qualifier, required a reasonable interpretation to avoid rendering a program unrecognizable to the Congress that created it. 134 S.Ct. at 2444. But faced with the more precise text of 42 U.S.C. §7475(a) and the specific phrase "each pollutant subject to regulation under [the Act]," 42 U.S.C. §7475(a), the Court acknowledged that "the necessary judgment has already been made by Congress." 134 S.Ct. at 2448. Section 111(d)'s origin-based exclusion is even more specific than that provision.

Intervenors' plain-language argument fares even worse. Intervenors' suggestion (Enviro. Br. 13-14) that the literal text would prohibit regulation of types of pollutants (*e.g.*, $CO_2$) even from sources not regulated under Section 112 ignores Section 111(d)'s clear origin-based terminology, which prohibits only double regulation of emissions "from" a source category listed under Section 112 through the establishment of standards of performance for that same category. EPA would retain authority to require states to promulgate emission standards for air pollutants (*e.g.*, $CO_2$) that are "emitted from" a source not subject to Section 112 so long as it makes a proper endangerment finding.

## B.    Section 302(a) Cannot Justify EPA's Interpretation.

EPA argues (at 173-179) that 42 U.S.C. §7411(d), which codifies Section 108(g) of the 1990 Amendments, does not actually reflect Congress's intent. But EPA does not contest that §7411(d) accurately reflects Section 108(g) of the 1990 Amendments, or that the Senate conferees expressly conceded to the substance of Section 108(g), which was not part of the Senate Bill. *See* Op.Br. 23-24. Nor does EPA acknowledge that Section 108(g) was in fact part of the law that EPA itself proposed in the House of Representatives.[7]

There is no reasonable argument that Congress intended to delegate authority to EPA to supplant the plain text of Section 108(g) based solely on

---

[7] *See* 135 Cong. Rec. 15810 (July 24, 1989) (referring to the draft introduced in the House as EPA's draft); *see also* Clean Air Act Amendments (Part 3): Hearings Before the Subcomm. On Health & the Env't of the H. Comm. on Energy & Commerce, 101st Cong., at 557 (1990) ("Welcome, Mr. Reilly. I am glad that EPA finally has put out a bill."). (*Contra* EPA Br. 174).

Section 302(a)'s update to a deleted cross-reference. Critically, EPA cannot identify any contemporaneous legislative record of the House's agreement to 302(a), or any indication that 302(a) was intended to be anything other than a conforming update of a cross-reference. *See* Op.Br. 25-29. Nor does EPA own up to its prior express determination that Section 302(a) was a drafting error. *See* 70 Fed. Reg. at 16031; *compare United States Nat. Bank of Oregon v. Independent Insurance Agents of Am., Inc.*, 508 U.S. 439, 462 (1993) (refusing to give effect to scrivener's error).

Likewise, EPA fails entirely to respond to the arguments that: (1) Executing both amendments in either order results in the statutory text codified at 42 U.S.C. § 7411(d), Op.Br. 26-27;[8] and (2) Section 302(a) does not speak to regulation of Section 112 source categories at all so it does not conflict with Section 108(g)'s enactment of a source category exclusion, Op.Br. 29-31. EPA's failure to address these arguments is telling.

This case is wholly unlike *Citizens to Save Spencer County v. EPA*, 600 F.2d 844 (D.C. Cir. 1979). *Spencer County* involved competing substantive provisions in different statutory sections, but here Section 108(g) reflects the House and Senate's considered judgment as reflected in the conference statement substantively resolving the relation of Section 108(g) to the competing Senate provision, whereas Section 302(a)'s conforming update of a

---

[8] Relatedly, EPA does not contest that it is the normal course of action for conforming amendments to fail to execute when the provision they purport to update is deleted by another provision. *See* NBCG Comment 34–35 (JA___–____) (citing dozens of examples to this effect).

deleted cross-reference failed to even execute and in any case did not reflect any considered judgment on the part of both the House and Senate. Even EPA previously admitted *Spencer County* does not control "because that canon applies where two provisions of a statute are in conflict, not where two amendments to the same statutory provision are in conflict." 70 Fed. Reg. at 16031. Accordingly, EPA has no authority to "devise" a preferred "middle course" that contravenes the Act's plain text. *Contra* EPA Br. 179.

Finally, EPA's "middle ground" interpretation does not "give effect" to 108(g); instead, it disregards entirely Section 108(g)'s prohibition on the establishment of Section 111(d) standards for source categories subject to Section 112.

## C.    EPA Cannot Circumvent the Plain Meaning of Section 7411(d)(1).

Faced with statutory text that is incompatible with their interpretation, EPA and the Intervenors fall back on other considerations. EPA claims (at 179) that its interpretation is necessary to provide Section 111(d) with "a meaningful role in the statutory scheme." But Coal Petitioners' interpretation does just that, with Section 111(d) potentially covering the non-criteria emissions from any sources that are not regulated under Section 112. Op.Br. 22; 42 U.S.C. §7412(c)(3); 42 U.S.C. §7412(n)(1). The existence of such sources was always envisioned by Congress, including when it authorized EPA to stop listing area sources after reaching 90 percent of area source emissions of the 30 most dangerous hazardous pollutants. 42 U.S.C. §7412(c)(3). And even if Congress left 111(d) with a minimal scope, it was Congress' prerogative to determine the

relative scope of Section 111(d) and Section 112 and to save sources not already regulated under Section 111(d) from double regulation under Sections 111(d) and 112.

Intervenor's argument (Enviro. Br. 10-11) based on Section 112(d)(7) is meritless for multiple reasons. First, Section 112(d)(7) is temporally inapplicable. It operates as a savings clause for Section 111 standards that predate a Section 112 rule, whereas the Section 111(d)(1) source category exclusion deals only with establishment of Section 111(d) standards that postdate Section 112 standards. This is clear both from Section 112(d)(7)'s text and from how it operates generally; for example, it saves standards "established under…part C," *i.e.*, the PSD program, but after the 1990 Amendments those referred only to existing standards because Section 112(b)(6) provided that "part C…shall not apply to pollutants listed under" Section 112. Second, Section 112(d)(7) is substantively inapplicable. Section 112(d)(7) only applies where "a more stringent emission limitation or other applicable requirement" is "established pursuant to Section 7411" or several other programs. But ACE is not a "more stringent emission standard," because it does not establish standards for Section 112-listed pollutants. And the Intervenors' claim that it is an "applicable requirement" begs the question because the whole point of the Section 111(d) exclusion is that it is *not* an applicable requirement. Third, Intervenors' argument is procedurally barred because it was not raised by EPA, *see Illinois Bell*, 911 F.2d at 785-86, and was

not part of EPA's justification in the ACE rule, *see Chenery*, 318 U.S. at 87-88; 84 Fed. Reg. 32520.

Nor can EPA and Intervenors' concerns regarding $CO_2$ justify rewriting Section 111(d)(1) to achieve their (respective) preferred policies. As EPA rightly notes (at 134), this Court should follow the text "no matter whether Petitioners (or the Court) believe that a particular policy approach would be best or whether Congress has authorized that approach in other contexts."

In the end, EPA falls back on an incomplete citation to *AEP*. *See* EPA Br. 172. But *AEP* did not say that $CO_2$ should be regulated under 111(d). Rather, *AEP* held that the Clean Air Act's procedures for choosing how and whether to regulate air pollutants, including $CO_2$, evinced that Congress intended to displace federal common-law nuisance claims. *See* 564 U.S. at 426. And in Footnote 7, the Court held that any regulation of $CO_2$ under Section 111(d) was subject to Section 7411(d)(1). *Id.* at 424 n.7 ("EPA may not employ §7411(d) if existing stationary sources of the pollutant in question are regulated under...the 'hazardous air pollutants' program, §7412. *See* §7411(d)(1)."). That was an open question when *AEP* was decided, as power plants were not then regulated under Section 112. It is not an open question today and EPA's reliance on *AEP*'s use of the phrase "pollutant in question" cannot overcome Footnote 7, let alone Section 111(d)'s plain text.

\*            \*            \*

It is time to put this long running saga to an end by acknowledging what this Court found over a decade ago when vacating a previous Section 111(d)

– 16 –

emission guideline for power plants: Section 111(d) "cannot be used to regulate sources listed under section 112." *New Jersey*, 517 F.3d at 574.

## CONCLUSION

The coal industry petitions for review should be granted.

Respectfully submitted,

/s/ *Mark W. DeLaquil*

Mark W. DeLaquil
Andrew Grossman
BAKER & HOSTETLER LLP
Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036

Martin T. Booher
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

*Counsel for*
*Westmoreland Mining Holdings LLC*

/s/ *Charles T. Wehland*

Shay Dvoretzky
Charles T. Wehland *
Robert E. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001

 * Not admitted in DC

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
One Cleveland Center
1375 East Ninth Street, Suite 1930
Cleveland, OH 44114

*Counsel for*
*The North American Coal Corporation*

July 30, 2020

## CERTIFICATE OF COMPLIANCE

The brief complies with the word limit in the Court's order because it contains 4,242 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typographic requirements of Federal Rule of Appellate Procedure 32(a) because it is typeset in proportionally spaced 14 point Calisto MT type.

*/s/ Charles T. Wehland*

July 30, 2020

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Coal Industry Petitioners Reply Brief and accompanying certificates have been filed using the CM/ECF system.

*/s/ Charles T. Wehland*

July 30, 2020