**ORAL ARGUMENT NOT YET SCHEDULED**

No. 19-1140 and consolidated cases

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN LUNG ASSOCIATION, *et al.*,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents.*

---

On Petition for Review of Final Action by the
United States Environmental Protection Agency

---

**INITIAL BRIEF OF PUBLIC HEALTH AND ENVIRONMENTAL
RESPONDENT-INTERVENORS**

---

Ann Brewster Weeks
James P. Duffy
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 359-4077
aweeks@catf.us
jduffy@catf.us

*Counsel for American Lung Association,
American Public Health Association,
Appalachian Mountain Club,
Clean Air Council, Clean Wisconsin,
Conservation Law Foundation, and
Minnesota Center for Environmental Advocacy*

Sean H. Donahue
Susannah L. Weaver
Donahue, Goldberg, Weaver,
 & Littleton
1008 Pennsylvania Ave., SE
Washington, DC 20003
(202) 277-7085
sean@donahuegoldberg.com
susannah@donahuegoldberg.com

*Counsel for Environmental Defense Fund*

Dated: July 16, 2020

*Additional counsel listed on following page*

Joanne Spalding
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5725
joanne.spalding@sierraclub.org

Andres Restrepo
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(202) 650-6062
andres.restrepo@sierraclub.org

Vera Pardee
Law Office of Vera Pardee
726 Euclid Avenue
Berkeley, CA 94708
(858) 717-1448
pardeelaw@gmail.com

*Counsel for Sierra Club*

Clare Lakewood
Elizabeth Jones
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(415) 844-7121
clakewood@biologicaldiversity.org
ljones@biologicaldiversity.org

*Counsel for Center for Biological Diversity*

Brittany E. Wright
Jon A. Mueller
Chesapeake Bay Foundation, Inc.
6 Herndon Avenue
Annapolis, MD 21403
(443) 482-2077
bwright@cbf.org
jmueller@cbf.org

*Counsel for Chesapeake Bay Foundation Inc.*

David Doniger
Benjamin Longstreth
Melissa J. Lynch
Lucas May
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-2403
ddoniger@nrdc.org
blongstreth@nrdc.org
llynch@nrdc.org
lmay@nrdc.org

*Counsel for Natural Resources Defense Council*

Vickie L. Patton
Tomás Carbonell
Benjamin Levitan
Environmental Defense Fund
1875 Connecticut Ave., NW
Suite 600
Washington, DC 20009
(202) 387-3500
vpatton@edf.org
tcarbonell@edf.org
blevitan@edf.org

*Counsel for Environmental Defense Fund*

Howard Learner
Scott Strand
Alda Yuan
Environmental Law & Policy Center
35 E Wacker Dr. Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org
sstrand@elpc.org
ayuan@elpc.org

*Counsel for Environmental Law & Policy Center*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Respondent-Intervenors state as follows:

**A. Parties**

All petitioners, respondents, and intervenors are listed in the Opening Brief of Public Health and Environmental Petitioners.

**Amici Curiae for Petitioners:**

Institute for Policy Integrity at New York University School of Law; Maximilian Auffhammer; Philip Duffy; Kenneth Gillingham; Lawrence H. Goulder; James Stock; Gernot Wagner; Union of Concerned Scientists; National Parks Conservation Association; Coalition to Protect America's National Parks; Thomas C. Jorling; American Thoracic Society; American Academy of Allergy, Asthma, & Immunology; American College of Occupational and Environmental Medicine; National Medical Association; American College of Chest Physicians; Todd S. Aagaard; Blake Emerson; Daniel Farber, Prof.; Kathryn E. Kovacs, Attorney, Prof.; Richard J. Lazarus, Prof.; Ronald Levin; Nina Alexandra Mendelson; Environment America; National Trust for Historic Preservation; Patagonia Works; Columbia Sportswear Company; Service Employees International Union; Sheldon Whitehouse, Senator; Michael Greenstone; National Council of Churches USA; Evangelical Environmental Network; Coalition on the Environment and Jewish Life; Hazon; Maryknoll Sisters; Sisters of Mercy of the Americas; Institute Leadership Team; Union

for Reform Judaism; Women of Reform Judaism; Men of Reform Judaism; Central

Conference of American Rabbis; National Baptist Convention, USA, Inc.; Dallas

Burtraw; Charles T. Driscoll, Jr.; Amelia Keyes; Kathy Fallon Lambert; Benjamin F.

Hobbs; Brendan Kirby; Kenneth J. Lutz; James D. McCalley; National League of

Cities; City of Boston; U.S. Conference of Mayors; County of Boulder; City of

Albuquerque; Town of Chapel Hill; City of Asheville; City of Coral Gables; Mayor

and City Council of Baltimore; Town of Cutler Bay; Detroit Mayor Mike Duggan;

City of Houston; Mayor of City of Durham; City of Las Cruces; Mayor of the

Borough of Glen Rock; City of Minneapolis; Harris County; City of New Orleans;

City of Phoenix; Mayor of Salt Lake City; City of Pittsburgh; City of Santa Fe; City of

Portland; City of Providence; City of Saint Paul; David Battisti; Kim Cobb; Andrew

E. Dessler; Kerry Emanuel; John Harte; Daniel Kirk-Davidoff; Katherine Mach;

Michael MacCracken; Pamela Matson; James C. McWilliams; Mario J. Molina; Michael

Oppenheimer; Joellen L. Russell; Noelle Eckley Selin; Drew Shindell; Abigail Swann;

Kevin Trenberth; Diana H. Wall; Charles B. Curtis; Elizabeth Anne Moler; James

John Hoecker; Nora Mead Brownell; Jon Wellinghoff; John Norris; Norman C. Bay;

Colette Honorable; Paul Tonko; Jared Huffman; Nancy Pelosi; Steny H. Hoyer; James

E. Clyburn; Ben Ray Lujan; Frank Pallone, Jr.; Kathy Castor; Peter A. DeFazio; Eliot

L. Engel; Raul M. Grijalva; Eddie Bernice Johnson; Marcy Kaptur; James P.

McGovern; Jose E. Serrano; Nanette Diaz Barragan; Joyce Beatty; Donald S. Beyer,

Jr.; Earl Blumenauer; Lisa Blunt Rochester; Suzanne Bonamici; Julia Brownley; Salud

O. Carbajal; Tony Cardenas; Sean Casten; Yvette D. Clarke; Emanuel Cleaver; Steve
Cohen; Gerald Connolly; Jason Crow; Diana DeGette; Debbie Dingell; Michael F.
Doyle; Anna G. Eshoo; Adriano Espaillat; Jesus G. Garcia; Al Green; Debra A.
Haaland; Alcee L. Hastings; Brian Higgins; Joseph P. Kennedy, III; Ann M. Kuster;
Andy Levin; Mike Levin; Ted Lieu; Alan S. Lowenthal; Doris Matsui; A, Donald
McEachin; Jerry McNerney; Grace Napolitano; Joe Neguse; Eleanor Holmes Norton;
Ilhan Omar; Ed Perlmutter; Scott H. Peters; Chellie Pingree; Mark Pocan; Mike
Quigley; Raul Ruiz; Bobby Rush; John P. Sarbanes; Janice D. Schakowsky; Darren
Soto; Dina Titus; Rashida Tlaib; Marc Veasey; Deborah Wasserman Schultz; Peter
Welch; Michael F. Bennet; Benjamin L. Cardin; Thomas R. Carper; Dianne Feinstein;
Edward J. Markey; Chris Van Hollen.

**Amicus Curiae for Respondents:**

National Association of Home Builders of the United States

## B. Ruling Under Review

These consolidated cases involve final agency action of the U.S. Environmental
Protection Agency titled, "Repeal of the Clean Power Plan; Emission Guidelines for
Greenhouse Gas Emissions From Existing Electric Utility Generating Units;
Revisions to Emission Guidelines Implementing Regulations," which appears in the
Federal Register at 84 Fed. Reg. 32,520 (July 8, 2019).

**C.  Related Cases**

These cases have not previously been before this Court or any other court.

There are no related cases currently pending in this Court or any other court.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Public Health and Environmental Organization Petitioners make the following disclosures:

### American Lung Association

The American Lung Association is a non-profit corporation organized under the laws of the State of Maine and incorporated under Section 501(c)(3) of the Internal Revenue Code. The American Lung Association's mission is to save lives by improving lung health and preventing lung disease through education, advocacy and research. The American Lung Association works to protect public health from unhealthy air pollution by supporting the Clean Air Act and pressing the U.S. Environmental Protection Agency to ensure that all Americans have air that is safe and healthy to breathe. This includes encouraging more protective limits on ozone and particle pollution, reducing power plant carbon dioxide emissions, and cleaner gasoline and vehicle standards. The American Lung Association has no parent companies, and no publicly held company has a ten percent or greater ownership interest in the American Lung Association.

### American Public Health Association

The American Public Health Association ("APHA") is incorporated in Massachusetts and headquartered in Washington, DC. APHA has 54 state and regional Affiliates representing all 50 states, the District of Columbia and Puerto Rico.

APHA is recognized as a non-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. The APHA champions the health of all people and all communities. We represent more than 23,000 individual members and strengthen the public health profession. We speak out for public health issues and policies backed by science. We are the only organization that combines a nearly 150-year perspective, a broad-based member community and the ability to influence federal policy to improve the public's health. APHA has long advocated in support of the Clean Air Act, including as a tool to combat climate change and for strong public health protections from ozone and other dangerous air pollutants. The APHA has no parent companies, and no publicly held company has a ten percent or greater ownership interest in the APHA.

## Appalachian Mountain Club

Appalachian Mountain Club is a non-profit environmental and recreation corporation organized and existing under the laws of the Commonwealth of Massachusetts. The Club has a mission of promoting the protection, enjoyment and understanding of mountains, forest, waters, and trails of the Appalachian Region. Appalachian Mountain Club has no parent corporations, and no publicly held company has a ten percent or greater ownership interest in it.

## Center for Biological Diversity

The Center for Biological Diversity is a non-profit corporation organized and existing under the laws of the State of California that works through science, law, and

advocacy to secure a future for all species, great and small, hovering on the brink of extinction, with a focus on protecting the lands, waters, and climate that species need to survive. The Center for Biological Diversity has no parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Chesapeake Bay Foundation

The Chesapeake Bay Foundation, Inc. is a non-profit, tax exempt organization incorporated in the State of Maryland whose purpose is to "Save the Bay" and keep it saved, as defined by reaching a 70 on the Chesapeake Bay Foundation's Health Index. The Chesapeake Bay Foundation has no parent corporation, and no publicly held company has a ten percent or greater ownership in the Chesapeake Bay Foundation.

## Clean Air Council

Clean Air Council is a non-profit environmental organization, organized under the laws of the Commonwealth of Pennsylvania. Clean Air Council's mission is to protect and defend everyone's right to breathe clean air. Clean Air Council does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Clean Wisconsin

Clean Wisconsin, created in 1970 as Wisconsin's Environmental Decade, is a non-profit membership corporation organized and existing under the laws of Wisconsin, whose mission is to protect Wisconsin's air, water, and special places by being an effective voice in the legislature, state and federal agencies, and the courts.

Clean Wisconsin does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Conservation Law Foundation

Conservation Law Foundation ("CLF") is a non-profit corporation organized and existing under the laws of the Commonwealth of Massachusetts. CLF protects New England's environment for the benefit of all people by using the law, science and the market to create solutions that preserve our natural resources, build healthy communities, and sustain a vibrant economy. CLF does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Environmental Defense Fund

Environmental Defense Fund ("EDF") is a national non-profit organization, organized under the laws of the State of New York, that links science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems. EDF does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Environmental Law & Policy Center

The Environmental Law & Policy Center ("ELPC") is a non-profit corporation organized and existing under the laws of the State of Illinois. ELPC is the Midwest's leading public interest environmental legal advocacy and eco-business innovation organization that works to improve public health and to protect our natural resources

across the Great Lakes states and the Midwest region. ELPC has no parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Minnesota Center for Environmental Advocacy

Minnesota Center for Environmental Advocacy ("MCEA") is a non-profit corporation organized and existing under the laws of the state of Minnesota. MCEA uses law, science, and research to protect Minnesota's environment, its natural resources and the health of its people. MCEA does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Natural Resources Defense Council

Natural Resources Defense Council ("NRDC"), a corporation organized and existing under the laws of the State of New York, is a national non-profit organization dedicated to improving the quality of the human environment and protecting the nation's endangered natural resources. NRDC does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

## Sierra Club

Sierra Club is a non-profit corporation organized under the laws of the State of California. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these

objectives. Sierra Club does not have any parent corporations, and no publicly held

corporation has a ten percent or greater ownership interest in Sierra Club.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................i

RULE 26.1 DISCLOSURE STATEMENT.....................................................v

TABLE OF CONTENTS.........................................................................xi

TABLE OF AUTHORITIES....................................................................xiii

GLOSSARY OF ABBREVIATIONS .......................................................xvi

STATUTES AND REGULATIONS ............................................................1

STATEMENT OF THE CASE....................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.............................1

ARGUMENT .............................................................................................3

I.       UNDER SECTION 111(d), EPA MUST REGULATE POWER
         PLANT CARBON DIOXIDE EMISSIONS REGARDLESS OF
         WHETHER THOSE SOURCES' HAZARDOUS AIR
         POLLUTANT EMISSIONS HAVE BEEN REGULATED
         UNDER SECTION 112 ....................................................................3

    A.   The 1990 Clean Air Act Amendments Preserved the Regulation
         of Different Pollutants Under Sections 111(d) and 112................6

    B.   Petitioners' Reading of the 1990 Amendments Is Unreasonable. ...............9

         1.   Petitioners' Reading Conflicts with the Plain Language of
              Section 112(d)(7). ...................................................................10

         2.   Petitioners' Reading Compels the Senseless Result that EPA
              May Regulate Power Plants' $CO_2$ Emissions Under Section
              111(d) Before, but Not After, Regulating Their Hazardous
              Pollutants Under Section 112....................................................10

         3.   Petitioners' Reading of the House Amendment Is
              Manifestly Unreasonable and Extreme.....................................11

4.  Petitioners' Reading Would Require the Court to Entirely Ignore the Senate-Originated Amendment, a Duly-Enacted Provision of the Statutes at Large. ........................................................14

II.  COAL PETITIONERS' CLAIM THAT EPA FAILED TO MAKE A SIGNIGICANT CONTRIBUTION FINDING UNDER SECTION 111(b) IS MERITLESS ....................................................17

III.  BIOGENIC PETITIONER'S CLAIMS LACK MERIT ..............................20

A.  Biomass Fuels Are Not Categorically "Carbon Neutral." ...........................20

B.  The Endangerment Finding Encompasses $CO_2$ Released from Biomass Combustion. ........................................................23

C.  *UARG* Does Not Support Special Treatment for Biogenic $CO_2$. ..............24

CONCLUSION ........................................................25

CERTIFICATE OF COMPLIANCE ........................................................28

CERTIFICATE OF SERVICE ........................................................29

# TABLE OF AUTHORITIES

## Cases

*Am. Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011) .................................................................... 4, 19

*Bell Atlantic Telephone Cos. v. FCC,*
    131 F.3d 1044 (D.C. Cir. 1977) ...................................................12

*Ctr. for Biological Diversity v. EPA,*
    722 F.3d 401 (D.C. Cir. 2013) ............................................... 21, 22

*Greenlaw v. United States,*
    554 U.S. 237 (2008) ......................................................................11

*King v. Burwell,*
    135 S. Ct. 2480 (2015) .................................................................11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................20

*New Jersey v. EPA,*
    517 F.3d 574 (2008) ........................................................................6

*Scialabba v. Cuellar De Osorio,*
    134 S. Ct. 2191 (2014) ...................................................................8

*Stephan v. United States,*
    319 U.S. 423 (1943) ......................................................................16

*United States v. Welden,*
    377 U.S. 95 (1964) ........................................................................16

*Util. Air Regulatory Grp. v EPA,*
    573 U.S. 302 (2014) ................................................................. 4, 25

Authorities chiefly relied upon are marked with an asterisk.

## Statutes

42 U.S.C. §7411(a)(1) ....................................................................20

42 U.S.C. §7411(b)(1)(A) ..............................................................17

42 U.S.C. §7411(b)(1)(B) ..............................................................17

42 U.S.C. §7411(d) ........................................................................17

42 U.S.C. §7411(d)(1) ................................................................ 7, 12

42 U.S.C. §7411(d)(1)(A) .................................................................6

42 U.S.C. §7411(d)(1)(A)(i) ..........................................................13

42 U.S.C. §7412(b) ...........................................................................7

*42 U.S.C. §7412(d)(7) ..........................................................8, 10, 13

42 U.S.C. §7475(a)(1) ....................................................................25

42 U.S.C. §7479(2)(C) ...................................................................25

42 U.S.C. §7661a(a) .......................................................................25

## Code of Federal Regulations

40 C.F.R. § 60.5508 *et seq*...........................................................18

40 C.F.R. pt. 61 ................................................................................5

40 C.F.R. pt. 63 ................................................................................5

40 C.F.R. pt. 63, subpt. AAAA ........................................................3

40 C.F.R. pt. 63, subpt. BB ..............................................................4

## Federal Register Notices

36 Fed. Reg. 5,931 (Mar. 31, 1971).................................................18

42 Fed. Reg. 12,022 (Mar. 1, 1977)..................................................4

56 Fed. Reg. 24,468 (May 30, 1991) .....................................................................9

61 Fed. Reg. 9,905 (Mar. 12, 1996) ......................................................................3

65 Fed. Reg. 66,672 (Nov. 7, 2000) ......................................................................9

68 Fed. Reg. 2,227 (Jan. 16, 2003) ........................................................................9

68 Fed. Reg. 74,868 (Dec. 29, 2003) ....................................................................9

73 Fed. Reg. 44,354 (July 30, 2008) ......................................................................9

74 Fed. Reg. 66,496 (Dec. 15, 2009).............................................................23, 24

80 Fed. Reg. 64,510 (Oct. 23, 2015) ...........................................................17, 18, 19

80 Fed. Reg. 64,662 (Oct. 23, 2015) ...........................................3, 6, 8, 10, 11, 12, 13, 15

84 Fed. Reg. 32,520 (July 8, 2019). .....................................................................18

## Legislative History

S. Rep. No. 91-1196 (1970)....................................................................................3

S. Rep. No. 101-228 (1989)...............................................................................6, 8

H.R. Rep. No. 101-952 (1989)..............................................................................8

S. 816, as introduced, 101st Cong. (Apr. 18, 1989) ..........................................15

S. 1490, as introduced, 101st Cong. (Aug. 3, 1989)..........................................15

S. 1630, as reported, 101st Cong. (Dec. 20, 1989) ............................................15

S. 1630, as passed, 101st Cong. (Apr. 3, 1990) .................................................15

Pub. L. 101–549, 104 Stat. 2399 (1990) ..............................................................7

## Other Authorities

Office of Law Revision Counsel, "Positive Law Codification,"
https://uscode.house.gov/codification/legislation.shtml.............................16

## GLOSSARY OF ABBREVIATIONS

ACE           Affordable Clean Energy Rule

BACT         Best Available Control Technology

CAA           Clean Air Act

$CO_2$           Carbon dioxide

EPA           Environmental Protection Agency

HAP           Hazardous air pollutant

JA             Joint Appendix

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in the Addendum to the Brief of the State and Municipal Petitioners ("State Pet. Br.") and the Addendum to the Brief for Respondents ("Resp. Br.").

## STATEMENT OF THE CASE

Respondent-Intervenors adopt the statements of the case included in the Brief of the State and Municipal Petitioners and the Brief of State and Municipal Respondent-Intervenors ("State Resp.-Int Br.").

## INTRODUCTION AND SUMMARY OF ARGUMENT

Existing coal-fired power plants are the nation's largest industrial source of carbon dioxide ("$CO_2$")—the principal greenhouse gas driving the current climate crisis. The Environmental Protection Agency ("EPA" or "agency") argues, and Respondent-Intervenors agree, that Section 111 of the Clean Air Act ("CAA" or "Act") *requires* EPA to regulate $CO_2$ from existing power plants. Yet some Petitioners seek to block the agency from placing any limits on this dangerous pollution, even those found in the pitifully weak Affordable Clean Energy Rule ("ACE"). We support EPA's rejection of these arguments and offer the following supplementary points.

First, Coal Petitioners wrongly argue that EPA is barred from regulating power plant $CO_2$ emissions under Section 111(d) of the Act because the agency regulates those sources' emissions of *different* pollutants—"hazardous air pollutants" ("HAPs"), such as mercury—under Section 112. The only reasonable reading of the relevant

1

clause would only preclude Section 111(d) regulation of a source's HAPs that are already regulated under Section 112. Coal Petitioners assert that in 1990 Congress silently opened a bizarre loophole in the very provision of the Act that was created to assure that there would be "no gaps" in the statute's coverage. This interpretation is at odds with the statute's text, purpose, structure, and history. Every Administration to have considered the question has rejected Coal Petitioners' position.

Second, Coal Petitioners wrongly claim that EPA must make a $CO_2$-specific finding of significant contribution from power plants before regulating it under Section 111(d) of the Act. This question pertains to a different rulemaking finalized in 2015 and is not properly before the Court in this case. In any event, Coal Petitioners misconstrue Section 111, and EPA actually made the finding that they seek in the 2015 rulemaking.

Finally, contrary to Biogenic Petitioner's argument, the record does not support a blanket exemption for the $CO_2$ emitted from burning biomass. Rather, the record demonstrates that the net effect of biomass combustion on atmospheric greenhouse gas concentrations must be determined through a rigorous, science-based investigation.

2

# ARGUMENT

I. **UNDER SECTION 111(d), EPA MUST REGULATE POWER PLANT CARBON DIOXIDE EMISSIONS REGARDLESS OF WHETHER THOSE SOURCES' HAZARDOUS AIR POLLUTANT EMISSIONS HAVE BEEN REGULATED UNDER SECTION 112**

Since 1970, the CAA has comprehensively covered all forms of dangerous air pollution from existing stationary sources through a three-part structure that addresses emissions of (1) criteria pollutants under Sections 108-110; (2) HAPs under Section 112; and (3) any other pollutants that endanger public health or welfare under Section 111(d). As the 1970 Senate Report stated, Section 111(d) assures that there will be "no gaps" in authority to curb dangerous air pollutants from stationary sources. S. Rep. No. 91-1196, at 20 (1970). *See also* 80 Fed. Reg. 64,662, 64,711 (Oct. 23, 2015) (the "specific role" of Section 111(d) is "to cover pollutants that are not regulated under either the criteria pollutant/NAAQS provisions or section 112").

EPA has long used Section 111(d) to limit existing sources' emissions of harmful pollutants that are not regulated under those other sections, while simultaneously regulating the same sources under Section 112 for their emissions of HAPs.[1] Fully aware of Sections 108-110 and 112, the Supreme Court found that

---

[1] For example, landfills' emissions of methane and non-methane organic compounds are regulated under Section 111(d), while their emissions of vinyl chloride, ethyl benzene, toluene, and benzene are regulated under Section 112. *See* 61 Fed. Reg. 9,905 (Mar. 12, 1996) & 40 C.F.R. pt. 63, subpt. AAAA. Similarly, phosphate fertilizer plants' emissions of fluorides are regulated under Section 111(d) and their emissions

111(d) "'speaks directly' to emissions of [CO$_2$] from [existing coal-fired power] plants." *See Am. Elec. Power Co. v. Connecticut* ("*AEP*"), 564 U.S. 410, 424-25 (2011).

Coal Petitioners contend that the 1990 Amendments to the CAA silently abandoned this long-standing "no gaps" framework and opened up a major loophole in the Act's coverage. In Coal Petitioners' view, the Act prohibits EPA from regulating CO$_2$ from power plants under Section 111(d) because the agency regulates power plants' emissions of HAPs under Section 112. Coal Pets. Br. 20-33. They maintain that EPA is barred from using Section 111(d) to regulate *any* pollutant emitted by a source category regulated under Section 112—even pollutants *not regulated* under Section 112. This claim is fundamentally illogical: it presumes that Congress decided some dangerous pollutants should be immune from any regulation at all because *other* pollutants from the same sources are regulated under another section. This is akin to exempting restaurants from food safety requirements because they are subject to the fire code. The CAA does not work that way. Rather, the Act provides a comprehensive statutory scheme including several complementary programs designed to reduce risks from *all* forms of air pollution.

By depriving Section 111(d) of its core gap-filling function, Coal Petitioners seek to "overthrow" CAA's "structure and design." *Util. Air Regulatory Grp. v. EPA*

---

of hydrogen fluoride and other toxic pollutants are regulated under Section 112. *See* 42 Fed. Reg. 12,022 (Mar. 1, 1977) & 40 C.F.R. pt. 63, subpt. BB.

("*UARG*"), 573 U.S. 302, 321 (2014). If accepted, this new construction of the Act would create a major loophole that would gut Section 111(d), preventing regulation of dangerous but non-hazardous pollutants not only from power plants, but also from any of the more than 140 source categories regulated under Section 112, including petroleum refineries, Portland cement facilities, landfills, fertilizer plants, and chemical plants. *See* 40 C.F.R. pts. 61, 63; Resp. Br. 181-183.

Coal Petitioners nevertheless insist the 1990 CAA Amendments unambiguously commanded these results through a "precise statutory proscription." Coal Pets. Br. 20. As EPA shows, and we elaborate below, Coal Petitioners' claim is meritless, conflicting with language enacted by those very amendments. It specifically runs afoul of Section 112(d)(7), also adopted in 1990, which states that regulations under Section 112 shall not be construed to diminish EPA's authority under Section 111. It also flatly contradicts amendments to Section 111(d) that were adopted by the Senate, passed by the full Congress, and duly enacted into law. Coal Petitioners interpretation further produces implausible consequences, entirely contrary to the structure and purpose of the Act, the most extreme of which even they seek to avoid but can do so only by acknowledging that their reading departs from the text of the statute.

Contrary to Coal Petitioners' alternative history of the 1990 CAA Amendments, there is no evidence that Congress intended to abandon Section 111(d)'s long-established "gap-filling" role. *See* Resp. Br. 182-183. On the contrary, the 1990 Amendments were designed to *strengthen* the Act's core programs, and the

text and history of those provisions specifically show that Congress did not intend its revisions to Section 112 to limit EPA's authority under Section 111. Coal Petitioners' reading of the Act has been consistently rejected by every EPA Administration since the passage of the 1990 Amendments. Coal Petitioners' reading is not even reasonable, let alone commanded by the statute.

### A. The 1990 Clean Air Act Amendments Preserved the Regulation of Different Pollutants Under Sections 111(d) and 112.

Coal Petitioners do not dispute that before 1990, Section 111(d) unambiguously directed EPA to regulate existing sources' emissions of dangerous air pollutants that are not regulated under other CAA programs that curb criteria and hazardous pollutants. Coal Pets. Br. 20; 42 U.S.C. §7411(d)(1)(A) (1988). Their argument that Congress abandoned this policy in 1990 does not withstand scrutiny.

In 1990, Congress amended the statute to, among other things, accelerate EPA's regulation of HAPs under Section 112. *See* 80 Fed. Reg. at 64,711; *see also, e.g., New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) (explaining Congress altered Section 112 because it was concerned by "the fact that EPA had failed for decades to regulate HAPs sufficiently") (citing earlier D.C. Circuit decision discussing the relevant House and Senate Reports); S. Rep. No. 101-228, at 133 (1989). To accomplish this goal, Congress eliminated Section 112(b)(1)(A), which had provided a *process* for EPA to regulate specific HAPs, and replaced it with a *list* of 189 such pollutants that EPA *must* regulate. *See* 42 U.S.C. §7412(b). The House and Senate each

6

made adjustments to Section 111(d) to reflect their respective bills' changes to Section 112, and the final legislation—somewhat unusually—included *both* provisions. Pub. L. 101–549, §108(g), 104 Stat. 2399, 2467 (1990); Pub. L. 101–549, §302(a), 104 Stat. 2399, 2574 (1990). Whether read independently or together, the two provisions preserve the preexisting "no gaps" function of Section 111(d): to cover dangerous pollutants not regulated under Sections 108-110 or Section 112. *See* Resp. Br. 175-189.

The Senate-originated amendment merely updated the old cross-reference by replacing "112(b)(1)(A)" with "112(b)." So amended, Section 111(d) directs EPA to promulgate emission guidelines for existing sources of any dangerous air pollutant "which is not included on a list published under §7408(a) or 7412(b) of this title." Pub. L. No. 101-549, §302(a), 104 Stat. at 2574. This amendment effected no change to the pre-1990 scope of the Section 112 exclusion, unambiguously preserving EPA's ability to regulate power plant greenhouse gas emissions under Section 111(d). Resp. Br. 177-78.

The House-originated amendment directs EPA to regulate existing sources of "*any air pollutant*…for which air quality criteria have not been issued or which is not included on a list published under section 7408(a) of this title or *emitted from a source category which is regulated under section 7412 of this title*." 42 U.S.C. §7411(d)(1) (emphasis added). This clause has only one reasonable reading in light of the text, structure, purpose and history of the statute. *See* 80 Fed. Reg. at 64,713-14; *see infra* pp. 12-13.  In the Clean Power Plan and ACE rules (and in previous post-1990 rulemakings), EPA

7

determined that the phrase "regulated under section 7412 of this title" refers to both the *source category* and the *pollutant* at issue. 80 Fed. Reg. at 64,710-17; ACE Response to Comments, Ch.1 at 11, JA __. Under this interpretation, Section 111(d) forbids the regulation of a dangerous pollutant from a source category only if that *same* pollutant is regulated from the *same* source category under Section 112. This common-sense reading of the House-originated amendment is consistent with the unambiguous meaning of the Senate-originated amendment, which was likewise duly enacted. As such, it accords with the canon that "provisions in a statute should be read to be consistent, rather than conflicting, if possible." 80 Fed. Reg. at 64,713 (citing *Scialabba v. Cuellar De Osorio*, 134 S. Ct. 2191, 2214, 2219-20 (2014)). Moreover, it upholds the seamless protection from stationary source air pollutants that Congress clearly intended in establishing the "no gaps" regulatory structure of Sections 108-110, 111, and 112. With the 1990 Amendments, Congress intended to strengthen the Act's core programs, not diminish them, *see* S. Rep. No. 101-228, at 14, 133 (1989); H.R. Rep. No. 101-952, at 336, 340, 345 & 347 (1989), and clearly preserved the scope and effectiveness of Section 111. *See* 42 U.S.C. §7412(d)(7); 80 Fed. Reg. at 64,714.

Since the enactment of the 1990 CAA Amendments, every Administration from George H.W. Bush to Donald J. Trump has considered this precise issue and concluded that the House-originated amendment precludes Section 111(d) regulation of a source category only as to the pollutants that are actually regulated under Section 112. EPA described its Section 111(d) authority within months of the passage of the

1990 CAA Amendments (in a proposed regulation for municipal solid waste landfills), as permitting it to set standards for any "*pollutant*…[that] is not 'hazardous' within the meaning of section 112 of the CAA and is not controlled under sections 108 through 110." 56 Fed. Reg. 24,468, 24,469 (May 30, 1991) (emphasis added). The agency has maintained this position consistently to the present day,[2] including when regulating greenhouse gas emissions under Section 111(d).[3]

## B. Petitioners' Reading of the 1990 Amendments Is Unreasonable.

Coal Petitioners' reading of the 1990 Amendments to Section 111(d), and the Amendments' cross-references to Section 112, is unreasonable. *See* Resp. Br. 172-190. It ignores the duly-enacted, Senate-originated amendment and interprets the House-originated amendment in a manner that contradicts the language and structure of the Act and produces extreme and unintended results.

---

[2] *See* 65 Fed. Reg. 66,672, 66,674-75 (Nov. 7, 2000) (proposing Section 112 regulation of HAPs from landfills and explicitly recognizing that Section 111(d) emission guidelines for non-HAPs from landfills would continue to apply); 68 Fed. Reg. 2,227, 2,229 (Jan. 16, 2003) (finalizing the proposed standards while continuing to regulate non-hazardous emissions from landfills under Section 111(d)); 68 Fed. Reg. 74,868 (Dec. 29, 2003) (approving state implementation plans to regulate landfill gases under Section 111(d) that apply concurrently with Section 112 regulations for landfills).

[3] When soliciting comment on regulating greenhouse gas emissions, the George W. Bush EPA explained that Section 111(d) "provides a 'regulatory safety net' for *pollutants* not otherwise subject to major regulatory programs under the CAA." 73 Fed. Reg. 44,354, 44,418 (July 30, 2008) (emphasis added). The Obama Administration embraced this same position in the Clean Power Plan, as did the Trump Administration in ACE. *See generally* Inst. for Policy Integrity Amicus Br. 20-31, *West Virginia v. EPA*, No. 15-1363, ECF 1606724 (Apr. 1, 2016).

9

1.  <u>Petitioners' Reading Conflicts with the Plain Language of Section 112(d)(7).</u>

Coal Petitioners' reading of Section 111(d)(1)(A) is incompatible with Section

112(d)(7), which was enacted in 1990 simultaneously with the Section 111(d)

amendments. Entitled "Other requirements preserved," this provision is a savings

clause stating that "no emission standard or other requirement promulgated under

[Section 112] shall be interpreted, construed or applied to diminish or replace the

requirements of a more stringent emission limitation or other applicable requirement

pursuant to Section 7411" or "other authority of [the CAA]." 42 U.S.C. §7412(d)(7).

This contemporaneous directive—enacted before either $CO_2$ or HAP regulations for

power plants were in place—makes crystal clear that Congress did not intend the

changes to Section 112 to weaken or prohibit EPA's authority to cover dangerous but

non-hazardous air pollutants under Section 111(d), *see* 80 Fed. Reg. 64,714, let alone

"expressly preclude" such standards as Coal Petitioners claim, *contra* Coal Pets. Br. 20-

22. In short, Section 112(d)(7) clarifies the meaning of Section 111(d)(1). *See King v.*

*Burwell*, 135 S. Ct. 2480, 2492 (2015) (statutory provision's meaning is "clarified by the

remainder of the statutory scheme").

2.  <u>Petitioners' Reading Compels the Senseless Result that EPA May Regulate</u>
    <u>Power Plants' $CO_2$ Emissions Under Section 111(d) Before, but Not After,</u>
    <u>Regulating Their Hazardous Pollutants Under Section 112.</u>

Coal Petitioners' argument is all the more bizarre because it makes EPA's

authority to regulate dangerous pollutants entirely dependent on the *sequence* of the

agency's actions: under their interpretation, EPA could regulate power plants' $CO_2$

emissions under Section 111(d) so long as it did so *before* regulating HAPs from power plants under Section 112 but not *afterward*. An interpretation that makes EPA's Section 111(d) authority to regulate a dangerous air pollutant contingent upon the order in which the agency invokes Sections 111 and 112 is senseless and runs directly counter to the specific "gap-filling" role of Section 111(d). *See* 80 Fed. Reg. at 64,714 n.292; *see also Greenlaw v. United States*, 554 U.S. 237, 251 (2008) (rejecting interpretation that would draw "a puzzling distinction"). The only plausible reading of the House-originated amendment is that it preserves EPA's Section 111 authority as it existed prior to the 1990 Amendments.

3.  Petitioners' Reading of the House Amendment Is Manifestly Unreasonable and Extreme.

Tellingly, in arguing that Congress "expressly" and "unambiguously" prohibited regulation under Section 111(d) of any pollutants emitted from a source category regulated under Section 112, Coal Petitioners do not even quote in full the provision they claim is so clear. They instead cite only a part of that clause—"or emitted from a source category which is regulated under section 112." Coal Pets. Br. 20-23. But, an isolated clause "taken out of context cannot provide conclusive proof of congressional intent." *Bell Atlantic Telephone Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1977).

Coal Petitioners' interpretation is neither compelled nor even reasonable when examined in light of the statutory context and structure. As EPA explained in the

11

Clean Power Plan rulemaking, the full clause added by the House amendment is subject to other theoretical readings only when read in isolation, but none of these alternatives are reasonable when considered within the framework of the statute. *See* 80 Fed. Reg. at 64,713.[4] Reading Section 111(d) to prohibit regulation of any pollutant emitted from a Section 112 source category, including those not listed as hazardous, would make no sense. It would eviscerate the Section 111(d) program, precluding regulation of *any* pollution from *any* of the more than 140 source categories regulated under Section 112. *See* Resp. Br. 180-183. Petitioners' reading thus fundamentally disrupts the comprehensive three-part scheme for regulating existing sources, when in fact Congress intended to "preserve[]," rather than "diminish or replace the requirements" of Section 111. *See* 42 U.S.C. §7412(d)(7) and 80 Fed. Reg. at 64,714.

---

[4] For instance, because the three clauses following "any air pollutant" are connected by "or" rather than "and," a literal reading of this provision would set forth three independent conditions, each sufficient to trigger EPA's duty to regulate existing sources. Under that interpretation, EPA would be required to regulate emissions of any pollutant that is not a criteria pollutant, regardless whether it is also a HAP. 42 U.S.C. §7411(d)(1) (requiring EPA to regulate "any air pollutant…for which air quality criteria have not been issued"). The text can also be read to require EPA to regulate "any air pollutant…emitted from a source category which is regulated under section 7412," *id.*, precisely the opposite of Coal Petitioners' interpretation. This is because, unlike the first and second clauses, the third clause is not phrased in the negative. These readings, however, are inconsistent with the statutory context and structure and therefore unreasonable. *See* 80 Fed. Reg. at 64,713. But they make clear that Coal Petitioners' claim to have identified the inevitable meaning of "the literal text," Coal Pets. Br. 34, is unfounded.

Moreover, despite their claims, Coal Petitioners do not even adhere to the "literal text" of the House-originated version of Section 111(d)(1)(A). Coal Pets. Br. 34. That language limits Section 111(d) regulations to pollutants that are not "emitted from a source category which is regulated under Section 7412 of this title." 42 U.S.C. §7411(d)(1)(A)(i) (emphasis added). Read literally, if a pollutant is emitted from "a source category"—*any* source category—that is regulated under Section 112, then EPA may not regulate emissions of that pollutant *at all*, even if that pollutant is non-hazardous and is emitted from a non-112 source.[5] For instance, $CO_2$ is an air pollutant emitted by "a source category"—power plants (as well as many others). This would mean that EPA could not regulate $CO_2$ emissions—a non-hazardous pollutant—from *any* sources under Section 111(d), even sources that are not already subject to Section 112 regulations.

Even Coal Petitioners recognize this would be a bridge too far. Instead, they assert that Section 111(d)'s exclusionary effect applies only to emissions from the same source category that is regulated under Section 112. Under their reading, the text would prohibit EPA from regulating *power plants'* $CO_2$ emissions under Section 111(d), but not $CO_2$ emissions from *other* sources. Yet Coal Petitioners can arrive at this

---

[5] Counsel for non-State petitioners in the *West Virginia* litigation confirmed at oral argument that this is a logical consequence of their clients' reading of the statute, the same reading now advanced by Coal Petitioners. *See* Oral Arg. Tr. 135-36, *West Virginia v. EPA*, No. 15-1363 (argument held Sept. 27, 2016; transcript docketed Oct. 11, 2016).

outcome only by reading words into the text of Section 111(d). As they would have it, Section 111(d) regulations may not extend to "any existing source for any air pollutant…which is not…emitted from [*the same*] source category which is regulated under Section 7412 of this title." Coal Petitioners thus, in their own words, "engraft[] a limit onto the statute" that yields their desired end result—the precise accusation they have leveled against EPA. Coal Pets. Br. 33. And unlike Coal Petitioners, EPA's interpretation is supported by the statutory structure, context, purpose, and history, as discussed in its brief. *See* Resp Br. 180-83.

4. Petitioners' Reading Would Require the Court to Entirely Ignore the Senate-Originated Amendment, a Duly-Enacted Provision of the Statutes at Large.

Unable to reconcile their position with the Senate-originated amendment— which was passed by both houses of Congress and signed by the President— Petitioners make three arguments for stripping it of legal effect. None has merit.

First, Coal Petitioners caricature the Senate-originated amendment as a "scrivener's amendment" unintentionally included in the 1990 CAA Amendments. Coal Pets. Br. 25. To the contrary, the Senate chose this approach deliberately. The language adopted by the Senate was originally proposed in S. 816. S. 816, as introduced, 101st Cong. §4(c) (Apr. 18, 1989). Another bill was also introduced with language mirroring the House provision. S. 1490, as introduced, 101st Cong. §108

14

(Aug. 3, 1989).[6] Both were referred to the Senate Committee on Environment and Public Works. When the Committee reported its bill at the end of 1989, it chose the language of S. 816, not S. 1490. *See* S. 1630, as reported, 101st Cong. §305 (Dec. 20, 1989); 1990 CAA Legis. Hist., at 8153; *see also* S. 1630, as passed, 101st Cong. §305 (Apr. 3, 1990). As EPA noted in the Clean Power Plan preamble, the Senate-originated amendment's cross-reference "was not a mindless, ministerial decision," but a conscious choice "to retain the pre-1990 approach of using a cross-reference to 112(b) to define the scope of the Section 112 Exclusion." 80 Fed. Reg. at 64,712.

Second, Coal Petitioners argue that the Senate text is ineffective "[s]ince Congress separately decided to entirely eliminate the cross-reference" in Section 108(g). Coal Pets. Br. 25-26. But this argument ignores the fact that Congress adopted *both* the House and Senate text in the final bill. Similarly, Coal Petitioners appear to argue that the Senate text is superfluous because it would not cover any emissions that are not already covered by the source-category exclusion in the House text. Coal Pets. Br. 31-32. Again, Coal Petitioners' argument wrongly assumes that the House text—as they unreasonably interpret it—alone controls. This merely begs the question that Coal Petitioners seek to answer.

---

[6] This bill was identical to the original House bill cited by Coal Petitioners, as noted in bold type at the top of H.R. 3030 as introduced. *See also* 1990 CAA Legis. Hist., at 3737.

Third, Coal Petitioners argue that the codification decisions of the Office of Law Revision Counsel should take precedence over the Statutes at Large. *See* Coal Pets. Br. 26-27. Congress, however, has never enacted the codification of the CAA as positive law. "[T]he [U.S.] Code cannot prevail over the Statutes at Large when the two are inconsistent." *Stephan v. United States*, 319 U.S. 423, 426 (1943); *see also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) (observing that a decision "made by a codifier without the approval of Congress…should be given no weight"); Office of Law Revision Counsel, "Positive Law Codification," https://uscode.house.gov/codification/legislation.shtml (last visited July 16, 2020) ("The text of the law appearing in the Statutes at Large prevails over the text of the law appearing in a non-positive law title [of the United States Code].").

\* \* \*

Coal Petitioners' interpretation of Section 111(d) is neither compelled by the text of the House-originated language nor a reasonable reading of that provision. Their reading cannot be squared with the Senate-originated amendment, which has equal status as U.S. law. Fundamentally, Coal Petitioners contend that while strengthening the CAA in 1990, Congress bizarrely and silently opened a gaping loophole in the very provision intended to assure "no gaps" in the coverage of dangerous air pollutants from the nation's industrial sources. EPA properly rejected Coal Petitioners' unreasonable position.

## II.   COAL PETITIONERS' CLAIM THAT EPA FAILED TO MAKE A SIGNIGICANT CONTRIBUTION FINDING UNDER SECTION 111(b) IS MERITLESS

Coal Petitioners claim that EPA may not regulate power plant $CO_2$ emissions under Section 111 because the agency never made a pollutant-specific finding that power plants' $CO_2$ emissions "contribute[] significantly" to endangerment of public health and welfare. That issue is not properly before the Court in this case and can be raised only in a pending challenge to the 2015 carbon pollution standards for new and modified power plants issued under Section 111(b), 80 Fed. Reg. 64,510 (Oct. 23, 2015). On the merits, no such finding is required by the plain language of Section 111(b). In any event, EPA actually made the requested finding in the alternative in that 2015 rule.

Section 111(b)(1)(A) requires EPA to list each category of stationary sources that "causes or contributes significantly to" air pollution that may reasonably be anticipated to endanger human public and welfare. 42 U.S.C. §7411(b)(1)(A). Section 111(b)(1)(B) requires EPA to establish standards of performance for new sources in those categories. *Id.* at §7411(b)(1)(B). Section 111(d) then establishes the process for regulating the emissions of existing sources in such categories. *Id.* at §7411(d).

Building on the 2009 Endangerment Finding and recognizing the enormous quantities of $CO_2$ that power plants emit, 80 Fed. Reg. at 64,530, EPA established standards of performance for $CO_2$ from new and modified fossil fuel-fired power plants in 2015, 40 C.F.R. § 60.5508 *et seq.* In that rulemaking, the agency concluded

17

that when a category of sources has already been properly listed under Section 111(b)(1)(A), EPA need not make an additional determination of significant contribution in order to regulate other dangerous pollutants emitted by sources in that category. 80 Fed. Reg. at 64,529-30.

Power plants have been listed as a source category under Section 111(b)(1)(A) since 1971. 36 Fed. Reg. 5,931 (Mar. 31, 1971). In the 2015 rule, EPA thus determined that it was unnecessary to make a $CO_2$-specific significant contribution finding before regulating those emissions. Nevertheless, the agency concluded that, based on a detailed record, $CO_2$ emissions from power plants without doubt do contribute significantly to dangerous climate-changing air pollution. 80 Fed. Reg. at 64,530-31. In the ACE rulemaking, EPA revised the emission guidelines for existing coal-fired power plants. EPA specifically stated that it was "not re-opening any issues related" to the 2015 rulemaking issued under Section 111(b). 84 Fed. Reg. at 32,533.

Coal Petitioners' assertion—that a pollutant-specific endangerment and significant contribution finding is legally required—is not properly raised in this proceeding. That issue may only be addressed in a challenge to the 2015 new source rule, in which EPA explicitly provided its legal interpretation and factual findings that Coal Petitioners inexplicably claim are absent. A challenge to that rule is currently before this Court in *North Dakota v. EPA* (No. 15-1381). Tellingly, whenever Coal Petitioners describe the agency legal position that they dispute, they cite exclusively to

the 2015 rulemaking. *See* Coal Pets. Br. 2, 4, 8-9, 15-17. Petitioners' claims may be raised only in that case, not here.

If the Court nevertheless concludes that the questions are properly posed now, Coal Petitioners' claim fails for at least two reasons. First, EPA actually made the finding the Petitioners say is necessary. In promulgating the 2015 new source standards, the agency thoroughly documented the harms to public health and welfare attributable to power plant $CO_2$ emissions. 80 Fed. Reg. at 64,517-24. It concluded that those harms reinforced the agency's 2009 Endangerment Finding and firmly supported a finding that power plants significantly contribute to atmospheric loadings of dangerous $CO_2$. *Id.* at 64,530-31. Based on extensive analysis of the vast amounts of $CO_2$ coming from power plants, EPA reasonably determined that those emissions significantly contribute to the dangerous air pollution that drives climate change. *See* State Resp.-Int. Br. 19-23. On that record, not regulating these enormous contributors of emissions would be arbitrary and capricious. *See AEP*, 564 U.S. at 427.

Second, the plain language of Section 111(b) belies Coal Petitioners' argument—it requires a significant contribution finding only for the purposes of *listing a source category*, not for *issuing standards* from a category once it has been listed. Nothing in the statutory text requires an additional pollutant-specific finding before the agency issues performance standards for a source category's emissions of dangerous pollutants not discussed in the initial finding. Coal Petitioners wrongly claim that this reading renders "EPA's regulatory authority…absurdly broad." Coal Pets. Br. 9. This

is untrue. Any decision to regulate additional pollutants from a source category must be based on reasoned decisionmaking guided by the emission reduction and health-protective purposes of the statute, *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983), and the statute provides very specific criteria defining how a pollutant may be regulated, 42 U.S.C. §7411(a)(1).

## III.   BIOGENIC PETITIONER'S CLAIMS LACK MERIT

Environmental and Public Health Respondent-Intervenors support EPA's rejection of Biogenic Petitioner's arguments, but for somewhat different reasons. As Petitioners challenging the repeal of the Clean Power Plan and the adequacy of ACE, we agree with Biogenic Petitioner that Section 111 does not limit compliance measures "to activities that physically take place at the regulated facility itself." Biogenic Br. 6; *see* Pub. Health & Envtl. Pets. Br. Sec. II. However, neither science nor law supports Biogenic Petitioner's claims that biomass combustion is categorically carbon neutral, or that EPA lacks authority to regulate biogenic emissions.

### A. Biomass Fuels Are Not Categorically "Carbon Neutral."

The record conclusively refutes Biogenic Petitioner's claim that emissions from the combustion of biomass in power plants are categorically harmless and carbon neutral.[7] Each molecule of $CO_2$ impacts the atmosphere equally regardless of whether

---

[7] Tellingly, Biogenic Petitioner does not contend that biomass emissions are "zero carbon," but rather describe them as "low-carbon." Biogenic Br. 10, 24, 32.

it originated from fossil or biogenic fuel. *See Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 406 (D.C. Cir. 2013) ("[T]he atmosphere makes no distinction between carbon dioxide emitted by biogenic and fossil-fuel sources."). In fact, combusting biomass in power plants creates *more* $CO_2$ at the smokestack per unit of energy produced than burning fossil fuels. Resp. Br. 256; Joint Biomass Comments 4, EPA-HQ-OAR-0355-24037, JA__.

Biogenic Petitioner claims that burning biomass "simply return[s] carbon to the atmosphere that farmers already removed from the carbon cycle." Biogenic Br. 2. Petitioners, however, ignore important climate impacts stemming from biomass emissions. The record demonstrates that the climate impacts of biomass fuels depend on factors such as biomass type, effects on land use, harvesting and combustion methods, soil carbon loss rates, the fate of the biomass had it not been combusted for energy, and the time required for regrowth.[8] EPA's own Science Advisory Board has

---

[8] *See* Joint Biomass Comments 19, JA__(citing EPA Science Advisory Board Review of EPA's Accounting Framework for Biogenic $CO_2$ Emissions from Stationary Sources, 5 (Sept. 28, 2012) ("There are circumstances in which biomass is grown, harvested and combusted in a carbon neutral fashion but carbon neutrality is not an appropriate a priori assumption…[I]t is a conclusion that should be reached only after considering a particular feedstock's production and consumption cycle.")); *id.* at 19 (citing EPA, Science Advisory Board, Draft Review of EPA's 2014 Framework for Assessing Biogenic CO2 Emissions from Stationary Sources, 2 (Aug. 2018) ("[N]ot all biogenic emissions are carbon neutral nor net additional to the atmosphere, and assuming so is inconsistent with the underlying science.")); EDF ACE Comments, 63-68 & Att. Lubowski & Leslie, EPA-HQ-OAR-0355-24419, JA__ (explaining the scientific consensus that climate impacts of biofuels depend greatly on factors unique

concluded that accounting for these impacts is essential to determining the climate impacts of biomass fuels, and that it is incorrect to assume all biomass fuels are carbon neutral. *See* Resp. Br. 249 n.67.

Biogenic Petitioner asserts that, as a categorical matter, biomass combustion does not contribute to "elevated levels" of $CO_2$. This is incorrect. The net effect of combusting biomass on atmospheric greenhouse gas concentrations must be assessed through a rigorous life-cycle analysis that investigates, among other things, what would otherwise have happened to the carbon sequestered in the biomass. Biomass combustion rapidly releases $CO_2$. For many sources of biomass, years or even many decades of regrowth is required before the effect on net atmospheric concentrations is "neutral" (excepting other biomass production and transport emissions). Those emissions plainly elevate atmospheric $CO_2$ levels and disrupt the climate in the meantime. Joint Biomass Comments 6, JA__; *see also* Biogenic Br. 2 n.1 (citing reports (which undermine Petitioner's own claims) asserting that "biomass carbon stock lost…equal[s] biomass carbon stock *gained through regrowth*," and that "$CO_2$ emitted from biomass-based fuels combustion does not increase atmospheric $CO_2$ concentrations, assuming the biogenic carbon emitted is offset by the uptake of $CO_2$ resulting from the growth of new biomass"). Under Petitioner's logic, broad-scale use

---

to regions and feedstocks); *see also Ctr. for Biological Diversity*, 722 F.3d at 406 (explaining that carbon impact "will depend on the type of source and its life cycle").

of bioenergy that dramatically reduced biogenic carbon stocks and transferred that carbon to the atmosphere would be inconsequential, even if it significantly increased atmospheric carbon concentrations for years or decades.

### B. The Endangerment Finding Encompasses $CO_2$ Released from Biomass Combustion.

Biogenic Petitioner misunderstands EPA's 2009 Endangerment Finding determination that "elevated concentrations of greenhouse gases in the atmosphere may…endanger public health and welfare," as a "[r]ecogni[tion] that…not all greenhouse gases are harmful." Biogenic Br. 3. It concludes, therefore, that ACE wrongly "extend[s] to biogenic emissions *sub silentio* a finding made with respect to fossil fuels." *Id*. at 30. This string of false inferences unravels quickly.

First, EPA's finding that elevated concentrations of greenhouse gases endangers public health and welfare does not render some types of greenhouse gases harmless or implicitly exclude biogenic $CO_2$ emissions. 74 Fed. Reg. 66,496, 66,516 (Dec. 15, 2009); Biogenic Br. 3-4. EPA concluded that "[a]tmospheric greenhouse gas concentrations have been increasing because anthropogenic emissions are outpacing the rate at which greenhouse gases are removed from the atmosphere by natural processes over timescales of decades to centuries." 74 Fed. Reg. 66,496, 66,517 (Dec. 15, 2009). 66,516. EPA's Finding did not suggest that biogenic $CO_2$ emissions do not contribute to this "outpacing." Nor could it: as discussed above, the net carbon

impact of biomass combustion depends on a host of factors, and certainly cannot be deemed "carbon neutral" as a categorical matter.

Second, while the Finding differentiated between *natural* greenhouse gas emissions and *anthropogenic* emissions, EPA specifically declined to distinguish among anthropogenic sources. Burning biomass to generate electricity is clearly anthropogenic. The agency explained that it "look[ed] at 'emissions' as the pollution once it is emitted from the source into the air, and not also as the process that generates the pollution." 74 Fed. Reg. at 66,517. EPA reasoned that while $CO_2$ and other greenhouse gases may "originate from different processes…that does not detract from the fact that they are all long-lived, well-mixed in the atmosphere, directly emitted, [and] of well-known radiative forcing." *Id.* at 66,541.

### C. *UARG* Does Not Support Special Treatment for Biogenic $CO_2$.

Finally, Biogenic Petitioner incorrectly contends that *UARG* compels EPA to exempt biogenic $CO_2$ emissions from a source's emission rate. Biogenic Br. 16-17. *UARG*, however, neither addresses biomass combustion nor announces any principle applicable to this issue.

Sections 165 and 169 of the Act require new sources that (depending on the industrial category) emit more than 100 or 250 tons per year of any air pollutant to obtain a pre-construction permit. 42 U.S.C. §§7475(a)(1), 7479(2)(C). Title V of the CAA requires sources emitting more than 100 tons per year of any air pollutant to obtain an operating permit. *Id.* at §7661a(a). *UARG* held that Congress could not have

24

intended $CO_2$ emissions to trigger these permit requirements because $CO_2$ is emitted in vastly greater amounts than the pollutants Congress had in mind when it chose those statutory threshold amounts. *See UARG*, 573 U.S. at 328. Allowing $CO_2$ to trigger those permitting obligations would sweep millions of small sources into programs that Congress intended to apply to a smaller number of large sources. *Id.* The Court thus concluded that under those provisions $CO_2$ emissions do not trigger permit applicability for any source. *Id.* at 321. On the other hand, the Court also held that for large sources that are otherwise required to acquire pre-construction permits, there is nothing incongruous about requiring them to apply the "best available control technology" ("BACT") to their $CO_2$ emissions. As a result, $CO_2$ is a regulated air pollutant for purposes of the BACT requirements. *Id.* at 316.

Biogenic Petitioner fails to demonstrate any consequence from regulating biogenic $CO_2$ emissions under Section 111(d) that is remotely similar to the dramatic mismatch at issue in *UARG. UARG* is inapposite.

## CONCLUSION

Coal Petitioners' petition for review should be dismissed insofar as it relates to the endangerment and significant contribution finding. In all other respects, their petition for review should be denied. Biogenic Petitioner's petition for review should likewise be denied.

Dated: July 16, 2020

Respectfully submitted,

*/s/ Melissa J. Lynch*
David Doniger
Benjamin Longstreth
Melissa J. Lynch
Lucas May
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-2403
ddoniger@nrdc.org
blongstreth@nrdc.org
llynch@nrdc.org
lmay@nrdc.org

*Counsel for Natural Resources Defense Council*


Joanne Spalding
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5725
joanne.spalding@sierraclub.org

Andres Restrepo
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(202) 650-6062
andres.restrepo@sierraclub.org

Vera Pardee
Law Office of Vera Pardee
726 Euclid Avenue
Berkeley, CA 94708
(858) 717-1448
pardeelaw@gmail.com

*Counsel for Sierra Club*

Sean H. Donahue
Susannah L. Weaver
Donahue, Goldberg, Weaver,
 & Littleton
1008 Pennsylvania Ave., SE
Washington, DC 20003
(202) 277-7085
sean@donahuegoldberg.com
susannah@donahuegoldberg.com

Vickie L. Patton
Tomás Carbonell
Benjamin Levitan
Environmental Defense Fund
1875 Connecticut Ave., NW
Suite 600
Washington, DC 20009
(202) 387-3500
vpatton@edf.org
tcarbonell@edf.org
blevitan@edf.org

*Counsel for Environmental Defense Fund*


Ann Brewster Weeks
James P. Duffy
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 359-4077
aweeks@catf.us
jduffy@catf.us

*Counsel for American Lung Association,*
*American Public Health Association,*
*Appalachian Mountain Club,*
*Clean Air Council, Clean Wisconsin,*
*Conservation Law Foundation, and*
*Minnesota Center for Environmental Advocacy*

Clare Lakewood
Elizabeth Jones
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(415) 844-7121
clakewood@biologicaldiversity.org
ljones@biologicaldiversity.org

*Counsel for Center for Biological Diversity*


Brittany E. Wright
Jon A. Mueller
Chesapeake Bay Foundation, Inc.
6 Herndon Avenue
Annapolis, MD 21403
(443) 482-2077
bwright@cbf.org
jmueller@cbf.org

*Counsel for Chesapeake Bay Foundation Inc.*

Howard Learner
Scott Strand
Alda Yuan
Environmental Law & Policy Center
35 E Wacker Dr. Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org
sstrand@elpc.org
ayuan@elpc.org

*Counsel for Environmental Law & Policy Center*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitation of Circuit Rule 32(e)(2)(B) and the Court's order of January 31, 2020 (Doc. No. 1826621). According to the count of Microsoft Word, this brief contains 6,207 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font.


Dated: July 16, 2020                              */s/ Melissa J. Lynch*
                                                  Melissa J. Lynch

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July, 2020, the foregoing Initial Brief of

Public Health and Environmental Respondent-Intervenors has been served on all

registered counsel through the Court's electronic filing system.


*/s/ Melissa J. Lynch*
Melissa J. Lynch